IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, STATE OF OREGON, by and through Attorney General Ellen F. Rosenblum, and STATE OF MINNESOTA, by and through Attorney General Keith Ellison,<br><br>                      Plaintiffs,<br><br>      **v.**<br><br>DONALD J. TRUMP, President of the United States of America; MICK MULVANEY, Director of the Office of Management and Budget; RICK PERRY, Secretary of Energy, U.S. Department of Energy; ELAINE L. CHAO, Secretary of Transportation, U.S. Department of Transportation; R. ALEXANDER ACOSTA, Secretary of Labor, U.S. Department of Labor; DAVID BERNHARDT, Acting Secretary of the Interior, U.S. Department of the Interior; ANDREW WHEELER, Administrator, U.S. Environmental Protection Agency; and ALEX M. AZAR II, Secretary of Health and Human Services, U.S. Department of Health and Human Services,<br><br>                      Defendants. | Case No. 19-960<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    The State of California, by and through its Attorney General Xavier Becerra, the

State of Oregon, by and through its Attorney General Ellen F. Rosenblum, and the State of

Minnesota, by and through its Attorney General Keith Ellison (together, Plaintiff States), bring

this action for declaratory and injunctive relief to challenge (1) Executive Order 13771

("Reducing Regulation and Controlling Regulatory Costs," hereinafter Order), dated January 30,

2017 and published in the Federal Register on February 3, 2017 (82 Fed. Reg. 9,339); and (2) the Office of Management and Budget's (OMB) interim guidance to assist agencies in implementing the Order, dated February 2, 2017, and final guidance, dated April 5, 2017 (together, Guidance). The Order and Guidance are in effect, and agencies are complying with them.

2.      The Order's core requirement is that an agency fully offset the cost of any new regulation by repealing at least two existing regulations that impose equal or greater costs. For purposes of complying with the Order, agencies are not to consider the public benefits of either the new or existing regulations in their accounting, just the costs. The Order also imposes an annual, agency-specific "incremental cost" cap, which limits the cumulative cost of an agency's regulatory portfolio.

3.      Past Executive Orders have required agencies to "consider" or analyze the economic impacts of a proposed rule, or to review their regulations to identify potentially outdated regulations. This Order is distinct in that it *requires* that agencies repeal at least two regulations, outdated or not, to fully offset the cost of a new regulation. The Order further purports to authorize the OMB to block agency rulemakings not in compliance with the Order's mandates.

4.      These actions exceed the President's constitutional authority, violate the separation of powers doctrine and the President's duty under the "Take Care" clause, and are generally *ultra vires*. In issuing the Guidance to implement the Order, the OMB acted in excess of statutory jurisdiction, among other things, in violation of the Administrative Procedure Act (APA). 5 U.S.C. § 706. In complying with the Order, OMB, Department of Energy, Department of Transportation, Department of Labor, Department of Interior, Environmental Protection Agency, and Department of Health and Human Services (together referred to as "Agency Defendants") have acted in excess of their statutory jurisdiction pursuant to, among other things, the APA.

5.      The Order and Guidance cannot lawfully be enforced under any circumstances. While agencies generally have authority to rescind or repeal obsolete or unnecessary regulations (provided they satisfy the requirements of their governing statutes and/or the APA), an agency would be in violation of its statutory mandate(s) were it to take any action—or to not take action, as the case may be—to comply with the Order, and neither the President nor the OMB can require it to do so.

6.      Plaintiff States have quasi-sovereign and proprietary interests in effective and robust federal rulemaking to protect the health and well-being of, among other things, their citizens, natural resources, infrastructure, institutions, and economies. In addition, Plaintiff States have substantive and procedural interests in ensuring that members of the federal executive branch respect the bounds of their constitutional and statutory authority and do not hamstring agencies' ability to execute Congressional mandates. In issuing and implementing the Order and Guidance, the President and OMB, respectively, acted beyond the scope of their authority. As a result, numerous federal regulations addressing matters of public health, safety, welfare, and the environment have been and will continue to be revised, delayed, withdrawn, or repealed by agencies, including the Agency Defendants, to comply with the Order's arbitrary mandates, and new rules will be delayed or not proposed at all. This deprives Plaintiff States of the benefits those regulations would have provided, in some instances leaving them exposed to harms they may be unable to adequately address themselves.

7.      The Order and Guidance are unlawful on their face.  Implementation, enforcement of, and compliance with the Order and Guidance should be enjoined, and the Order and Guidance should be set aside.

## JURISDICTION AND VENUE

8.     Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). This Court also has jurisdiction under the APA, 5 U.S.C. §§ 701-706. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

9.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district, insofar as Plaintiff States seek relief against federal officials acting in their official capacities. 28 U.S.C. § 1391(e)(1).

## PARTIES

### I.     PLAINTIFFS

10.    The State of California is a sovereign state in the United States of America. The State of California brings this action by and through Attorney General Xavier Becerra. The Attorney General is the chief law officer of California (Cal. Const., art. V, § 13), and is authorized to file civil suits directly involving the state's rights and interests or deemed necessary by the Attorney General to protect public rights and interests. Cal. Gov't Code § 12511; *Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934). This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of California.

11.    The State of Oregon is a sovereign state in the United States of America.  The State of Oregon brings this action by and through its Attorney General, Ellen F. Rosenblum, its chief legal officer. Or. Rev. Stat. § 180.210. Her powers and duties include acting in federal court on matters of public concern to Oregon. Or. Rev. Stat. § 180.060(1)(d)).

4

12.     The State of Minnesota is a sovereign state in the United States of America. Attorney General Keith Ellison brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

13.     Plaintiff States have special solicitude to sue in matters in matters involving harm to their quasi-sovereign interests, which interests include their territories and "all the earth and air within [their] domain." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007), citing *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907). Plaintiff States also have *parens patriae* standing to bring suit against executive agencies to protect the interests of their citizens. *See, e.g.*, *Texas v. United States*, 86 F. Supp. 3d 591, 625 (S.D. Tex. 2015) *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("*Parens patriae* permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity." (citing *Snapp*, 458 U.S. at 601)).

## II.   DEFENDANTS

14.     Defendant Donald J. Trump is President of the United States. President Trump issued the Order challenged in this complaint. Plaintiff States sue President Trump in his official capacity.

15.     Defendant Mick Mulvaney is the Director of the OMB (Director) and OMB's highest-ranking official. The Director is charged with the supervision and management of all actions of the OMB, including execution of the mandates set forth in the Order. Plaintiff States

sue Director Mulvaney in his official capacity. The OMB is an office within the Executive Office

of the President (31 U.S.C. § 501) and an agency within the meaning of the APA. 5 U.S.C. §

551(1).

16.    Defendant Rick Perry is the Secretary of Energy and the highest ranking official of

the U.S. Department of Energy (DOE). He is charged with the supervision and management of

all decisions and actions of that agency. Plaintiffs sue Secretary Perry in his official capacity.

DOE is an agency within the meaning of the APA.

17.    Defendant Elaine L. Chao is the Secretary of Transportation and the highest ranking

official of the U.S. Department of Transportation (DOT). She is charged with the

supervision and management of all decisions and actions of that agency. Plaintiffs sue Secretary

Chao in her official capacity. DOT is an agency within the meaning of the APA.

18.    Defendant David Bernhardt is the Acting Secretary of the Interior and the highest-

ranking officer in the Department of the Interior. He is charged with the supervision and

management of all decisions and actions of that agency. Plaintiffs sue Acting Secretary

Bernhardt in his official capacity. The Department of the Interior is an agency within the

meaning of the APA.

19.    Defendant R. Alexander Acosta is the Secretary of Labor, U.S. Department of Labor

(DOL), and DOL's highest-ranking officer. He is charged with the supervision and management

of all decisions and actions of that agency. Plaintiffs sue Secretary Acosta in his official capacity.

DOL is an agency within the meaning of the APA.

20.    Defendant Andrew Wheeler is the Administrator of EPA and the agency's highest

ranking official. He is charged with the supervision and management of all decisions and actions

of that agency. Plaintiffs sue Administrator Pruitt in his official capacity. EPA is an agency within the meaning of the APA.

21.     Defendant Alex M. Azar II is the Secretary of Health and Human Services, U.S. Department of Health and Human Services (HHS), and HHS's highest-ranking officer. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Secretary Azar in his official capacity. HHS is an agency within the meaning of the APA.

## BACKGROUND

### I.    SCOPE OF EXECUTIVE POWER

22.     The President purports to have issued the Order "by the authority vested in me as the President by the Constitution and the laws of the United States of America, including the Budget and Accounting Act of 1921, as amended (31 U.S.C. § 1101, *et seq*.), section 1105 of title 31, United States Code, and section 301 of title 3, United States Code."

23.     The Constitution vests executive power in the President. U.S. Const., art. II, § 1. The primary function of the President is understood to be cabined in the "Take Care" clause: "[H]e shall take care that the laws be faithfully executed." U.S. Const., art. II, § 3. The President's additional powers and duties are specifically enumerated in sections 2 and 3 of Article II. None of those additional powers and duties can be construed to authorize the President to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits.

24.     The Budget and Accounting Act of 1921 (31 U.S.C. § 1101, *et seq*.) addresses government spending. No provision of the Budget and Accounting Act can be construed to

authorize the President to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits.

25.    The President specifically cited 31 U.S.C. section 1105 as a basis of authority to issue the Order. Section 1105 provides that, at the beginning of each calendar year, the President "shall submit a budget of the United States Government for the following fiscal year" that includes a number of listed items. Nothing in section 1105 can be construed to authorize the President to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits.

26.    3 U.S.C. section 301, which the President cited as another basis for his authority to issue the Order, does not authorize the President to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing regulations and/or consider the cost of the new regulation in isolation of its benefits.

27.    The President does not have, under the Constitution or otherwise, an undefined "inherent" power, even in "emergency" circumstances. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952).

28.    The President cannot delegate authority he does not have. 3 U.S.C. § 301.

29.    The President may issue Executive Orders to manage the internal operations of the federal government, including to direct agencies to exercise their regulatory discretion consistent with priorities of the administration. Executive Orders have the force of law.

30.    The President cannot direct an agency, by Executive Order or otherwise, to take any action that would violate a Constitutional or statutory mandate, or otherwise run afoul of Congressional intent.

## II.    THE POWERS AND DUTIES OF THE OFFICE OF MANAGEMENT AND BUDGET

31.    The powers and duties of the OMB are limited by statute, and largely relate to assisting in development and administration of the federal budget. Those powers include "establish[ing] governmentwide financial management policies for executive agencies" and "[r]eview[ing] and, where appropriate, recommend[ing] to the Director changes to the budget and legislative proposals of agencies to ensure that they are in accordance with financial management plans of the [OMB]." 31 U.S.C. § 503(a).

32.    Congress has also directed the OMB to "coordinate with agencies to develop priority goals to improve the performance and management of the Federal Government," including "outcome-oriented goals covering a limited number of crosscutting policy areas." 31 U.S.C. § 1120(a)(1)(A). The statute also sets forth the process by which agencies are to develop their own priority goals. The OMB, however, is given no role in developing the priority goals of individual agencies; its role is limited to coordinating that process among agencies: "The Director of the Office of Management and Budget shall determine the total number of agency priority goals across the Government, and the number to be developed by each agency." *Id*. at § 1120(b)(1).

33.    Nothing in these authorities, or any other authority, can be construed to authorize the OMB to preclude a federal agency from promulgating a regulation or to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private

cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits.

### III.   ADMINISTRATIVE RULEMAKING

34.    Administrative agencies are creatures of statute and have only such power and authority as are conferred upon them by statutory enactment. One mechanism by which agencies exercise their statutory authority and/or accomplish their legislative goals is by promulgating and implementing regulations.

35.    Federal agencies are generally required to undertake reasoned and evidence-based decision-making when exercising their delegated authority to promulgate rules. The APA, for one, provides that a reviewing court *shall* "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

36.    It follows that "[t]he process by which [an agency] reaches [a] result must be logical and rational." *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Further, agency action is lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 42 (1983). An agency must consider the factors that Congress has directed it to consider, and cannot "rel[y] on factors which Congress has not intended it to consider." *Id.* at 43.

37.    A number of legal authorities, including enabling statutes and Executive Order 12866, require agencies to weigh the relative costs and benefits of a proposed regulation before promulgating it. These requirements are consistent with agencies' existing duty to make rational

regulatory decisions based on their review of the relevant data and any statutory Congressional directives.

38.     No statute authorizes or permits an agency to consider the number of total regulations in an agency's regulatory portfolio, or the cumulative cost of those regulations, in evaluating the necessity or wisdom of an additional regulatory measure.

## IV.   STATES' RELIANCE ON FEDERAL REGULATION

39.     Plaintiff States have proprietary interests in ensuring that agencies of the federal government perform their statutory duties to regulate in matters directly impacting states' sovereign territory and natural resources, institutions, and infrastructure.

40.     Further, Plaintiff States have quasi-sovereign interests independent of and behind the titles of their citizens in all the earth and air within their domains and in the health and well-being, both physical and economic, of their citizens, which interests are similarly impacted by the federal government's performance of its statutory duties to regulate. While States retain significant powers under our federal system of government, on entering the Union, Plaintiff States "surrender[ed] certain sovereign prerogatives" which "are now lodged in the Federal Government." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007). In keeping with the federal government's end of the bargain, Congress orders agencies to achieve certain legislative goals for the benefit of all states, including Plaintiff States. Agencies fulfill these statutory mandates by promulgating and enforcing regulations. The need for updated or new regulations is driven by external factors such as population growth, climate change, and technological innovation that do not cease to occur in deference to a political desire to deregulate to reduce private costs without consideration of public benefits. Thus, the Order and Guidance's direct interference with agencies' performance of their obligations is harming Plaintiff States' interests.

41.     One function federal regulation often serves is to create a regulatory "floor" to
protect public health and the environment and to safeguard against a race to the bottom among
states and other regulatory jurisdictions. For example, by imposing standards that limit the
amount of certain air pollutants a new, modified or reconstructed source can emit, section 111 of
the Clean Air Act both serves to reduce pollution and to set a level playing field for a particular
source category (e.g., Portland cement plants, bulk gasoline terminals) across the country.
Without such federal standards setting the floor, Plaintiff States would be forced to decide
whether to provide that basic level of protection for public health, safety, and the environment on
their own, or to forego such protections in the hopes that less regulation would attract a given
industry.

42.     Where Congress expressly preempts state authority or enacts comprehensive
legislation occupying an entire field, states must rely on the federal agencies to implement the
will of Congress through the adoption of regulations. Thus, for example, regulation of securities
and commodities exchanges, regulation of employee benefit plans, and the issuance and
regulation of patents, trademarks, and copyrights lie almost exclusively with the federal
government.

43.     Even where a state is not preempted from regulating, in other instances, the scope of
states' regulatory jurisdiction may not be sufficient to fully address issues that pose a significant
threat to the health and well-being of their citizens, natural resources, infrastructure, institutions,
and economies. The emission of greenhouse gases (GHG) is one example. GHGs emitted in
other states accumulate in the atmosphere and contribute directly to an array of climate change
impacts in Plaintiff States. Where Congress has directed federal agencies to enact regulations
reducing such emissions on a nationwide basis, and those agencies fail to adopt regulations

implementing that directive, Plaintiff States are harmed. *See Massachusetts*, *supra*, 549 U.S. at 521.

44.     Plaintiff States also have a particular interest in federal rulemaking to the extent federal regulations may directly impact state lands and natural resources or touch on the state's management of those resources. For example, the quality and quantity of freshwater available in downstream states depends in large part on the management of water resources in upstream states, which is governed in large part by regulations under the federal Clean Water Act. Similarly, a state's air resources may be adversely impacted by pollutants emitted in neighboring states, a harm the downwind state may be unable to adequately address.

45.     Further, each of Plaintiff States has federally managed lands within their territory, and federal-agency management of those lands has spillover impacts on neighboring state lands. In California, more than 46 million acres, or nearly 46% of the state, are administered by the federal government. More than 32.6 million acres of Oregon's land, which is over half the state, is administered by the federal government. In Minnesota, the federal government administers over 3.4 million acres. Plaintiff States may be directly impacted by rules promulgated and enforced by the federal agencies responsible for those intra-state federal lands.  For example, the development of fossil fuel resources on federal lands causes air and water pollution that impacts not only the federally-managed lands where the activity occurs, but also surrounding state lands.

46.     As key participants in a federal system, Plaintiff States also have an interest in ensuring that the federal government, and each of its branches, acts within the defined bounds of its constitutional authority—just as states must act within the bounds of their authority—and they have a concomitant legal right not to be injured by *ultra vires* executive action. This is

particularly true in matters implicating the administration of federal rules on which Plaintiff
States rely to protect their proprietary and quasi-sovereign interests.

## V.    EXECUTIVE ORDER 13771 AND OMB'S GUIDANCE MEMORANDA

47.    President Trump signed Executive Order 13771 ("Reducing Regulation and
Controlling Regulatory Costs") on January 30, 2017. 82 Fed. Reg. 9,339. The Order cited the
Constitution, the Budget and Accounting Act of 1921 (31 U.S.C. 1101, *et seq.*, and specifically §
1105), and 3 U.S.C. § 301 as the bases of the President's authority.

48.    The stated purpose of the Order is to manage the *private* costs of complying with
federal regulations: "In addition to the management of the direct expenditure of taxpayer dollars
through the budgeting process, it is essential to manage the costs associated with the
governmental imposition of private expenditures required to comply with Federal regulations."
Sec. 1. The Order then states, in relevant part, "Toward that end, it is important that for every
one new regulation issued, at least two prior regulations be identified for elimination." *Id.*

49.    For Fiscal Year (FY) 2017, the Order set forth two separate mandates. The first was
that an agency must repeal two regulations for each new regulation it promulgates. Sec. 2(a). The
second is that the agency must ensure that the total "incremental cost" of all new and repealed
regulations is no greater than zero. Sec. 2(b).

50.    The requirements were essentially the same for FY 2018 and beyond: the cost of any
new regulation must "be offset by the elimination of existing costs associated with at least two
prior regulations." Sec. 3(a) (referencing the requirements set forth in Section 2(c)).

51.    The Order also directs the OMB to establish an annual, agency-specific "incremental
cost" cap, which limits the cumulative cost of the agency's regulatory portfolio. For 2018, the

caps varied by agency from zero to *negative* $196 million in annualized costs.[1] The cap may be adjusted from year to year.

52.      On February 2, 2017, the OMB issued "Interim Guidance Implementing Section 2 of the EO of January 30, 2017." It issued the final "Guidance Implementing Executive Order 13771" on April 5, 2017. The final guidance states that it is consistent with the interim guidance, but clarifies that where there is a conflict between the two memoranda, the final guidance supersedes the interim guidance.

53.      The Order does not require that there be a nexus between the proposed regulation and the two regulations proposed for repeal, other than that the saved costs of the latter offset the cost of the former. With OMB approval, offsets can even be transferred between agencies. Neither the Order nor the Guidance attempt to provide a logical basis for the requirement that "two" regulations be repealed, as opposed to one or three or any other number.

54.      The fact that the societal benefits of a proposed rule far exceed its *private* costs is immaterial under the Order; an agency must still offset its cost. Also immaterial are the net benefits of the rules to be repealed to offset the cost of any new regulation. It follows that the Order will likely compel rulemaking actions that result in a net loss of benefits to society.

55.      By its terms, the Order does not apply to regulations related to certain government functions (military, national security, or foreign affairs); intra-agency administration; or "other categories" exempted by the OMB guidance. The Order also contains legal disclaimers ("unless otherwise required by law") and a statement that it "shall not be construed to impair or otherwise

---

[1] OMB, Regulatory reform: Two-for-One Status Report and Regulatory Cost Caps, 1-2 (2017) (hereinafter "*Two-for-One Report*"), available at https://mobile.reginfo.gov/public/pdf/eo13771/FINAL_TOPLINE_All_20171207.pdf (last accessed April 4, 2019).

affect" an agency's legal authority. The Guidance issued by the OMB further clarifies that the Order applies only to "significant" rules[2]; does not apply to independent agencies; cannot stop agencies from issuing statutorily mandated regulations; and cannot force agencies to take cost into consideration for rules whose underlying laws prohibit it.

56.     Where an agency is required to issue regulations by statute, the Order acknowledges that it cannot—and does not—"change the agency's obligations under [such a] statute." This does not, however, relieve the agency of the obligation to eventually offset the cost of the required regulations.

57.     Where an agency believes a rule otherwise subject to the Order "qualifies for an exemption," the Guidance directs the agency to submit an exemption request to the Office of Information and Regulatory Affairs (OIRA), prior to submitting the proposed regulation to OMB for review. The Guidance lists four categories of circumstances under which an exemption may apply, including that (1) the rule is expressly exempt; (2) there is an emergency; (3) the rule is statutorily or judicially required; or (4) the rule will have *de minimis* costs. The Guidance further notes, "These categories are not exhaustive," suggesting that an agency may apply for relief on another basis. The Guidance does not clarify what criteria OMB will consider in determining whether to grant an exemption.

58.     Where an agency cannot comply with the Order's mandates—that is, where it cannot identify at least two regulations to repeal and/or to fully offset the cost of any new rule—the

---

[2] As defined by Executive Order 12866 (1993), a "significant" regulatory action is one that (1) may have an annual economic impact of at least $100 million or adversely affect "in a material way" the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or sub-national governments or communities; (2) be inconsistent with another agency action; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues.

Order implicitly prohibits the agency from issuing the rule and/or purports to authorize the OMB

to block the rulemaking. In a required submission to the OMB, agencies are to identify any

regulation that "increases incremental cost" and the existing regulations proposed to offset that

cost. Each regulation approved by the Director shall be included in the Unified Regulatory

Agenda. An agency may not issue a regulation that has not been included in the Unified

Regulatory Agenda or otherwise approved in writing by the Director.

59.     The Order constitutes a significant departure from the efforts of previous

administrations to cull unnecessary regulations. The majority of past Executive Orders

addressing this issue required agencies to "consider" or analyze the economic impacts of a

proposed rule. Two Orders imposed a mandatory substantive requirement, including Executive

Order 12291 (issued by President Reagan in 1981), which sought to preclude regulatory action

"unless the potential benefits to society … outweigh the potential costs to society," and

Executive Order 12,861 (issued by President Clinton in 1993), which required executive

departments to "eliminate not less than 50 percent of its civilian internal management regulations

that are not required by law within 3 years."

60.     This Order is of an entirely different character. Not only does it direct agencies to

repeal outdated regulations, but it requires that they repeal *two* regulations, outdated or

otherwise, as a pre-condition to issuing any new one. Where an agency, in its discretion, cannot

or will not repeal two regulations, the Order purports to authorize OMB to prevent the agency

from issuing a new regulation. This Order is also unique in that it focuses solely on the

compliance costs of regulation with no consideration of the corresponding public benefits.

61.     Neither the Order nor the Guidance provides a mechanism for notifying the public

whether and when a proposed (or possible) regulatory action might be delayed or abandoned due

to the requirements of the Order. The Guidance further precludes agencies from publicly stating that the Order was the "basis or rationale, in whole or in part," for taking or not taking any regulatory action. The Guidance thus leaves the public in the dark about the actual effect of the Order on agency rulemaking.

62.    No constitutional or statutory provision cited by the President in the Order authorizes him to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits, and no such provision exists.

63.    The OMB cannot lawfully deny an agency's request for exemption from this Order or otherwise prevent an agency from issuing a rule on the basis that the agency has not complied with the terms of this Order.

64.    Together, the Order and the Guidance are self-executing in that they represent the Executive Branch's final word on the subject, and federal agencies must comply with their substantive mandates.

## VI.    IMPACTS OF THE ORDER AND OMB'S GUIDANCE

65.    The Order—which was now issued over two years ago—has harmed and will continue to harm Plaintiff States in that it has the effect of preventing, delaying and/or discouraging the promulgation of federal regulations that would address important public health and safety issues and/or environmental concerns with which Plaintiff States are grappling.

66.    Numerous regulations that were proposed by various federal agencies during the Obama Administration have not been finalized under the Trump Administration. The failure of agencies to finalize many of these regulations is attributable to the Order.  For example, the Environmental Protection Agency (EPA) cited the Order as one of the bases for rescinding

significant portions of its 2017 Accidental Release Prevention Requirements rule. 83 Fed. Reg. 24, 850, 24,873 (May 30, 2018) ("Rescinding these provisions would also allow EPA greater flexibility to offset the incremental costs associated with other new regulations in accordance with E.O. 13771").

67.     The Administration itself has proclaimed the Order's effectiveness. Reflecting on fiscal year 2017, the Administration stated that agencies surpassed the "two-for-one" ratio and in fact "issued 22 deregulatory actions for every new regulatory action;" that "agencies plan on achieving even more regulatory rollbacks in FY 2018 compared with FY 2017, and plan to issue at least three deregulatory actions for every one new regulation;" and that in "this Administration, agencies have withdrawn or delayed 1,579 planned regulatory actions."[3]

68.     More recently, the Administration proclaimed that agencies had achieved a 12:1 ratio of deregulatory to regulatory actions and eliminated $23 billion in regulatory costs, "far exceeding the $11 billion projected."[4]

69.     Plaintiff States have been and continued to be harmed by agencies' withdrawal or delay of regulatory actions as a result of the Order.

### A.     Specific Harms Resulting from Regulatory Actions (and Inactions) Attributable to the Order

70.     Many of the proposed regulations that have not been finalized, at least in part as a result of the Order, address issues that are of critical importance to Plaintiff States. These include several rules to address energy conservation and GHG emissions and rules to improve vehicle safety on our nation's roadways, as discussed below.

---

[3] https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-delivering-deregulation/ (last accessed April 2, 2019).

[4] https://www.reginfo.gov/public/do/eAgendaEO13771 (last accessed April 4, 2019).

### 1.    Rules to Address Energy Conservation and GHG Emissions

71.    In 2007, the Supreme Court held that Congress, in adopting the Clean Air Act,
intended to create a statute that would adapt to new pollutants and new threats, such as GHG
emissions and the threat of climate change. *See Massachusetts*, *supra,* 549 U.S. at. 532.
Previously, in 1975, Congress passed the Energy Policy Conservation Act, which endeavored in
part to reduce energy consumption. These are just two examples of statutes in which Congress
vested substantial authority and responsibility in federal agencies to address pressing matters of
national concern, namely the conservation of energy and the reduction of harmful pollutants.

72.    Federal agencies' delay or abandonment of energy efficiency measures is a failure to
address increased energy demand. As energy demands increase, such failures to mandate more
efficient use of energy by regulations will result in Plaintiff States expending greater resources to
meet the demand. For example, Plaintiff States will be required to invest resources in energy
infrastructure that is proportional to energy demand, both to produce energy and to transmit it to
consumers. Regardless of the source, producing and transmitting energy generally poses some
risk of harm to public health, safety, and/or the environment, and additional state resources must
be expended to mitigate these risks. Moreover, inefficient use of energy resources leads to
additional energy costs for consumers and businesses.

73.    Particularly with respect to fossil fuels, inefficient use of energy resources also leads
to greater emissions of pollutants associated with the production, transmission and burning of
those fuels, including GHGs. In 2009, the EPA found that GHGs endanger public health and
welfare, particularly insofar as they cause and contribute to climate change.

74.    Evidence that the United States is already experiencing the deleterious impacts of
climate change is overwhelming and incontrovertible. Recently, on November 23, 2018, the
federal government—through the United States Global Climate Research Program (USGCRP), a

federal program for which EPA is a constituent agency—issued Volume II of the Fourth

National Climate Assessment, a dire, 1,500-page report about the effects of climate change on

the health and welfare of Americans and the United States economy. *See* USGCRP, *Fourth*

*National Climate Assessment, Volume II: Impacts, Risks, and Adaptation in the United States*

(Nov. 23, 2018) (National Assessment).[5] The National Assessment is a comprehensive,

interdisciplinary assessment that represents the executive branch's best understanding of the

causes and consequences of climate change for the United States. In sum, "[i]t concludes that *the*

*evidence of human-caused climate change is overwhelming and continues to strengthen, that the*

*impacts of climate change are intensifying across the country, and that climate-related threats to*

*Americans' physical, social, and economic well-being are rising*." *Id*. at 36 (emphasis in

original).

      75.    The National Assessment provides detailed evidence of specific harms climate

change has imposed on the United States. A number of these impacts directly threaten human

health and well-being, particularly populations that are already vulnerable, including "[h]igher

temperatures, increasing air quality risks, more frequent and intense extreme weather and

climate-related events, increases in coastal flooding, disruption of ecosystem services, and other

changes." *Id.* at 55.

      76.    Some of the specific harms suffered by Plaintiff States from GHG emissions include:

         a.    increased heat deaths and illnesses due to intensified and prolonged heat

              waves;

---

[5] Available at https://nca2018.globalchange.gov/ (last accessed April 4, 2019).

b.    increased ground-level ozone pollution, with concomitant increases in asthma, bronchitis, heart disease, and emphysema, as well as coughing, throat irritation, and lung tissue damage;

c.    beach erosion, temporary and permanent inundation of portions of coastal state property, damage to publicly owned coastal facilities and infrastructure, and salinization of water supplies from accelerated sea level rise;

d.    more frequent flooding from more severe rains and higher storm surges resulting in property damage and hazard to human safety;

e.    diminished water supplies and adverse impacts to agriculture due to reduced snowpack and more frequent and severe droughts;

f.    deaths, property damage, and impairment of air and water quality from increasingly more severe and damaging wildfires;

g.    additional state emergency-response costs caused by more frequent and intense storm surges, floods, and wildfires; and

h.    widespread loss of species and biodiversity, including the disappearance of hardwood forests from the northern United States.

77.    These impacts are inflicting substantial social and economic costs on Plaintiff States. The adverse health impacts attributable to rising temperatures and diminished air quality impose a significant burden on state health care systems. Additionally, Plaintiff States have spent and will continue to spend significant resources addressing threats to critical infrastructure and preparing for and responding to ever-more-frequent and intense natural disasters.

78.    In California, drought conditions beginning in 2012 left reservoirs across the state at record low levels, often no more than a quarter of their capacity. The Sierra snowpack—critical

to California's water supply, tourism industry, and hydroelectric power—was the smallest in at

least 500 years. The resulting water cutbacks threatened the livelihoods of farmers and fishermen

alike. In the Central Valley, the drought cost California agriculture about $2.7 billion and more

than 20,000 jobs in 2015 alone. In addition, the drought led to land subsidence, due to reduced

precipitation and increased groundwater pumping, and contributed to the stress on forests

threatened by pest invasions and fire. California has also documented a notable increase in

average daily temperatures, rising sea level and coastal erosion, and an increase in the intensity

and frequency of wildfires, including the worst fire season on record in 2018 (and 2017 before

that).

79.     As with California, Oregon has experienced the ill-effects of climate change caused

by global warming. It has seen an increase of number, intensity, and duration of wildfires over

the last several decades, and has declared four drought emergencies in Oregon counties in 2018.

Oregon faces increasingly higher temperatures, which results in low snowpack, and

correspondingly lower stream flow. Additionally, Oregon's coast faces similar risks as

California's: increased erosion and flooding caused by sea level rise.

80.     Minnesota has similarly experienced the negative impacts of climate change. In the

Twin Cities from 1951 to 2012, the annual average temperatures increased by 3.2 degrees

Fahrenheit, which was faster than both the national and global rates of increase. Minnesota has

also seen an increase in annual precipitation and severe storms, which has led to sudden and

intense flooding that has severely damaged crops, homes, and businesses. Additionally,

Minnesota has experienced a significant loss of fish habitats for prominent species, such as trout

and walleye, due to the warming of surface waters.

81.   Plaintiff States have taken significant measures to reduce their own GHG emissions, but such efforts do not obviate the need for meaningful reductions on a national scale, nor do they relieve federal agencies of their statutory responsibilities to address the issue.

82.   Methane emissions are a particular concern. Methane is 86 times more potent than carbon dioxide over a 20-year time period. By reducing methane emissions now, we can more quickly slow or reverse the rate of climate change in the near-term, buying time to develop adaptive strategies.

83.   Federal rulemaking in this area has been and will be impacted by the Order. In some instances, the Administration has sought to delay or repeal existing rules and to shelve proposed rules that would reduce GHG emissions. For example, while EPA has final regulations to reduce emissions from municipal solid waste landfills under the Clean Air Act,[6] it has failed to comply with its duty to implement them and purports to be "reconsidering" them, and EPA included a stay of the rules on a list of "Completed Deregulatory Actions."[7] Similarly, while the Bureau of Land Management (BLM) has a final rule to reduce the waste of methane from the oil and gas operations, BLM has twice attempted to delay or suspend the regulation, and has classified the suspension as "deregulatory" for purposes of the Order.

84.   Yet another example is the Federal Highway Administration's (FHWA) repeal of the Greenhouse Gas Performance Measure (GHG Measure) for the national highway system. The FHWA issued the final GHG Measure on January 18, 2017, and it became effective on February 17, 2017. 82 Fed. Reg. 5,970 (January 18, 2017). Pursuant to the GHG Measure, state transportation departments were to track on-road GHG emissions within their jurisdictions and

---

[6] 81 Fed. Reg. 59,276 (Aug. 29, 2016); 81 Fed. Reg. 59,332 (Aug. 29, 2016).
[7] *See* https://www.epa.gov/laws-regulations/epa-deregulatory-actions (last accessed April 4, 2019).

set locally appropriate targets for GHG emissions on national highways. According to the

FHWA, it adopted the GHG Measure because, by incentivizing the funding of lower-GHG

emitting transportation strategies, the rule would result in reduced national GHG emissions. *See,*

*e.g.*, 82 Fed. Reg. at 6,001 (anticipating that GHG Measure will influence decision-making and

reduce GHG emissions); *id.* at 5,996-97 (agreeing that policies to reduce GHG pollution from

transportation, such as the GHG Measure, are "essential to minimize the impacts from climate

change"). But on May 31, 2018, the FHWA published notice of its repeal of the GHG Measure,

stating "The FHWA initiated this rulemaking [to repeal the Measure] after reviewing existing

and pending regulations pursuant to Executive Order 13771 and 13777." 83 Fed. Reg. 24,920,

24,922 (May 31, 2018).

85.   The repeal of a rule designed to reduce national GHG emissions and to minimize the

impacts of climate change results in greater GHG emissions and greater climate-change impacts,

which harm the States.

86.   In other instances, the Administration has failed to follow through with proposed

rules, even after the agencies and stakeholders, including Plaintiff States, have expended

considerable resources in developing them. The agencies' failures to complete these rulemakings

are attributable to the Order, and the harms these failures cause Plaintiff States are plain. An

example is set forth below.

### 2.   Energy efficiency standards for residential conventional cooking products

87.   The Energy Policy and Conservation Act (EPCA) authorizes the Department of

Energy (DOE) to set energy conservation standards for various consumer products and certain

commercial and industrial equipment. Pursuant to EPCA, any new or amended energy

conservation standard must be designed to achieve the maximum improvement in energy

efficiency that is technologically feasible and economically justified, and result in a significant conservation of energy. 42 U.S.C. § 6295(o)(3)(A) & (B).

88.    In June 2015, the DOE proposed a rule under the EPCA to amend the energy efficiency standards for residential conventional cooking products, such as stoves and ovens. 80 Fed. Reg. 33,030 (June 10, 2015). In doing so, the DOE confirmed that the proposed standard met the statutory criteria, that is, it (1) would result in significant conservation of energy; (2) was technologically feasible, and (3) was cost effective.

89.    To establish that the latter criterion was met, the DOE was required to determine that the standard's benefits exceeded its costs according to seven specific statutory factors: (1) the economic impact of the standard on manufacturers and consumers of the products subject to the standard; (2) the savings in operating costs throughout the estimated average life of the covered products in the type (or class) compared to any increase in the price, initial charges, or maintenance expenses for the covered products that are likely to result from the standard; (3) the total projected amount of energy (or as applicable, water) savings likely to result directly from the standard; (4) any lessening of the utility or the performance of the covered products likely to result from the standard; (5) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the standard; (6) the need for national energy and water conservation; and (7) other factors the Secretary of Energy considers relevant. 42 U.S.C. §§ 6295(o)(2)(B)(i)(I)-(VII); 6313(a)(6)(B)(ii).

90.    In proposing the rule, the DOE estimated that the lifetime energy savings from residential conventional cooking products purchased over a 30-year period would amount to 0.76 quadrillion British thermal units (roughly equivalent to the energy consumed by 21 million

homes in the U.S. in a year), a savings of 5.9 percent relative to the energy use of products in a

no-new-standards case.  81 Fed. Reg. 60,784, 60,787 (September 2, 2016).

91.     The net benefits of the standard were also significant. The DOE estimated that the

standard would impose an additional $42.6 million in increased equipment costs annually, but

result in a *net* annual benefit of more than $339 million per year (using a seven percent discount

rate). 81 Fed. Reg. at 60,789. This annualized net benefit included more than $293 million in

energy-bill savings for consumers, and more than $88 million in reduced air pollution benefits.

(Using a three percent discount rate, annualized net benefits would be $429 million.)

92.     These benefits included significant savings associated with reduced GHG emissions,

including reduced carbon dioxide emissions (associated with the decrease in energy needed to

power electrical appliances) and reduced methane emissions (associated with decreased natural

gas consumption for gas appliances). By increasing the energy efficiency standard (i.e., reducing

the energy consumption) of the subject appliances, the DOE projected that the proposed rule

would reduce total GHG emissions by about 125 million metric tons per year (81 Fed. Reg. at

60,859), equivalent to the annual emissions of more than 26 million cars. Using the Social Cost

of Carbon (a metric developed by a federal interagency working group), the DOE estimated that

the present monetary value of the $CO_2$ emissions reductions alone (not taking into account, for

example, the $CO_2$ equivalent emissions of methane and other GHGs) was $300 million to $4.5

billion. A significant portion of these benefits would have accrued to Plaintiff States in reduced

costs attributable to climate-change impacts.

93.     In September 2016, DOE issued a supplemental notice of proposed rulemaking. 81

Fed. Reg. at 60,784. DOE was required by statute to publish a final rule no later than two years

after the original proposal—that is, by June 2017. 42 U.S.C. § 6295(m)(3)(A). To date, it has not done so.

94.    In the Fall 2017 edition of the Unified Agenda, the DOE reported that the proposed rule is "Major," "Economically Significant," and subject to the Order.[8] As such, before the DOE can finalize the rule—and despite the fact that the rule's economic benefits outweigh its costs nine to one—the DOE must identify for repeal two existing regulations whose regulatory costs would offset the costs imposed by the rule. In doing so, the DOE would not take into account the regulatory benefits of the rules identified for repeal (which would almost certainly be greater than their costs). Were the DOE to complete this exercise—finalizing the rule at issue here and repealing two existing rules to offset its costs—the cumulative result would likely be a net loss of regulatory benefits.

95.    Plaintiff States are generally preempted from imposing energy efficiency standards for residential conventional cooking products (among other consumer products) that are more stringent than the existing federal standard. 42 U.S.C. § 6297(b). Plaintiff States may petition for a waiver of federal preemption for products sold in their states; but, they cannot rely on this as a option with any certainty. It *may* apply only in unique circumstances, and in making such a petition, Plaintiff States must show that there are "unusual and compelling State or local energy … interests." 42 U.S.C. § 6297(d).

96.    Each day the rule is delayed, an additional 342,500 metric tons of GHGs is emitted into the atmosphere, aggravating the climate change-related harms to Plaintiff States that are discussed above.

---

[8] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1904-AD15 (last visited April 4, 2019).

97.    In addition, by failing to impose the highest energy-efficiency standard that that is technologically feasible and economically justified, as required by law, the DOE is exacerbating the strain on Plaintiff States' energy resources and putting public health, safety, and the environment at risk.

### 3.    Rules to Address Motor Vehicle Safety

98.    Another example where states themselves cannot fully address an important public safety issue is in the area vehicle safety. By their very nature, vehicles can and do cross state lines; thus, even assuming a state were able to require a particular safety feature on vehicles sold in that state, this would not address vehicles sold elsewhere, and traveling in the state. Accordingly, states rely on federal standards to more fully address safety concerns. In the absence of federal safety standards, states will suffer proprietary injuries in the form of increased health care costs (which they bear for a substantial portion of their population), among other things.

99.    The Motor Vehicle Safety Act was enacted "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. The Act mandates motor vehicle safety standards that are practicable, meet the need for motor vehicle safety, and are stated in objective terms. *Id.* § 30111(a). "Motor vehicle safety standard" means a minimum performance standard for motor vehicles or motor vehicle equipment. When prescribing such standards, the National Highway Traffic Safety Administration (NHTSA) must consider all relevant, available motor vehicle safety information, and whether a proposed standard is reasonable, practicable, and appropriate for the types of motor vehicles or motor vehicle equipment for which it is prescribed and the extent to which the standard will further the statutory purpose of reducing traffic accidents and associated deaths. *Id.* § 30111(a), (b).

100.   In pursuit of its statutory mandate, and having carefully considered all of the required factors, the NHTSA in January 2017 proposed to require all new light vehicles to include V2V crash-avoidance technologies, which will send information about a vehicle's speed, heading, brake status, and other data to surrounding vehicles and receive the same information from other vehicles. 82 Fed. Reg. 3,854, 3,855–57 (January 12, 2017). When it proposed the rule, NHTSA claimed that V2V technology "has the potential to revolutionize motor vehicle safety … [and to] reduce the number and severity of motor vehicle crashes." *Id*. at 3,855. Further, NHTSA expects V2V technology to advance development of vehicle automation. *Id.* If finalized, the safety standard will be phased in over time, with costs that change over that period.

101.   The total estimated vehicle costs per year range from $2 to $5 billion ($135–$300 per vehicle). *Id*. at 3,858. On the benefit side, NHTSA estimated that the technology "could potentially prevent 424,901–594,569 crashes and save 955–1,321 lives [annually] when fully deployed throughout the light-duty vehicle fleet." *Id*.  NHTSA found that net positive benefits would be realized in 3-5 years, and by 2051, the proposed rule could reduce the costs resulting from motor vehicle crashes by $53 to $71 billion (expressed in today's dollars). 82 Fed. Reg. at 3,858-3,859, 4,007.

102.   The benefits of the rule would accrue, in part, to Plaintiff States, considering that States bear a significant portion of the costs attributable to vehicle crashes. These include costs associated with health care, emergency response, damage to infrastructure, and lost economic activity.

103.   Despite the net benefits to society, including benefits to Plaintiff States and their citizens, the DOT will not be able to promulgate this safety standard without repealing two or more existing regulations that impose equivalent or greater costs. (Though it does not matter if

the costs of the repealed rules are borne by entities other than the entities that will bear the costs of the new rule.)

104.   In proposing the V2V rule, NHTSA stated, "Without a mandate to require and standardize V2V communications, the agency believes that manufacturers will not be able to move forward in an efficient way and that a critical mass of equipped vehicles would take many years to develop, if ever." 82 Fed. Reg. at 3,854.

105.   Promulgation of the rule has been delayed or abandoned as a result of the Order. In February 2017—shortly after the Order was issued—DOT stated, "As DOT rulemaking priorities are being evaluated in accordance with Executive Order 13771, the schedules for many ongoing rulemakings are still to be determined, so we will not post an Internet Report for the month of February." This entry was repeated for the months of March through July 2017.[9] Later, DOT moved this rulemaking from its "current agenda" to its list of "long term actions," listing the next action as "Undetermined" on a date "To Be Determined."

106.   It would take years for the NHTSA to aggregate cost-savings sufficient to offset the cost of the proposed V2V rule, thus to issue the rule in compliance with the Order. Meanwhile, it could issue no other regulation and would have to focus exclusively on deregulatory actions to generate the necessary cost-savings.

107.   During this delay, the Plaintiff States are deprived of the benefits identified in the proposed rule, and will incur costs associated with the additional demand on their health care and emergency-response systems, among other harms.

---

[9] *See* DOT, Significant Rulemaking Reports by Year, https://cms.dot.gov/regulations/significant-rulemaking-report-archive (last accessed April 4, 2019).

## 4.    Deregulatory Actions

108.   Agencies have also taken deregulatory actions to accrue cost savings for purposes of complying with the Order. Such deregulatory actions are often taken without regard for the significant public benefits provided by the regulations at issue. One example is the Department of Health and Human Services' recent notice of proposed rulemaking (NPRM) to remove the "service duration requirements" for Head Start preschool programs. These requirements would have increased the scope of services Head Start programs are required to provide to low income children, including both the number of hours per day and the number of days per year.

109.   The service duration requirements were set forth in the Head Start Performance Standards, a rule the HHS finalized in 2016. 81 Fed. Reg. 61,294 (September 6, 2016). In promulgating the service duration requirements, the HHS cited extensive research (approximately twenty studies) showing, among other things, "the importance of longer preschool duration in achieving meaningful child outcomes and preparing children for success in school. Shorter preschool programs may not have as much time to adequately support strong early learning outcomes for children and provide necessary comprehensive services." *Id.* at 61,304. The HHS also noted that the final rule was responsive to the many public comments the agency received, and that it reflected concerns about maintaining local flexibility. *Id.*

110.   In a March 26, 2019, notice of proposed rulemaking, HHS did an about-face, proposing to remove the service duration requirements from the Head Start Performance Standards. 84 Fed. Reg. 11,269. Therein, HHS stated that, in reviewing the Standards, it had identified the service duration requirements as a "provision that could interfere with how local programs determine what works best for their communities," and that it would "impose a high cost on providers and result in fewer children being served in the Head Start program," concerns

that the agency had thoroughly considered and addressed when it promulgated the Standards in the first place.

111.   The NPRM notes that the proposed rule, if finalized, would be "an E.O. 13771 deregulatory action." *Id*. at 11,272. It estimates that the net cost savings associated with the proposed deregulatory action is $6.78 million (FY16 dollars) by 2020-21 (when the service duration requirements would have been required to be fully implemented). *Id*. at 11,274. The majority of these costs were attributed to "planning time" for program directors and managers.

112.   Plaintiff States are harmed by HHS' deregulatory action. To the extent the goals of the service duration requirements were to improve child outcomes and promote greater success in school for low-income families, those goals are undermined. This imposes an added burden on Plaintiff States to provide ongoing educational support services for vulnerable children deprived of such benefits at a critical time in their early development.

### B.   Other Impacts of the Order on Plaintiff States

113.   The number of present and future agency actions and inactions potentially predicated on this Order are myriad and diverse. The existence of this unlawful Order calls into question the lawfulness of agencies' decisions to repeal regulations as well as their inaction on any new regulation. That, in turn, places an additional burden on Plaintiff States to: (1) review agencies' actions and to identify failures to act, to determine if a legal challenge is appropriate; (2) determine whether to invest resources in developing and issuing their own rules to fill the regulatory vacuum; or (3) shoulder the burden of lost public health and environmental benefits resulting from agencies repeal or foregoing of regulation.

114.   Collectively, Plaintiff States have already expended significant resources challenging discrete agency actions taken pursuant to the Order. These include unlawful actions to delay or

suspend validly promulgated regulations. For example, one or more Plaintiff States are challenging EPA's failure to implement and enforce final regulations that seek to reduce emissions from municipal solid waste landfills under the Clean Air Act, as well as the Department of the Interior's unlawful "suspension" of regulations to reduce methane emissions from the oil and gas sector.

115.   Plaintiff States have also expended significant resources working to determine the precise effect of the Order on rulemaking, including conducting searches of public databases for information regarding the bases for various agency actions or inactions.

116.   Federal agencies are diverting significant resources to comply with the Order, to the detriment of their ability to implement and enforce regulations to protect public health and safety, among other things.

## FIRST CAUSE OF ACTION

### (Violation of Separation of Powers Doctrine)
### (Against All Defendants)

117.   The foregoing allegations are re-alleged herein by reference.

118.   The President's powers are limited to those specifically conferred on him by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

119.   Agencies, including the Agency Defendants, derive their rulemaking authority from statutes enacted by Congress, which prescribe the manner in which agencies are to regulate.

120.   No constitutional or statutory provision authorizes the President to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits.

121.   Any instance where the President, by Executive Order or otherwise, directs an agency to take an action that runs afoul of a statute or the legislative intent of Congress is a violation of the Separation of Powers doctrine.

122.   The Order directs federal agencies to take actions that would violate Constitutional and statutory mandates, or otherwise run afoul of Congressional intent in several respects:

a.      In promulgating a rule, an agency may not consider factors other than those Congress intended it to consider, as articulated in the enabling statute(s) and the APA. No statute authorizes an agency, in promulgating a new regulation, to consider the costs of other regulations issued in the same fiscal year or of regulations issued in prior years when determining whether to take regulatory action. Nor does any statute authorize federal agencies to condition issuance of a new regulation on the repeal of existing regulations to offset the new regulation's cost. The Order thus requires agencies to act in contravention of statutory authority.

b.      The APA directs a reviewing court to set aside any agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A). The Order requires an agency, in issuing a new rule, to consider factors (a) that Congress did not intend for it to consider; (b) that have no nexus to the substantive merit of the proposed rule; and/or (c) for which neither the Order nor the Guidance provide any logical basis, among other things. The Order thus requires an agency, in promulgating a new regulation, to act in a manner that is inherently arbitrary and capricious, subjecting the regulation to mandatory set-aside under the APA.

c.      Congress often grants agencies discretion to determine whether action is warranted to fulfill their statutory mandates. This discretion may be general, as where the legislature directs an agency to "prescribe such other rules as may be necessary and

35

appropriate to carry out the purposes" of a given statute (*see*, e.g., 26 U.S.C. § 989(c) (Secretary of the Treasury)), or specific, as where the Clean Air Act directs EPA to "review, and revise as necessary" standards for emission of hazardous air pollutants. 42 U.S.C. 7412(d)(6). The basis for this discretion (and, often, the basis for judicial deference to the agency's action on review) is the agency's deep expertise in a given area. The Order impermissibly commandeers an agency's discretionary authority by requiring that, instead of making decisions on the basis of its expertise and judgment, it act instead to fulfill arbitrary and irrelevant substantive requirements not set forth in the governing statute(s).

d.    Many existing mandates direct agencies to weigh the relative costs and benefits of a proposed regulation before promulgating it, consistent with agencies' statutory duty to be logical and rational in their rulemaking. The Order imposes a cost analysis that requires an agency to consider the cost of a proposed regulation in relation not to that regulation's expected benefits, but to the costs of existing regulations in the agency's regulatory portfolio, shifting the regulatory focus from maximizing the net societal benefits of regulations to minimizing the private costs, in contravention of agencies' statutory duty.

e.    An agency cannot take steps to comply with the Order (including considering the Order's mandates in any decision to propose, issue, or repeal a rule, or to revise or delay a proposed rule) without violating the agency's enabling statutes or the APA. In complying with the Order, each of the Agency Defendants has violated the statute(s) that provide its congressionally mandated purpose and authority, as well as the APA. No judicial deference would be due an agency action taken under influence of the Order.

123.   This court is authorized to enjoin any action by the Executive that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional

enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F.Supp. 569 (D.D.C. 1952), *aff'd*, 343

U.S. 579 (1952).

124.   Plaintiff States are irreparably harmed by the President's violation of the Separation

of Powers doctrine insofar as the Order has caused and will cause the delay or abandonment of

numerous federal regulations that would otherwise safeguard the health and well-being of

Plaintiff States' citizens, natural resources, infrastructure, institutions, and economies, among

other things.

125.   By declaring the Order unlawful and setting it aside, this Court can redress this

injury.

## SECOND CAUSE OF ACTION

### (Violation of Take Care Clause)
### (Against Defendant President Trump)

126.   The foregoing allegations are re-alleged herein by reference.

127.   The President has a constitutional duty to "take care that the laws be faithfully

executed." U.S. Const., art. II, § 3. The Take Care Clause is violated where executive action

undermines statutes enacted by Congress and signed into law.

128.   The Order undermines the APA and those statutes that direct, authorize, or otherwise

enable an agency to exercise discretion to achieve certain legislative goals.

129.   The stated purpose of the Order is to manage the private costs of complying with

federal regulations. By requiring agencies to make cost a primary concern of any regulatory

action, without regard for the countervailing societal benefits, the Order subjugates legislative

goals related to public health, safety, and the environment to the interests of regulated entities.

130.   The President's action issuing the Order thus violates the Take Care Clause.

131.   This Court is authorized to enjoin any action by the Executive that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F.Supp. 569 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952).

132.   Plaintiff States are irreparably harmed by the President's violation of the Take Care Clause insofar as the Order causes the delay or abandonment of federal regulations that would otherwise safeguard the health and well-being of Plaintiff States' citizens, natural resources, infrastructure, institutions, and economies, among other things.

133.   By declaring the Order unlawful and setting it aside, this Court can redress this injury.

## THIRD CAUSE OF ACTION

### (*Ultra Vires* action)
### (Against All Defendants)

134.   The foregoing allegations are re-alleged herein by reference.

135.   Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

136.   The Order and Guidance purport to prohibit agency rulemaking not in compliance with the Order and/or to authorize the OMB to reject or disapprove any proposed regulation where the agency has not complied with the Order's substantive requirements.

137.   No authority—constitutional, statutory or otherwise—authorizes the President or the OMB to condition an agency's ability to exercise its statutory rulemaking authority on the requirement that it offset the private cost of any new rule by repealing at least two existing rules and/or consider the cost of the new rule in isolation of its benefits.

138.   By issuing the Order and the Guidance, the President and the Director of the OMB, respectively, have acted outside the scope of their constitutional and statutory authority.

139.   Any action taken by the OMB to *enforce* the Order or to otherwise preclude an agency from issuing a regulation on the basis that it has not complied with the Order would similarly be *ultra vires*.

140.   Executive agencies, including the Agency Defendants, are not authorized to delay, weaken, or forgo new regulations based on whether they can repeal two or more existing regulations to offset the new costs or to satisfy an annual cost cap. The Agency Defendants cannot implement the Order without violating the statutes from which they derive their rulemaking authority, and the APA.  In complying with the Order each of the Agency Defendants has violated its statutory authority created by Congress.

141.   The APA authorizes challenges to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

142.   The Agency Defendants are agencies under the APA. 5 U.S.C. § 551(1).

143.   This court is authorized to enjoin any action by the Executive that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F.Supp. 569 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952).

144.   Plaintiff States have an interest in ensuring that the federal government, and each branch of it, acts within the defined bounds of its constitutional authority.  Plaintiff States also have a legal right not to be injured by *ultra vires* executive action.

145.   Plaintiff States are irreparably harmed by these *ultra vires* actions insofar as the Order causes the delay or abandonment of federal regulations that would otherwise safeguard the

health and well-being of Plaintiff States' citizens, natural resources, infrastructure, institutions, and economies, among other things.

146. By declaring the Order and Guidance unlawful and setting them aside, this Court can redress this injury.

## FOURTH CAUSE OF ACTION

### (*Violation of the APA*)
### (Against All Defendants)

147. The foregoing allegations are re-alleged herein by reference.

148. The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

149. Agency Defendants are agencies under the APA. 5 U.S.C. § 551(1).

150. The OMB issued Guidance to assist agencies in complying with the Order.

151. Together, the Order and the Guidance represent the Executive Branch's final word on the subject, and purport to be binding on federal agencies, which must now comply with its dictates. As such, the Guidance constitutes a final "agency action" and is subject to review under the APA. 5 U.S.C. §§ 551(1), (13), 704.

152. The Guidance assists agencies in complying with the Order's directive to repeal two regulations for each new regulation they promulgate and to ensure that the total "incremental cost" of all new and repealed regulations is no greater than zero. These are substantive requirements that have no nexus to the substance of the rulemaking and thus are arbitrary and capricious.

153.   For the OMB to preclude an agency from issuing a rule otherwise authorized by statute on the bases that the agency has not repealed two existing regulations or that the agency has not offset the cost of the proposed rule is inherently arbitrary and capricious.

154.   In issuing and enforcing the Guidance, the OMB has acted in a manner that is arbitrary, capricious, otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, and/or short of statutory right, in violation of the APA. 5 U.S.C. § 706.

155.   Agency Defendants have implemented and continue to implement the Order. In taking action to comply with the Order, the Agency Defendants have acted in a manner that is arbitrary, capricious, otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, and/or short of statutory right, in violation of the APA. 5 U.S.C. § 706.

156.   Plaintiff States are irreparably harmed by Agency Defendants violations of the APA insofar as the Order causes the delay or abandonment of federal regulations that would otherwise safeguard the health and well-being of Plaintiff States' citizens, natural resources, infrastructure, institutions, and economies, among other things.

157.   By declaring the Guidance unlawful and setting it aside, this Court can redress this injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully request that this Court:

1.     Issue a declaratory judgment that the Order and the Guidance are unlawful on their face;

2.      Issue a declaratory judgment that Defendants exceeded their authority in issuing the

Order and the Guidance;

3.      Issue a mandatory injunction compelling Defendants President Trump and OMB to

set aside the Order and the Guidance;

4.      Issue a mandatory injunction enjoining federal agencies from taking action to

comply with the Order and the Guidance;

5.      Award Plaintiff States their costs, expenses, and reasonable attorneys' fees; and

6.      Award such other relief as the Court deems just and proper.


Dated:  April 4, 2019                           Respectfully submitted,

                                                XAVIER BECERRA
                                                Attorney General of California
                                                 DAVID ZONANA
                                                Supervising Deputy Attorney General
                                                ELIZABETH B. RUMSEY
                                                ROBERT SWANSON
                                                Deputy Attorneys General

                                                 /s/ Megan K. Hey
                                                Deputy Attorney General
                                                California Department of Justice
                                                300 S. Spring Street
                                                Los Angeles, CA 90013
                                                (213) 269-6000
                                                Megan.Hey@doj.ca.gov
                                                *Attorneys for the State of California*

*Additional counsel listed on following page*

ELLEN F. ROSENBLUM
Attorney General of Oregon
PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street, N.E.
Salem, Oregon 97301-4096
(503) 947-4342
paul.garrahan@doj.state.or.us
*Attorneys for the State of Oregon*


KEITH ELLISON
Attorney General
State of Minnesota
MAX KIELEY
CHRISTINA BROWN
Assistant Attorneys General
445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101-2127
(651) 757-1244
max.kieley@ag.state.mn.us
*Attorneys for the State of Minnesota*