# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, *et al.*,

                              Plaintiffs,

v.                                                            Civil Action No. 1:19-cv-00960-RDM

DONALD J. TRUMP, President of the United
States, *et al.*,

                              Defendants.

---

## DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON STANDING

Defendants move to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the ground that Plaintiffs lack standing to bring this action. The basis for this motion is set forth in the attached Memorandum of Points and Authorities; the declarations of David Nemtzow, Colleen Rathgeb, James Tichenor, Penny Lassiter, Deborah Aiken, Thomas Everett, and Christopher M. Lynch; Plaintiffs' Complaint; and the proposed order accompanying this motion.

In the alternative, Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the ground that there is no genuine issue of disputed material fact that Plaintiffs lack standing and that Defendants are therefore entitled to judgment as a matter of law.

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................................. 1

**BACKGROUND** ................................................................................................................ 2

I.    Factual Background ................................................................................................ 2

II.   Procedural Background............................................................................................ 5

**STANDARD OF REVIEW** ............................................................................................... 6

**ARGUMENT** ....................................................................................................................... 7

I.    Plaintiffs Cannot Demonstrate Standing Based on Their Allegations About Non-Environmental Harms ................................................................................................ 8

      A.   Plaintiffs' Allegations of Harms from the Expenditure of Resources to Review Regulations or in Their *Parens Patriae* Capacity Fail to Establish an Injury in Fact ................................................................................ 9

           i.    Conclusory Allegations About the Expenditure of Resources Fail to Establish an Injury in Fact ................................................... 9

           ii.   Plaintiffs Lack Standing to Sue on Behalf of their Citizens as *Parens Patriae* ..................................................................... 10

      B.   Plaintiffs Cannot Establish that Any Injury Purportedly Caused by HHS' Proposed Elimination of Head Start's Service Duration Requirements Is Traceable to Executive Order 13,771 or Redressable by this Court.................... 13

      C.   Plaintiffs Cannot Establish that Any Injury Purportedly Caused by DOT's Actions Relating to the V2V Rulemaking Is Traceable to Executive Order 13,771 or Redressable by this Court ................................................ 16

II.   Plaintiffs Cannot Demonstrate Standing Based on Their Allegations About Environmental Harms ............................................................................................. 18

      A.   Plaintiffs Cannot Establish Standing through EPA's Reconsideration of Emissions Guidelines and Performance Standards for Solid Waste Landfills ................................................................................................ 18

           i.    Plaintiffs Have Failed to Allege a Cognizable Injury in Fact ............. 18

           ii.   Executive Order 13,771 Did Not Cause EPA's Reconsideration of Emissions Guidelines and Performance Standards for Solid Waste Landfills ............................................................................ 20

      iii.     Enjoining Executive Order 13,771 Will Not Redress Any Putative Injury Related to EPA's Reconsideration of Emissions Guidelines and Performance Standards for Solid Waste Landfills ................................................ 21

B.    Plaintiffs Cannot Establish Standing from the Federal Highway Administration's Repeal of its Greenhouse Gas Performance Measure ........................................ 21

      i.      Plaintiffs Have Failed to Allege a Cognizable Injury in Fact .............................. 21

      ii.     Executive Order 13,771 Did Not Cause the Federal Highway Administration to Repeal Its Greenhouse Gas Performance Measure .................. 23

      iii.     Enjoining Executive Order 13,771 Will Not Reinstate the Greenhouse Gas Performance Measure .................................................................................... 23

C.    Plaintiffs Do Not Have Standing Because of the Delay or Suspension of the BLM's Waste Prevention Rule ........................................................................... 24

      i.      Plaintiffs Have Failed to Allege a Cognizable Injury in Fact .............................. 24

      ii.     Executive Order 13,771 Did Not Cause the Delay or Suspension of the BLM's Waste Prevention Rule ..................................................................... 25

      iii.     Invalidating Executive Order 13,771 Will Not Result in Reinstatement of the Waste Prevention Rule ................................................................................... 26

D.    Plaintiffs do not Have Standing with Respect to DOE's Energy Efficiency Standards for Residential Cooking Products .................................................... 27

      i.      Plaintiffs Have Failed to Allege a Cognizable Injury in Fact .............................. 27

      ii.     Executive Order 13,771 Did Not Cause the Alleged Delay in Promulgation of the DOE's Energy Efficiency Standards for Residential Cooking Products .................................................................................................. 29

      iii.     Plaintiffs Cannot Establish Redressability ........................................................... 31

**CONCLUSION** ........................................................................................................... **31**

# TABLE OF AUTHORITIES

## CASES

*Advanced Mgmt. Tech., Inc. v. F.A.A.*,
  211 F.3d 6336 (D.C. Cir. 2000) ............................................................................. 27

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,
  458 U.S. 5922 (1982) .............................................................................................. 11

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 2420 (1986) ................................................................................................ 7

*Arabaitzis v. Unum Life Ins. Co. of Am.*,
  Civ. A. No. 16-1273 TNM/DAR, 2018 WL 46108934 (D.D.C. Sept. 11, 2018)...................... 7

*California v. Bureau of Land Mgmt.*,
  286 F. Supp. 3d 1054, (N.D. Cal. 2018) ........................................................... 24, 25

*Carbon Sequestration Council v. E.P.A.*,
  787 F.3d 11291 (D.C. Cir. 2015) ........................................................................... 27

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 3323 (2006) ................................................................................................ 6

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
  28 F.3d 12686 (D.C. Cir. 1994) ........................................................................ 8, 10

*Feldman v. FDIC*,
  879 F.3d 3471 (D.C. Cir. 2018) ............................................................................... 6

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 6580 (D.C. Cir. 1996) ......................................................................... 19, 22

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 9059 (D.C. Cir. 2015) ............................................................................. 10

*Forrester v. U.S. Parole Comm'n*,
  310 F. Supp. 2d 1627 (D.D.C. 2004) ....................................................................... 6

*\*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 1730 (D.C. Cir. 2019) ..................................................................... 1, 8, 11

*Huron v. Cobert*,
  809 F.3d 12749 (D.C. Cir. 2016) ............................................................................. 7

*Lujan v. Defenders of Wildlife*,
  504 U.S. 5551 (1992) ............................................................................................ 6, 7

*Massachusetts v. Mellon*,
  262 U.S. 4476 (1923)................................................................................ 11

*Microwave Acquisition Corp. v. F.C.C.*,
  145 F.3d 14103 (D.C. Cir. 1998)............................................................... 30

*Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*,
  792 F.2d 11728 (D.C. Cir. 1986)............................................................... 22

*Nat. Res. Def. Council v. Abraham*,
  355 F.3d 1797 (2d Cir. 2004)..................................................................... 27

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
  468 F.3d 8261 (D.C. Cir. 2006)................................................................... 9

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
  366 F.3d 9304 (D.C. Cir. 2004)................................................................. 15

*North Carolina v. EPA*,
  587 F.3d 4226 (D.C. Cir. 2009)................................................................. 18

*Nunnally v. District of Columbia*,
  243 F. Supp. 3d 558 (D.D.C. 2017)............................................................. 7

*Pennsylvania v. Kleppe*,
  533 F.2d 6688 (D.C. Cir. 1976)................................................................. 11

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 10873 (D.C. Cir. 2015)............................................................... 10

*\*Pub. Citizen, Inc. v. Trump*,
  361 F. Supp. 3d 604 (D.D.C. 2019)........................................... 1, 5, 16, 28

*Pub. Citizen, Inc. v. Trump*,
  297 F. Supp. 3d 64 (D.D.C. 2018)............................................................. 12

*Schmidt v. U.S. Capitol Police Bd.*,
  826 F. Supp. 2d 594 (D.D.C. 2011)............................................................. 6

*Siegel v. U.S. Dep't of Treasury*,
  304 F. Supp. 3d 455 (D.D.C. 2018)........................................................... 18

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 185 (D.C. Cir. 2015)..................................................................... 9

*United Transp. Union* v. *Interstate Commerce Comm'n*,
  891 F.2d 9082 (D.C. Cir. 1989)................................................................... 9

*Von Aulock v. Smith,*
   720 F.2d 1760 (D.C. Cir. 1983) ............................................................. 23

*West v. Lynch,*
   845 F.3d 12285 (D.C. Cir. 2017) ................................................. 14, 15, 17

## STATUTES

3 U.S.C. § 301 .................................................................................................. 3

31 U.S.C. § 1101 *et seq.* ................................................................................. 3

31 U.S.C. § 1105 .............................................................................................. 3

42 U.S.C. § 6295 ....................................................................................... 27, 29

42 U.S.C. § 7607 ............................................................................................. 20

## RULES

Fed. R. Civ. P. 56 .............................................................................................. 6

## REGULATIONS

10 C.F.R. part 430, subpart C ........................................................................ 29

Accidental Release Prevention Requirements: Risk Management Programs Under the
   Clean Air Act,
   83 Fed. Reg. 24,850 (May 30, 2018) ......................................................... 20

Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills,
   81 Fed. Reg. 59,276 (Aug. 29, 2016) ........................................................ 18

Energy Conservation Program: Energy Conservation Standards for Residential
   Conventional Cooking Products,
   81 Fed. Reg. 60,784 (Sept. 2, 2016) ......................................................... 17

Energy Conservation Program: Test Procedures for Cooking Products, Notification of
   Petition for Rulemaking,
   83 Fed. Reg. 17,944 (Apr. 25, 2018) ........................................................ 29

Federal Motor Vehicle Safety Standards; V2V Communication,
   82 Fed. Reg. 3854 (Jan. 12, 2017) ............................................................ 16

Head Start Performance Standards,
   81 Fed. Reg. 61,294 (Sept. 6, 2016) ............................................... 13, 14, 15

Head Start Service Duration Requirements,
   84 Fed. Reg. 11,269 (Mar. 26, 2019) ................................................. 14, 15

National Performance Management Measures; Assessing Performance of the National
   Highway System, Freight Movement on the Interstate System, and Congestion
   Mitigation and Air Quality Improvement Program,
   83 Fed. Reg. 24,920 (May 31, 2018) .......................................................................... 21, 22, 23

Notice of Request for Comments: V2X Communications,
   83 Fed. Reg. 66,338 (Dec. 26, 2018) ................................................................................. 16

Secretarial Determination to Lower Head Start Center-Based Service Duration Requirement,
   83 Fed. Reg. 2743 (Jan. 19, 2018) .................................................................................... 15

Standards of Performance for Municipal Solid Waste Landfills,
   81 Fed. Reg. 59,332 (Aug. 29, 2016) ............................................................................ 18, 19

Stay of Standards of Performance for Municipal Solid Waste Landfills and Emission
   Guidelines and Compliance Times for Municipal Solid Waste Landfills,
   82 Fed. Reg. 24,878 (May 31, 2017) ............................................................................ 19, 20

Waste Prevention, Production Subject to Royalties, and Resource Conservation,
   81 Fed. Reg. 83,008 (Nov. 18, 2016) ................................................................................ 24

Waste Prevention, Production Subject to Royalties, and Resource Conservation; Delay
   and Suspension of Certain Requirements,
   82 Fed. Reg. 58,050 (Dec. 8, 2017) ............................................................................ 25, 26

Waste Prevention, Production Subject to Royalties, and Resource Conservation;
   Rescission or Revision of Certain Requirements,
   83 Fed. Reg. 49,184 (Sept. 28, 2018) ............................................................................... 25

*Reducing Regulation and Controlling Regulatory Costs,
   Exec. Order No. 13,7771, 82 Fed. Reg. 9339 (Jan. 30, 2017) .......................................... *passim*

Enforcing the Regulatory Reform Agenda,
   Exec. Order No. 13,777, 82 Fed. Reg. 12,285 (Feb. 24, 2017) ................................................. 4

Promoting Energy Independence and Economic Growth,
   Exec. Order No. 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2018) ....................................... 24, 25

**INTRODUCTION**

The Complaint filed by Plaintiffs in this matter, California, Minnesota, and Oregon, leaves no doubt that they strongly disagree with the policy set forth in Executive Order 13,771. But the strength of Plaintiffs' objection does not establish that they have suffered Article III injury as a result of its operation.  As this Court previously held in a closely related lawsuit, "Plaintiffs still bear the burden of demonstrating that they or their members have been or will likely be injured" by certain regulatory action or inaction prompted by Executive Order 13,771. *Pub. Citizen, Inc. v. Trump ("Pub. Citizen II")*, 361 F. Supp. 3d 60, 64 (D.D.C. 2019).  Plaintiffs have failed to satisfy this burden.

Plaintiffs identify three general types of harms they allege to have suffered as a result of the Executive Order: (1) injury to the general welfare of their citizens and increased costs on the states as a result, (2) injury from the costs of tracking federal rulemakings and filing lawsuits, and (3) environmental injury in their sovereign capacities.  As an initial matter, they have failed to demonstrate an injury in fact on the basis of these allegations.  Plaintiff States cannot assert an injury in their *parens patriae* capacities against the federal government, *see Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–80 (D.C. Cir. 2019), and their purported harm from filing lawsuits is entirely a choice of their own making that would no doubt have existed in the absence of the Executive Order.  And the States have failed to sufficiently allege that each of the rulemakings identified in the Complaint would actually result in the purported harms, either to their public fiscs or their sovereign territory, about which they complain.

However, even if Plaintiffs had alleged a cognizable injury in fact, such alleged harm would not be traceable to the Executive Order or redressable by its invalidation.  In an attempt to correct the pleading deficiencies that were identified by this Court in the related *Public Citizen*

1

lawsuit, Plaintiffs identify six separate rulemakings, by five different agencies, that were purportedly affected by the Executive Order in a manner that caused them harm.  But Plaintiffs' allegations on causation, many of which are entirely conclusory in nature, rest entirely on speculation about the potential effects of the Executive Order.  Such allegations should be dismissed on the face of the Complaint.  However, if there were any doubt as to causation, it should be removed by the declarations submitted by the named Defendants in support of this Motion.  Those declarations establish that the rules mentioned by Plaintiffs have not been delayed, withdrawn, amended, repealed, or otherwise altered substantively by the operation of Executive Order 13,771.

Accordingly, as with the related case in *Public Citizen*, Plaintiffs' lawsuit should be dismissed for lack of standing.  After several years and multiple attempts to identify injuries arising out of rules affected by the Executive Order, Plaintiffs here and in *Public Citizen* have failed to base their purported injuries on anything other than speculation about the general effect and purpose of the Order.  Such a basis fails to satisfy the requirements of Article III.

## BACKGROUND

### I.    Factual Background

By now, the Court is well aware of the facts surrounding Executive Order 13,771, from the related litigation in *Public Citizen*.  *See Public Citizen v. Trump*, No. 17-cv-253 (D.D.C), Defs.' Mot. to Dismiss at 1-14, ECF No. 15-1.  Accordingly, Defendants only briefly set forth those facts again in this Memorandum.

The President issued Executive Order No. 13,771, 82 Fed. Reg. 9339 (Jan. 30, 2017) ("Reducing Regulation and Controlling Regulatory Costs") pursuant to his authority under the Constitution and laws of the United States, including the Budget and Accounting Act of 1921, 31

U.S.C. §§ 1101, *et seq.*, 31 U.S.C. § 1105 (Budget contents and submission to Congress) and 3 U.S.C. § 301 (Presidential delegation authority).  Exec. Order No. 13,771, Preamble.  As the Order explains, "[i]t is the policy of the executive branch to be prudent and financially responsible in the expenditure of funds, from both public and private sources." *Id.*, § 1.  The Order seeks to achieve those ends through the "manage[ment of] the costs associated with governmental imposition of private expenditures required to comply with Federal regulations." *Id.*  To manage those costs, the Order requires agencies to identify two prior regulations for elimination or revision for every new regulation issued, and requires agencies prudentially to manage the cost of planned regulations through an annual regulatory allowance.  *Id.*

To encourage a comprehensive review of existing rules, the Order imposes, to the extent permitted by law, several requirements on Executive Branch agencies.  First, whenever an agency proposes or adopts a new regulation, "it shall identify at least two existing regulations to be repealed," unless doing so is "prohibited by law." *Id.*, § 2(a).  Second, any new incremental costs from a new regulation "shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations." *Id.*, § 2(c).  Section 3 of Executive Order 13,771, titled "Annual Regulatory Cost Submissions to the Office of Management and Budget," establishes a regulatory allowance permitting OMB to assign the total amount of incremental regulatory costs that agencies can impose annually.

Beginning with the Regulatory Plans for Fiscal Year 2018, agencies "shall identify, for each regulation that increases incremental cost, the offsetting regulations described in section 2(c) of this order" and "provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation." Exec. Order No. 13,771, § 3(a).  During the annual Presidential budget process, the Director will then "identify to agencies a total

amount of incremental costs that will be allowed for each agency" for issuing new regulations in the next fiscal year. *Id.*, § 3(d).  Agencies will be required to operate within their allotted regulatory allowance "unless required by law or approved in writing by the Director." *Id.*  To promote enforcement of this new budgetary limitation on the issuance of new regulations, no regulation may be issued by an agency unless it was included on the Unified Regulatory Agenda or was approved in advance by the Director, "[u]nless otherwise required by law." *Id.*, § 3(c). The Order also provides that "[a]ny agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law." *Id.*, § 2(c).

Finally, Section 5 of the Order includes a general savings clause providing that nothing in the Order should be "construed to impair or otherwise affect" the authority of an agency or the Director's authority over budgetary, administrative, or legislative proposals. Exec. Order No. 13,771, § 5(a). Section 5 also confirms, in accordance with the plain text of the Order throughout, that the Order "shall be implemented consistent with applicable law and subject to availability of appropriations." *Id.*, § 5(b).  The Order also provides that it does not create any right or benefit enforceable against the United States or its agencies. *Id.*, § 5(c). Executive Order 13,771 is complemented by Executive Order No. 13,777, 82 Fed. Reg. 12,285 (Feb. 24, 2017) ("Enforcing the Regulatory Reform Agenda").  That Order reaffirms that "[i]t is the policy of the United States to alleviate unnecessary regulatory burdens placed on the American people" in carrying out various Executive Orders focused on regulatory cost, including Executive Order 13,771 and Executive Order 12,866.  Exec. Order No. 13,777, § 1.

## II.     Procedural Background

Plaintiffs initially sought to intervene in the related case of *Public Citizen et al. v. Trump et al.*, No. 1:17-cv-00253-RDM, United States District Court for the District of Columbia ("*Public Citizen*").  There, the Court held that "because this Court's jurisdiction remains in doubt . . . the Court must deny the States' motion to intervene as premature."  *Pub. Citizen II*, 361 F. Supp. 3d at 93.

Plaintiffs then filed this action asserting substantially similar claims.  Of particular relevance to this motion, Plaintiffs allege that they have been harmed by six rulemakings or other rule-related actions: (1) the Department of Health and Human Services ("HHS") proposal to return the service duration requirements for Head Start programs to prior requirements; (2) the Environmental Protection Agency's ("EPA") reconsideration of rules governing emissions from solid waste landfills; (3) the alleged delay of enforcement of a former Bureau of Land Management ("BLM") rule to reduce waste from oil and gas production on federal leases; (4) the Federal Highway Administration's ("FHWA") repeal of the greenhouse gas performance measure for the national highway system; (5) the alleged delay of National Highway Traffic Safety Administration ("NHTSA") vehicle-to-vehicle communications rule; and (6) the alleged delay of DOE's energy efficiency standards for residential cooking products. *See* Compl. ¶¶ 83, 84, 88, 100, 108.[1]

Following the filing of Plaintiffs' Complaint, the parties jointly moved to set a briefing schedule in this matter to address Plaintiffs' standing to raise the claims in their Complaint.  ECF

---

[1] Plaintiffs do not allege any injury connected with any action of the Department of Labor.  As a result, Plaintiffs lack standing to bring suit against the Department of Labor and the case should accordingly be dismissed with regard to that Defendant.

No. 12.  Specifically, the parties agreed to a schedule for cross-motions as to whether Plaintiffs had standing to bring the instant suit, which the Court subsequently adopted.

## STANDARD OF REVIEW

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a claim must be dismissed if a district court lacks subject-matter jurisdiction to entertain the claim.  *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 64 (D.D.C. 2011).  Plaintiffs bear the burden of demonstrating jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).

"Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt*, 826 F. Supp. 2d at 65.  And because the Court has "an affirmative obligation . . . to ensure that it is acting within the scope of its jurisdictional authority," the Court may "consider matters outside the pleadings" in addressing Defendants' motion to dismiss under Rule 12(b)(1) without converting it to a motion for summary judgment. *Forrester v. U.S. Parole Comm'n*, 310 F. Supp. 2d 162, 167 (D.D.C. 2004) (citation omitted).  Accordingly, "[w]here a motion to dismiss a complaint present[s] a dispute over the factual basis of the court's subject matter jurisdiction[,] . . . the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (citation omitted).

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  To defeat such a motion, "the

nonmoving party must do more than present a mere scintilla of evidence." Rather, "'the adverse party must set forth specific facts showing that there is a genuine issue for trial.'" *Arabaitzis v. Unum Life Ins. Co. of Am.,* Civ. A. No. 16-1273 TNM/DAR, 2018 WL 4610893, at *4 (D.D.C. Sept. 11, 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).  "[A] plaintiff's mere speculations are insufficient to create a genuine issue of fact." *Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 68 (D.D.C. 2017).

## ARGUMENT

Plaintiff States California, Oregon and Minnesota ("Plaintiffs") assert essentially the same claims as the plaintiffs in *Public Citizen*, based on similar types of speculative allegations in the Complaint about certain rulemakings that purportedly cause them harm.  And just like the *Public Citizen* plaintiffs, Plaintiffs here have failed to meet their burden of establishing that they have standing to challenge Executive Order 13,771.

To establish standing, Plaintiffs must demonstrate: they suffered an "injury-in-fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party"; and it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Huron v. Cobert*, 809 F.3d 1274, 1278-79 (D.C. Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61).

Plaintiffs appear to set forth three bases for their standing in this action: (1) a diversion of Plaintiffs' resources to monitoring federal rulemaking and engaging in litigation against the federal government, among other things, (2) *parens patriae* standing, including economic harms incurred as result of purported harms to their citizens, and (3) environmental harm to their sovereign territory.  Compl. ¶ 13.  As an initial matter, Plaintiffs' first two allegations of standing

fail to state an injury in fact as a matter of law in this Circuit.  Specifically, a plaintiff's self-imposed diversion of resources to litigation and other related activities does not constitute an injury in fact, *see Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994), and there is equally longstanding precedent that prohibits states from suing the federal Government in a *parens patriae* capacity.  *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–80 (D.C. Cir. 2019).  However, even if such allegations could constitute injury in fact, Plaintiffs cannot establish that such injuries are traceable to the Executive Order or redressable by its invalidation.

Although this Circuit has recognized environmental harms to a state as a potential injury in fact, Plaintiff States must still properly allege such harms and establish that such an injury would be causally related to the operation of the Executive Order.  There again Plaintiffs fail to demonstrate that they are suffering a non-speculative, cognizable injury that is traceable to the Executive Order and redressable by injunctive relief.  None of the rules that Plaintiffs point to as the basis for their purported harms have been postponed or withdrawn as an effect of Executive Order 13,771.

## I.      Plaintiffs Cannot Demonstrate Standing Based on Their Allegations About Non-Environmental Harms

Plaintiffs raise several allegations of injury in their Complaint that do not touch on the environment but instead focus on purported economic or safety harms to the State or its citizens. As an initial matter, these allegations fail to establish a cognizable injury as a matter of law. Accordingly, these bases for standing should be dismissed on that ground alone.  However, if there were any question about the adequacy of these allegations, they would still fail to

demonstrate that the purported harms are in any way connected to the operation of the Executive Order.

### A. Plaintiffs' Allegations of Harms from the Expenditure of Resources to Review Regulations or in Their *Parens Patriae* Capacity Fail to Establish an Injury in Fact

#### i. Conclusory Allegations About the Expenditure of Resources Fail to Establish an Injury in Fact

Plaintiffs raise vague allegations in their Complaint that the mere "existence of []… [Executive] Order [13,771] calls into question the lawfulness of agencies' decisions to repeal regulations as well as their inaction on any new regulation," which purportedly requires them to expend resources reviewing regulations, considering whether to develop their own regulations, litigating agency actions, and compensating for the lost benefits resulting from the repeal or foregoing of regulation.  Compl. ¶ 113; *see id.* ¶¶ 114-116.  These conclusory allegations should be rejected.  *See Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015) (where an allegation is "wholly speculative," a court "need not accept [Plaintiff's] assertion"); *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("Our authority to reject as speculative allegations of future injuries is well-established.").

Even if Plaintiffs had alleged with specificity the connection between these harms and the Executive Order, however, the alleged injuries are not cognizable under Article III because they are entirely self-inflicted. *See, e.g., Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III."). To be sure, "[t]he diversion of resources to [regulatory review, promulgation, and litigation] might well harm [Plaintiffs'] other programs, for money spent on [these activities] is money that is not spent on other things. But this particular harm is self-

9

inflicted; it results not from any actions taken by [Defendants], but rather from [Plaintiffs'] own budgetary choices. Indeed, it is not really a harm at all." *Fair Emp't Council of Greater Wash.* 28 F.3d at 1276. Plaintiffs may certainly be interested in the operation or effect of the Executive Order, and they may decide to review particular regulations as a result, but the Executive Order commands no such action of them. As state leaders, Plaintiffs presumably have always reviewed federal action or inaction to decide their response, and the mere fact that they continue to do so after the Executive Order cannot establish Article III injury.

If it were otherwise, then any organization could establish standing simply by considering or filing a lawsuit, which would entirely defeat the limitations on organizational standing. That is, for good reason, not the law of this Circuit. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("[A]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing.") (quotation omitted).

### ii.      Plaintiffs Lack Standing to Sue on Behalf of their Citizens as *Parens Patriae*

Plaintiffs next allege standing as *parens patriae* based on the purported injury to their citizens from the Executive Order, Compl. ¶ 13, which appears to be at least in part the basis for standing with respect to the cited V2V and Head Start rulemakings. *Id*. ¶ 103 (alleging that a V2V final rule would provide "benefits to Plaintiff States and their citizens"); *id*. ¶ 112 (alleging

that a cited Head Start rulemakings "undermines" the goals of improving outcomes for children in "low-income families").

As a general matter, states in certain circumstances may assert standing based on one or more "'quasi-sovereign' interest[s]" in the general "well-being of its populace." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 602 (1982). However, the D.C. Circuit has hewed to "longstanding precedent that a State in general lacks *parens patriae* standing to sue the federal government." *Bernhardt*, 923 F.3d at 183. This precedent is founded on the repeated holdings of the Supreme Court, which recognized that because the federal government represents citizens as *parens patriae*, states therefore "do[] not have standing as *parens patriae* to bring an action against the Federal Government." *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 610 n. 16; *see also Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("[I]t is no part of [states'] duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae[.]"); *Pennsylvania v. Kleppe*, 533 F.2d 668, 678 (D.C. Cir. 1976) (noting in the case law "an extreme reluctance to recognize state parens patriae standing against a federal defendant").

Plaintiffs cite no exception to this well-established rule, such as a relevant statute which authorizes a state to sue the federal government in its *parens patriae* capacity, and there is therefore no reason to allow Plaintiffs to ignore that doctrine here. And Plaintiffs provide little in their Complaint to support any claim of direct economic harm to themselves as states. Indeed, it is difficult to read the States' claim of harm from the operation of the Head Start rulemaking, i.e. the need "to improve child outcomes and promote greater success" through early education, as anything other than a purported injury to their citizens rather than the state (which, in any

event, would be self-inflicted).  Compl. ¶ 112.  But it is also entirely conclusory, as it does not

provide any concrete indication that the States are in fact planning to spend money to address

that purported injury, as well as speculative, in that it predicts the effects of a rule that is not even

in effect yet (and may never be).

The same conclusory and speculative allegations infect Plaintiffs' description of their

purported harms from the V2V rulemaking.  There Plaintiffs state in a conclusory fashion that

they "will incur costs associated with the additional demand on their health care and emergency-

response systems, among other harms," from the purported increased number of accidents that

would occur in the absence of the V2V rule.  Compl. ¶ 107.  In so doing, however, Plaintiffs

incorporate the very infirmities that required this Court to dismiss plaintiffs' Complaint in *Public

Citizen*.  Just as in *Public Citizen I*, Plaintiffs here say nothing about when a V2V rule would

achieve "a 'substantial' decrease in the risk of accidents, how that risk will decline over time,

'how many accidents would be avoided by' finalizing the proposed rule . . . and whether

[plaintiffs] face a 'substantial probability of harm' taking in to account the increased risk posed

by the delay in finalizing the V2V rule." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 34

(D.D.C. 2018) ("*Public Citizen I")*.  As a consequence, Plaintiffs here cannot show a concrete

injury arising out of the V2V rulemaking.

In any event, even if this Court were to credit these conclusory allegations, they would

still fail to satisfy Article III for the same reasons that this Court should dismiss the *Public

Citizen* lawsuit – Plaintiffs cannot establish that their purported injuries are caused by the

Executive Order.

**B.  Plaintiffs Cannot Establish that Any Injury Purportedly Caused by HHS'
Proposed Elimination of Head Start's Service Duration Requirements Is
Traceable to Executive Order 13,771 or Redressable by this Court**

Plaintiffs first contend that they are injured by Executive Order 13,771 because it caused
HHS's proposed removal of certain Head Start requirements, specifically for center-based
programs to provide a certain number of hours of classroom instruction each year.  By way of
background, Head Start provides comprehensive early learning services to children from birth to
age five each year through classes, home visitors, and family child care partners nationwide.  *See*
Head Start Performance Standards, 81 Fed. Reg. 61,294-01 (Sept. 6, 2016).  Head Start is
intended to help children from low-income families enter kindergarten more prepared to succeed
in school and in life.  *See id.*

In 2016, the Department of Health and Human Services updated performance standards
for the program, including so-called "service duration requirements," setting forth a minimum
number of hours and months which Head Start center-based providers and programs must
provide to receive Head Start funding.  Declaration of Colleen Rathgeb ("Rathgeb Decl.") ¶ 9.
In summary, the regulations required center-based Head Start programs to provide 1,020 hours
of classes per year to at least 50 percent of Head Start students by August 2019, and to 100
percent of Head Start Students by August 2021.  *Id.* ¶ 10.

However, as explained in the proposed rule, HHS has proposed to remove certain of these
requirements because Congress failed to fund the Head Start program at a sufficient level to
maintain current enrollment at the extended hours mandated by the 2016 rule.  *Id.* ¶¶ 23-25.  To
be sure, HHS's proposal is *consistent with* the administration's overall deregulatory focus as
reflected in Executive Order 13,771.  *Id.* ¶ 28.  But as Plaintiffs' Complaint effectively
acknowledges, the agency's stated reasons had nothing to do with Executive Order 13,771.  *See*

13

Compl. ¶ 110 (noting that HHS identified the existing requirements as "a provision that could interfere with how local programs determine what works best for their communities," that "impose a high cost on providers," and would "result in fewer children being served in the Head Start program" (quoting 84 Fed. Reg. at 11,269)); *see also* Rathgeb Decl. ¶¶ 24, 29.   In other words, the rule change is based on policy choices soundly within the agency's discretion: how to manage "the tradeoffs associated with providing longer services for some children at the expense of providing no services for other children" and whether local Head Start programs should have increased flexibility in managing their resources to best serve the unique needs of their communities.  84 Fed. Reg. at 11,270; Rathgeb Decl. ¶ 24.  Specifically, HHS determined that $696.6 million in additional funds would have been required to support the extended service requirements, money which has not been appropriated for this purpose.  84 Fed. Reg. at at 11273.  HHS accordingly concluded that, without additional funding, imposing the extended service requirements would result in the loss of approximately 77,522 Head Start slots.  *Id.*  It is unquestionably within the bounds of the Secretary's discretion to reject this trade-off, a determination which was based on the policy reasons set forth in the proposed rule, not Executive Order 13,771.  *See* Rathgeb Decl. ¶¶ 29-30.

    For similar reasons, Plaintiffs cannot demonstrate that enjoining Executive Order 13,771 would likely redress their alleged injuries, even if those injuries were to materialize.  *See West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) ("Redressability examines whether the relief sought . . . will likely alleviate the particularized injury alleged by the plaintiff.").  Colleen Rathgeb explains that while the 2016 regulation set forth certain service duration requirements, it also included a "safety valve" which provided the Secretary with discretion to lower or eliminate those requirements where, as here, the lack of sufficient funding would lead to a significant

decrease in the number of Head Start slots available for low-income families.  *See* Rathgeb Decl.

¶ 29; *see also* 81 Fed. Reg. at 61403.  And on January 18, 2018, the Acting Secretary exercised

his authority to do just that with respect to certain of the requirements, "waiv[ing] the August 1,

2019 Head Start center-based service duration requirements, effectively lowering this

requirement from 50 percent to 0 percent."  Secretarial Determination to Lower Head Start

Center-Based Service Duration Requirement, 83 Fed. Reg. 2743 (Jan. 19, 2018).

Although the proposed rulemaking at issue in Plaintiffs' Complaint relates to a different

set of requirements (the 100% requirements) that are not set to go into effect until August 2021,

the discretion that the rule provides to the Secretary to waive those requirements is the same.  81

Fed. Reg. at 61294; *see also* Rathgeb Decl. ¶ 26.  The Secretary will retain the complete

discretion to lower or eliminate the service duration requirements, regardless of the existence of

Executive Order 13,771.  *Id.*  The fact that the agency has chosen to proceed earlier via

rulemaking, to give the regulated community sufficient time to plan, does not change that fact.

84 Fed. Reg. at 11273.  Accordingly, it is entirely uncertain whether an order of this Court

enjoining the operation of the Executive Order would cause HHS not to move forward with the

rule, or, even if it did, whether the Secretary would still choose to exercise his authority to waive

the requirements in the future.  *But cf.* Rathgeb Decl. ¶ 29 (noting policy justifications leading

HHS to propose rule would support the rollback of the 100% requirement even in the absence of

the Executive Order).  Such uncertainties undermine Plaintiffs' allegations about the Head Start

rulemaking as a sufficient basis for Article III injury.  *Accord West*, 845 F.3d at 1236 (finding no

redressability where plaintiff did not challenge state laws which would remain in force and were

an independent cause of injury); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930,

944 (D.C. Cir. 2004) (finding no redressability where defendants would retain discretion to

implement the same policies) (abrogated on other grounds).

### C.  Plaintiffs Cannot Establish that Any Injury Purportedly Caused by DOT's Actions Relating to the V2V Rulemaking Is Traceable to Executive Order 13,771 or Redressable by this Court

Plaintiffs similarly cannot establish that any delay in the V2V rulemaking is being caused

by Executive Order 13,771.  Indeed, as explained in Defendants' Cross-Motion for Summary

Judgment on Standing in *Public Citizen* (*Public Citizen* ECF. No. 96 at 9-10), conclusive

evidence establishes that Executive Order 13,771 has not been a factor affecting any DOT

decisions about when or whether to issue a Final Rule with respect to the V2V Rulemaking, nor

has it been "a factor affecting any DOT decisions to delay, postpone, or make inactive the V2V

Rulemaking[.]"  Declaration of Christopher Lynch ("Lynch Decl.") Ex. A at 8.  Instead, policy

decisions, such as the type of technology to be mandated in any V2V rule, have been the driving

force for the rulemaking, including its current timing and status.  *Cf. Pub. Citizen II*, 361 F.

Supp. 3d at 65 (noting Plaintiffs' "burden of proving that the Executive Order, as opposed to

separate policy considerations or other factors, has delayed the issuance of [the V2V rule], which

would have otherwise issued, and that the resulting delay has caused them, or their members, to

suffer a redressable injury").

In particular, DOT initially proposed to mandate the use of a specific radio

communications technology—Dedicated Short-Range Communications ("DSRC")—as the

means for vehicle-to-vehicle communication in passenger cars and trucks.  *See* Federal Motor

Vehicle Safety Standards; V2V Communication," 82 Fed. Reg. 3854 (Jan. 12, 2017).  But DOT

subsequently issued a request for comments on multiple issues related to the V2V proposal, in

which the agency recognized that there "has been progress" in certain cellular technologies

which may offer "advantages and disadvantages" over DSRC technology.  *See* Notice of Request

for Comments: V2X Communications, 83 Fed. Reg. 66,338-01 (Dec. 26, 2018).  Accordingly,

the agency requested comments on several issues fundamental to the V2V rulemaking, such as

which type of communication technology should be utilized, whether multiple types of

technology can be "interoperable with one another," and whether certain technologies could be

"leveraged to support . . . automated vehicle applications."  *Id.* at 66,339-40.  DOT is continuing

to review and consider the more than 600 comments received in response to the two above-

referenced publications.  Lynch Decl. Ex. A at 3-4.  In short, the agency "continues to engage in

an evaluation of the substance and merits of the rulemaking," and Plaintiffs cannot meet their

burden to demonstrate that the lack of conclusion of the V2V rulemaking was caused by

Executive Order 13,771.  *Id.* at 16.

Finally, and for similar reasons, Plaintiffs have not established that invalidating the

Executive Order would likely result in the imminent issuance of a final V2V rule.  Plaintiffs

accordingly fail to demonstrate standing for the additional reason that they have failed to show

that their putative injury is redressable by the relief that they seek.  To establish redressability,

Plaintiffs must show that it is likely that invalidating the Executive Order would cause DOT to

stop its ongoing substantive evaluation of the rulemaking and imminently issue a Final Rule, and

that the Final Rule would contain requirements sufficient to remedy their alleged injuries.  *See*

*West v. Lynch*, 845 F.3d at 1235.  Specifically, Plaintiffs must show at the very least that, if the

Executive Order were enjoined, DOT would stop its evaluation of the V2V rulemaking and

decide to issue a final rule in this area.

But Plaintiffs cannot do so.  DOT's ongoing "evaluation, review and consideration [in the

V2V rulemaking] has not been prompted by, or connected with, E.O. 13771."  Lynch Decl. Ex.

A at 4.  Plaintiffs provide no allegations or facts demonstrating how the invalidation of the

Executive Order would likely cause the DOT to cease its evaluation and speedily issue a V2V

rule preferred by Plaintiffs.  "Common sense hardly dictates such a result and, in any event,

[Plaintiffs] fail[] to explain why it is likely to occur."  *West,* 845 F.3d at 1237.   Nor do Plaintiffs

claim that invalidating the Executive Order will likely result in a final V2V rule which mandates

installation of their preferred technology, on their preferred timeline, and which will not be

subject to delay for any other reason.  Where Plaintiffs "ask the court to 'pile conjecture on

conjecture'" to find that their injuries may be redressed, standing is lacking.  *See Siegel v. U.S.*

*Dep't of Treasury*, 304 F. Supp. 3d 45, 55 (D.D.C. 2018) (citation omitted) (Moss, J.).

## II.     Plaintiffs Cannot Demonstrate Standing Based on Their Allegations About Environmental Harms

Plaintiffs' next theory of standing is that certain regulatory action or inaction, purportedly

caused by Executive Order 13,771, will lead to an increase in greenhouse gas emissions or other

alleged environmental harms, which will in turn harm the territory and environment of Plaintiff

States.  To be sure, unlike *parens patriae* standing, environmental injury on the part of states

themselves may in certain cases support standing to sue the federal government.  However,

"notwithstanding any 'special solicitude' to which [states] may be entitled . . . [they] must

demonstrate Article III standing."  *See North Carolina v. EPA*, 587 F.3d 422, 426 (D.C. Cir.

2009).  Plaintiffs have failed to allege sufficient facts to demonstrate such standing here.

### A.     Plaintiffs Cannot Establish Standing through EPA's Reconsideration of Emissions Guidelines and Performance Standards for Solid Waste Landfills

#### i.   Plaintiffs Have Failed to Allege a Cognizable Injury in Fact

Plaintiffs first allege they have been injured by EPA's decisions to stay enforcement of

and reconsider its 2016 Municipal Solid Waste Landfills Emissions Guidelines and Standards of

Performance for Municipal Solid Waste Landfills.  *See* 81 Fed. Reg. 59,276 (Aug. 29, 2016); 81

18

Fed. Reg. 59,332 (Aug. 29, 2016); Compl. ¶ 83.  These regulations were intended to reduce

emissions of landfill gas, including methane.  But, although the EPA is indeed considering

whether to revise these regulations, no proposed alternative rules have even been issued, such

that any potential injury is uncertain.  *See* Declaration of Penny Lassiter ("Lassiter Dec.") ¶ 22.

Moreover, while Plaintiffs allege that enforcement of the rules were previously suspended, in

fact enforcement was stayed for only 90 days in May of 2017, and these rules have remained in

force continuously since the expiration of that stay.  *See* Stay of Standards of Performance for

Municipal Solid Waste Landfills and Emission Guidelines and Compliance Times for Municipal

Solid Waste Landfills, 82 Fed. Reg. 24,878 (May 31, 2017); *see also* Lassiter Decl. ¶ 23.

Accordingly, neither the years-old suspension of enforcement, nor the potential for a revised rule

in the future can support a claim of injury.

Absent a proposed rule, Plaintiffs are numerous, contingent steps away from their

putative harm; for any injury to materialize, EPA must first (at some unknown time in the future)

decide against leaving the current rules in place; second, develop and propose alternative rules

which are less favorable to Plaintiffs' preferred outcomes; and third, finalize and implement

those rules.  "Such a protracted chain of causation fails both because of the uncertainty of several

individual links and because of the number of speculative links that must hold for the chain to

connect the challenged acts to the asserted particularized injury."  *Fla. Audubon Soc'y v.*

*Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).  Plaintiffs cannot establish standing on the basis of

the reconsideration of these rules for this reason alone.

For similar reasons, any claim based on the reconsideration of these rules is unripe, as

there has as yet been no harm to Plaintiffs based on EPA's reconsideration, nor is there any

reason to believe that there will be at any foreseeable point in the future.

### ii. Executive Order 13,771 Did Not Cause EPA's Reconsideration of Emissions Guidelines and Performance Standards for Solid Waste Landfills

But even if this Court were to assume that Plaintiffs suffered some sort of harm, EPA's alleged actions with respect to this rule do not support Plaintiffs' standing to challenge Executive Order 13,771, because the Order played no role in EPA's decisions to either stay or reconsider the existing rules. *See* Lassiter Decl. ¶¶ 11, 15, 23. Rather, these decisions were prompted by the receipt of administrative petitions to the EPA seeking reconsideration of various aspects of the 2016 rules pursuant to section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B). *Id.* ¶¶ 15, 23. Under this section, if the relevant criteria are met, the statute states that, "the Administrator shall convene a proceeding for reconsideration of the rule[.]" 42 U.S.C. § 7607(d)(7)(B); *see also id.* ("If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment . . . and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule[.]"). This provision also authorizes the Administrator to stay a rule's effectiveness for up to three months. *Id.* "In a letter dated May 5, 2017, based on the criteria in CAA section 307(d)(7)(B), the Administrator convened a proceeding for reconsideration" and subsequently issued a 90 day stay for the two rules pending reconsideration. 82 Fed. Reg. at 24,878. In other words, the complained-of regulatory action was not the result of Executive Order 13,771, but rather of the Administrator's action following receipt of petitions challenging the rule, pursuant to the Clean Air Act.[2]

---

[2] Plaintiffs' Complaint also references an additional EPA rule, Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, 83 Fed. Reg. 24,850-01

### iii.   Enjoining Executive Order 13,771 Will Not Redress Any Putative Injury Related to EPA's Reconsideration of Emissions Guidelines and Performance Standards for Solid Waste Landfills

Likewise, Plaintiffs' putative injury is not redressable by an order of this Court enjoining Executive Order 13,771.  Because there is no injury there is nothing to redress: regardless of the status of the Executive Order, EPA would be free to continue reconsidering the rules and ultimately make some as-yet-undetermined substantive decision based on the merits, as it deems appropriate.  And because the Executive Order did not cause the reconsideration in the first place, there is no reason to believe that enjoining the Executive Order would have any impact on the outcome of that reconsideration.  Finally, enjoining the Executive Order would not remove any of the potential barriers to the existing rules remaining in effect should EPA ultimately decide to change the rules in a way that Plaintiffs dislike.

### B.   Plaintiffs Cannot Establish Standing from the Federal Highway Administration's Repeal of its Greenhouse Gas Performance Measure

### i.   Plaintiffs Have Failed to Allege a Cognizable Injury in Fact

Plaintiffs next allege injury from the Federal Highway Administration's repeal of the Greenhouse Gas Performance Measure, which was issued as a part of a January 2017 rule, and which required state departments of transportation and others to measure the overall change in certain emission levels.  Compl. ¶ 84; *see* National Performance Management Measures;

---

(May 30, 2018) (proposed rule).  *See* Compl. ¶ 66.  But Plaintiffs set forth no allegation that anything related to this rule caused them harm and so this rule cannot support Plaintiffs' standing.  *See id.*  In any event, Plaintiffs' lone allegation about the rule is incorrect as a matter of fact; the rule is not one "that w[as] proposed… during the Obama Administration [that has] not been finalized under the Trump Administration," *id.*  Although a new rule has been proposed during the current administration, *see* 83 Fed. Reg. at 24850-01, a final rule has not yet been issued and the rule promulgated during the prior administration remains in effect.  Accordingly, even if Plaintiffs had alleged some form of harm arising from the May 2018 proposal, no such injury would have materialized and any contention based on amendment of the rule would not yet be ripe for the same reasons as the rules discussed *supra* Part II.A.i.

Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24,920 (May 31, 2018).  Although Plaintiffs speculate that the rule would have "result[ed] in reduced national GHG emissions," Compl. ¶ 85, that assumption is pure conjecture.  As the agency explained in repealing the measure, "it is important to recognize that the measure itself did not require reductions in $CO_2$ emissions and would not have produced predictable climate change effects.  The measure did not require State DOTs . . . to adopt targets that reflect declining emissions levels."  83 Fed. Reg. at 24,925.  Instead, the measure produced only data that the agency concluded is available elsewhere; it did not in and of itself mandate reduction of emissions.

Plaintiffs do not allege harm from the lack of data that would have been collected had the measure remained in effect; they instead allege harm from "GHG emissions" themselves, including "increased heat deaths and illnesses," "more frequent flooding," "deaths [and] property damage," and "widespread loss of species and biodiversity." Compl. ¶ 76; *see id.* ¶¶ 74-81. These harms simply cannot be laid at the feet of a data collection measure that would not have any direct effect on emissions and/or climate change, even if the data were not redundant to other available data.  *See, e.g.*, *Fla. Audubon Soc'y*, 94 F.3d at 670; *Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("[T]he presence of an independent variable between . . . the harm and the conduct makes causation sufficiently tenuous that standing should be denied.").  The only certain effect of the repeal of the measure, in fact, is that it will benefit Plaintiffs, as they will no longer be required to take action

and incur costs, as previously mandated.  *See* 83 Fed. Reg. at 24,920 ("This repeal will alleviate a burden on State DOTs … that imposed costs with no predictable level of benefits.").[3]

### ii. Executive Order 13,771 Did Not Cause the Federal Highway Administration to Repeal Its Greenhouse Gas Performance Measure

DOT concluded that it should repeal the measure "based on the combined effects of three primary factors," i.e. (1) its conclusion that the statutory authorities should not be interpreted to authorize the measure; (2) its conclusion that the cost of the measure was not justified "when considered in relation to the lack of demonstrated benefits"; and (3) its conclusion that the measure "is unnecessary," because "there are other existing methods for producing nearly the same information as would result from the implementation of the GHG measure."  *Id.* at 24,922, 24,925; *see also* Declaration of Thomas Everett ("Everett Decl.") ¶ 6.  It is for these reasons that the GHG measure was repealed, not Executive Order 13,771.  Everett Decl. ¶ 8 ("EO 13771 did not cause FHWA to repeal the GHG Performance Measure.")  The repeal of the GHG measure thus does not afford Plaintiffs standing to challenge that Executive Order.

### iii. Enjoining Executive Order 13,771 Will Not Reinstate the Greenhouse Gas Performance Measure

Even if Executive Order 13,771 had been a cause for the repeal of the Greenhouse Gas Performance Measure (which it was not), the agency's stated policy justifications provide an independent basis, other than the Executive Order, that precludes redress of Plaintiffs' injuries. Even if the Executive Order were enjoined, in other words, the Plaintiffs' preferred action would still, in the agency's view (1) not be supported by the agency's interpretation of the relevant statutory authorities; (2) impose unnecessary regulatory burdens with no predictable benefits; and (3) produce nearly identical information to that already available from other sources.  As

---

[3] Should Plaintiffs wish to continue monitoring emissions within their territory, the repeal of this measure does not prevent them from doing so.

such, the repeal of the measure, which the agency adopted on the merits, would remain in place

for any if not all of these reasons.  Everett Decl. ¶¶ 8-9; *see Von Aulock v. Smith*, 720 F.2d 176,

180 (D.C. Cir. 1983) (explaining that "the existence of one absolute barrier [is] sufficient injury

only if its removal would mean that all other barriers to the ultimately sought relief were likely to

fall").  Thus, DOT would not reissue the rule regardless of the status of Executive Order 13,771

until it separately reconsiders these policy issues.  Everett Decl. ¶ 9.

### C.   Plaintiffs Do Not Have Standing Because of the Delay or Suspension of the BLM's Waste Prevention Rule

#### i.   Plaintiffs Have Failed to Allege a Cognizable Injury in Fact

In a single half-paragraph of their Complaint, Plaintiffs also allege injury from the delay

or suspension of a BLM rule promulgated with the intent to reduce waste of natural gas from

certain oil and gas production activities (the "2016 Waste Prevention Rule").  *See* Compl. ¶ 83;

81 Fed. Reg. 83,008.  As an initial matter, Plaintiffs' allegation regarding this rule is so cursory

that the contours of Plaintiffs' claim with respect to this rule are not entirely clear.  Plaintiffs'

allegation appears to be that they were harmed by the "attempt[] to delay or suspend" this

regulation.  Compl. ¶ 83.

But Plaintiffs fail to set forth any allegations of injury related to the attempted

suspension.  The 2016 rule that Plaintiffs support was immediately challenged by industry

groups and states in the District of Wyoming, and shortly thereafter the President issued

Executive Order 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2018), specifically directing review of

this regulation.  Decl. of James Tichenor ¶¶ 5, 7.  Accordingly, BLM found it appropriate to

publish for notice and comment a proposed rule delaying and suspending certain provisions of

the 2016 Waste Prevention Rule (the "Suspension Rule") pending BLM's review.  *Id.* ¶¶ 11-13.

This suspension was in effect less than two months—from January 8, 2018 to February 22,

2018—when the suspension rule was then enjoined by court order.  *See California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, (N.D. Cal. 2018).  Plaintiffs cannot plausibly allege that this six-week suspension causes the severe environmental harms that they allege in their Complaint. *See* Compl. ¶¶ 72-82.

> ii. **Executive Order 13,771 Did Not Cause the Delay or Suspension of the BLM's Waste Prevention Rule**

Even assuming Plaintiffs set forth a clear theory of injury, they do not attempt to link Executive Order 13,771 to this regulation, nor can they.  To be sure, the Secretary of the Interior has reviewed, suspended, and revised this rule pursuant to *an* Executive Order.  But not Executive Order 13,771.  Rather, Executive Order 13,783 specifically directed the Secretary to consider this rule and decide whether, "if appropriate, … as soon as practicable, suspend, revise, or rescind the guidance, or publish for notice and comment proposed rules suspending, revising, or rescinding" it.  Exec. Order No. 13,783, § 7(b)(iv).  Pursuant to Executive Order 13,783, the Secretary of the Interior sought to do just that, by (1) drafting a proposed revision of the rule and substantially revising others, *see* 83 Fed. Reg. at 7924 and (2) developing a rule to delay the compliance date of the provisions of the Waste Prevention Rule that had not yet become effective, and suspend for one year the effectiveness of provisions already in effect, *see* 82 Fed. Reg. at 58,050.

Although Plaintiffs may disagree with the results of the Secretary's review,[4] this process is not traceable to Executive Order 13,771.  As the agency explained in its final rule, it decided to revise the 2016 Waste Prevention Rule after a review directed by Executive Order 13,783, based on the findings that (1) "certain impacts [of the 2016 Waste Prevention Rule] were

---

[4] Indeed, plaintiff California sought, and obtained, an order preliminarily enjoining the rule intended to delay and suspend provisions of the Waste Prevention Rule.  *See California v. Bureau of Land Mgmt.*, 286 F.Supp.3d 1054 (N.D. Cal. 2018).

underestimated and many provisions of the rule would have added regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation"; (2) the rule's approach to reduction of certain emissions "departed from the historic approach of considering 'waste' in the context of a reasonable and prudent operator standard"; (3) the rule "would have imposed costs exceeding its benefits;" and (4) the rule "contains numerous administrative and reporting requirements that would have imposed unnecessary burdens on operators and the BLM."  Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements, 83 Fed. Reg. 49,184 (Sept. 28, 2018); *see* Waste Prevention, Production Subject to Royalties, and Resource Conservation; Delay and Suspension of Certain Requirements, 82 Fed. Reg. 58,050, 58,051 (Dec. 8, 2017)  ("[T]he BLM is currently reviewing the 2016 final rule to develop an appropriate proposed revision—to be promulgated through notice-and-comment rulemaking—that would propose to align the 2016 final rule with the policies set forth in section 1 of Executive Order 13,783. . . .  As noted above, the BLM has concerns regarding the statutory authority, cost, complexity, feasibility, and other implications of the 2016 final rule, and therefore wants to avoid imposing temporary or permanent compliance costs on operators for requirements that might be rescinded or significantly revised in the near future.").  Because Executive Order 13,771 played no role in any decisions to review, delay, suspend, or revise the 2016 Waste Prevention Rule, regulatory actions related to that rule cannot provide Plaintiffs with standing to challenge the Executive Order.

### iii.  Invalidating Executive Order 13,771 Will Not Result in Reinstatement of the Waste Prevention Rule

For similar reasons, Plaintiffs' purported injuries related to this rulemaking would not be redressed by enjoining Executive Order 13,771: both the President and the agency have

expressed doubt about the 2016 rule, and the agency has already withdrawn and replaced certain provisions of it.  *See* Tichenor Decl. ¶¶ 7, 17-19.  Moreover, two courts—the United States District Court for the District of Wyoming and the United States District Court for the Northern District of California—are overseeing litigation with respect to the substance of the 2016 Waste Prevention Rule and its 2018 revision, and the outcome of that litigation is likely to determine the status of this rule, regardless of Executive Order 13,771.  *See Western Energy Alliance et al. v. Secretary of Interior et al.*, No. 2:16-cv-280, United States District Court for the District of Wyoming; *State of Wyoming et al. v. United States Department of Interior et al.*, No. 2:16-cv-285, United States District Court for the District of Wyoming; *State of California et al. v. Zinke et al.*, No. 4:18-cv-05712-YGR, United States District Court for the Northern District of California.

### D.   Plaintiffs Do Not Have Standing with Respect to DOE's Energy Efficiency Standards for Residential Cooking Products

#### i.   Plaintiffs Have Failed to Allege a Cognizable Injury in Fact

Finally, Plaintiffs allege injury arising out of a purported delay in DOE's promulgation of energy efficiency standards for residential cooking products.  *See generally* Energy Conservation Program: Energy Conservation Standards for Residential Conventional Cooking Products, 81 Fed. Reg. 60,784 (Sept. 2, 2016).  Plaintiffs fail to establish that the alleged delay in issuing a final cooking products rulemaking is harmful to them in some way.

Notably, Plaintiffs' allegations on this issue include misstatements of fact and inaccurate conclusions of law related to the proposed rule, two examples of which Defendants note here. First, Plaintiffs allege that the notice of proposed rulemaking estimated that the proposed cooking products efficiency rule would reduce greenhouse gas emissions by 125 million metric tons per year, Compl. ¶ 92, when the table cited by Plaintiffs in fact estimates that the cumulative

GHG reductions that would result from the proposed rule would be approximately 46 million metric tons *over a 30-year period*.  Plaintiffs do not allege injury where the estimated amount of reduced emissions from the proposed rule is more than 30 times lower than the figures cited in the Complaint, and thus fail to allege a concrete injury-in-fact for purposes of Article III standing.  *Cf. Carbon Sequestration Council v. E.P.A.*, 787 F.3d 1129, 1141 (D.C. Cir. 2015) ("Standing cannot be 'inferred argumentatively,' based on a party's '(mis)characterization' and 'exaggeration of [an agency's] findings.'"  (quoting *Advanced Mgmt. Tech., Inc. v. F.A.A.*, 211 F.3d 633, 636 (D.C. Cir. 2000)) (alterations in original).

Second, Plaintiffs erroneously treat the proposed rule on residential cooking products, with its accompanying analyses, as a final rule.  In particular, Plaintiffs state that the notice of proposed rulemaking "confirmed that the proposed standard met the statutory criteria."  Compl. ¶ 88.  But until DOE prescribes a new or amended energy efficiency standard by issuing a *final* rule in the Federal Register, it does not make a determination that the statutory criteria for adopting an energy efficiency standard are satisfied.  *See* 42 U.S.C. § 6295(o) (DOE may not prescribe new or amended standards unless certain criteria are satisfied); *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 194–97 (2d Cir. 2004) (standards are not "prescribed" until a final standard is published in the Federal Register).  As no final rule has been issued, DOE has not yet conclusively made any such determination, and any numerical estimates in the notice of proposed rulemaking—whether as to energy efficiency, reduction in greenhouse gas emissions, or financial impact—remains subject to change.  Consequently, Plaintiffs' allegations of harm predicated on the estimated effects of a hypothetical final rule, which remains subject to change

until the moment a final rule is published, do not establish that Plaintiffs have a concrete and particularized injury-in-fact as a result of the purported delay.

> ## ii. Executive Order 13,771 Did Not Cause the Alleged Delay in Promulgation of the DOE's Energy Efficiency Standards for Residential Cooking Products

Nor can Plaintiffs show that Executive Order 13,771 is the cause of the alleged delay with respect to the residential cooking products rulemaking.  Indeed, in response to the plaintiffs' contention in *Public Citizen* that the delay in promulgating a final residential cooking products rule conferred standing on those plaintiffs, the Court noted "it is far from clear that either the Executive Order or OMB Guidance is to blame."  *Pub. Citizen II*, 361 F. Supp. 3d at 89.

The Court's observation is well-founded.  As Defendants have demonstrated in their recent motion for Summary Judgment in *Public Citizen*, the alleged delay in promulgating the Residential Cooking Products rule is not attributable to the Executive Order.  As explained by David Nemtzow, "Executive Order 13771 has not been a factor affecting any DOE decisions about when or whether to issue a final rule in the Cooking Products Rulemaking," nor has it "been a factor affecting any DOE decision to delay, postpone, or make inactive the Cooking products rulemaking."  Declaration of David Nemtzow ("Nemtzow Decl.") ¶ 8.  Instead, a final rule has not been issued because DOE is currently considering a petition for rulemaking it received, the outcome of which will affect the substance of any final rulemaking concerning energy efficiency standards for cooking products.

Specifically, currently pending with DOE is a petition by the Association of Home Appliance Manufacturers ("AHAM") to withdraw DOE's existing test procedure for cooking products.  *Id*. ¶¶ 6-8; *see* Energy Conservation Program: Test Procedures for Cooking Products, Notification of Petition for Rulemaking, 83 Fed. Reg. 17,944 (Apr. 25, 2018).  Test procedures are a standardized method for measuring the energy efficiency of a product, and are necessary

for DOE to enforce any performance-based energy efficiency standard (in contrast to a design-based efficiency standard). Test procedures typically are established by their own rulemaking process, and DOE policy is that a test procedure be in place before any Notice of Proposed Rulemaking is published on proposed standards. Nemtzow Decl. ¶¶ 4, 7; 10 CFR p.430, subpt. C, app. A ("Final . . . test procedures will be issued prior to the NOPR on proposed standards."); *see also* 42 U.S.C. § 6295(r) ("Any new or amended energy conservation standard . . . shall include, where applicable, test procedures prescribed in accordance with section 6293 of this title . . . .").

Thus, if DOE were to withdraw the cooking products test procedure as AHAM has petitioned, the establishment by DOE of an amended cooking products energy efficiency standard in the form of a performance standard would not be possible until DOE promulgated a new test procedure. Nemtzow Decl. ¶ 7. At present, DOE intends to propose withdrawing its current test procedure. It has stated that "[b]ased on the review of public comments and data received in response to this petition, DOE proposes to eliminate the test procedure for conventional cooking tops established under the Energy Policy and Conservation Act (EPCA) because it may not accurately represent consumer use for gas cooking tops, may not be repeatable or reproducible for both gas and electric cooking tops, and is overly burdensome to conduct."[5] Regardless of the outcome of this proposal, however, resolution of the AHAM petition—and potentially a rulemaking process establishing a new test procedure—is a necessary, and antecedent, step to conclusion of the Cooking Products Rulemaking. Nemtzow Decl. ¶ 7l. Because Executive Order 13,771 has not been a factor affecting any DOE decisions

---

[5] https://www.reginfo.gov/public/Forward?SearchTarget=Agenda&textfield=1904-AE36.

about when or whether to issue a final energy efficiency standards rule for cooking products, it cannot be the cause of Plaintiffs' purported injuries based on that delay.

### iii.   **Plaintiffs Cannot Establish Redressability**

Further, enjoining the Executive Order would not redress Plaintiffs' purported injuries related to the cooking products rule.  *See Microwave Acquisition Corp. v. F.C.C.*, 145 F.3d 1410, 1413 (D.C. Cir. 1998) (redressability, which "examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff" "overlaps" with traceability as the other side of a "causation coin") (citation omitted).  Even if the Executive Order were enjoined, DOE would still be required to resolve the AHAM petition and, depending on that resolution, potentially undergo a rulemaking process for the test procedure, before it could issue a final rule establishing energy efficiency standards for residential cooking products.  *See* Nemtzow Decl. ¶ 7.

## CONCLUSION

The Court should dismiss this case pursuant to Rule 12(b)(1) because the Plaintiffs have failed to meet their burden of establishing that they have standing.  In the alternative, should the Court determine that it is necessary to convert the instant motion to a motion for summary judgment, the Court should grant the motion on the same basis.  Either way, the Court should grant Defendants' motion and close this case.

DATED:  July 31, 2019                          Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*
Civil Division

JESSIE K. LIU
*United States Attorney*

ERIC R. WOMACK

31

*Assistant Branch Director*
Civil Division, Federal Programs Branch

*/s/ Christopher M. Lynch*
MICHAEL DREZNER (VA Bar No. 83836)
MICHAEL H. BAER (NY Bar No. 5384300)
CHRISTOPHER M. LYNCH
(D.C. Bar No. 1049152)
*Trial Attorneys*

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, DC 20005
Telephone: (202) 353-4537
Facsimile: (202) 616-8470
Email: Christopher.M.Lynch@usdoj.gov

*Counsel for Defendants*