# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:19-cv-00960-RDM |
| DONALD J. TRUMP, President of the United States, *et al.*, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON STANDING AND REPLY IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON STANDING

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.    Plaintiffs Have Abandoned Their Theories of Alleged Harm Based on the Expenditure of Resources to Review Regulations and Standing in Their *Parens Patriae* Capacity ......................................................................................... 2

II.    Plaintiffs Cannot Establish Standing Based on an Erroneous Understanding of Procedural Injury that They Failed to Allege in Their Complaint.......................................................................................................... 3

III.    Plaintiffs Have Not and Cannot Demonstrate Standing Based on the Specific Rules Addressed in Their Motion ............................................................ 8

    A.    Plaintiffs Have Failed to Establish Standing Through the Repeal of the Increased Service Duration Requirements for Head Start Programs ......................................................................................... 10

        1.    Plaintiffs Fail to Contest Defendants' Evidence Establishing the Executive Order Did Not Cause the Head Start Rule Change ......................................................... 10

        2.    Plaintiffs Have Failed to Demonstrate an Injury in Fact Related to the Head Start Rule ...................................... 11

        3.    Plaintiffs Fail to Establish Redressability .................................. 14

    B.    Plaintiffs Have Failed to Establish Standing through DOT's Actions Relating to the V2V Rulemaking ................................................. 14

        1.    Executive Order 13,771 Has Not Caused the Purported Delay of the V2V Rulemaking ........................................... 15

        2.    Plaintiffs Have Failed to Establish an Injury in Fact Relating to the V2V Rulemaking ................................................. 16

        3.    Plaintiffs Fail to Establish Redressability.................................... 17

    C.    Plaintiffs Cannot Establish Standing from the Federal Highway Administration's Repeal of its Greenhouse Gas Performance Measure.................................................................................... 17

1.  Executive Order 13,771 Did Not Cause the Repeal of the Performance Measure Rule ........................................................... 17

2.  Plaintiffs Cannot Demonstrate a Cognizable Injury from the Repeal of the Performance Measure Rule .............................. 19

3.  Plaintiffs Fail to Demonstrate Redressability .............................. 20

D.  Plaintiffs Do Not Have Standing with Respect to DOE's Energy Efficiency Standards for Residential Cooking Products ......................... 21

1.  Executive Order 13,771 Has Not Caused the Purported Delay in the Cooking Products Rulemaking ................................ 21

2.  Plaintiffs Have Failed to Demonstrate an Injury in Fact Related to the Cooking Products Rulemaking ............................ 23

3.  Plaintiffs Fail to Demonstrate Redressability .............................. 23

E.  Plaintiffs Have Abandoned Their Allegations that Any Other Rulemaking Is Affected by the Executive Order ...................................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) .................................................................................................... 7

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
901 F. Supp. 2d 19 (D.D.C. 2012) .......................................................................... 3

*Burnett v. Sharma*,
511 F. Supp. 2d 136 (D.D.C. 2007) ....................................................................... 25

*California ex rel. Lockyer v. USDA*,
459 F. Supp. 2d 874 (N.D. Cal. 2006) ..................................................................... 5

*Defs. of Wildlife v. Perciasepe*,
714 F.3d 1317 (D.C. Cir. 2013) ............................................................................... 5

*Del. Dep't of Nat. Res. & Envtl. Control v. FERC*,
558 F.3d 575 (D.C. Cir. 2009) ................................................................................. 5

*Envtl. Integrity Project v. McCarthy*,
319 F.R.D. 8 (D.D.C. 2016), *aff'd sub nom.*
*Envtl. Integrity Project v. Pruitt*, 709 F. App'x 12 (D.C. Cir. 2017) ....................... 6

*Fares v. Smith*,
249 F. Supp. 3d 115 (D.D.C. 2017),
*aff'd*, 901 F.3d 315 (D.C. Cir. 2018) ....................................................................... 4

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ................................................................................... 5

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019) ............................................................................... 23

*Grocery Mfrs. Ass'n v. EPA*,
693 F.3d 169 (D.C. Cir. 2012) ............................................................................... 13

*Hopkins v. Women's Div. Gen. Bd. Of Glob. Ministries*,
238 F. Supp. 2d 174 (D.D.C. 2002) ......................................................................... 3

*In re Endangered Species Act Section 4 Deadline Litig.–MDL No. 2165*,
704 F.3d 972 (D.C. Cir. 2013) ......................................................................... 3, 4, 7

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)........................................................................ 3, 6, 15, 23

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)............................................................................... 4

*Nat. Res. Def. Council, Inc. v. EPA,*
    822 F.2d 104 (D.C. Cir. 1987) .................................................................. 6

*Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.,*
    786 F.3d 1050 (D.C. Cir. 2015) ................................................................ 7

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
    567 F.3d 659 (D.C. Cir. 2009) ................................................................ 18

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers,*
    170 F. Supp. 3d 6 (D.D.C. 2016) ..................................................... 8, 17, 24

*New Hampshire v. Holder,*
    293 F.R.D. 1 (D.D.C. 2013).................................................................... 7

*Nunnally v. District of Columbia,*
    243 F. Supp. 3d 55 (D.D.C. 2017) .......................................................... 10

*Pub. Citizen, Inc. v. Trump,*
    297 F. Supp. 3d 6 (D.D.C. 2018) ........................................................... 16

*Pub. Citizen, Inc. v. Trump,*
    361 F. Supp. 3d 60 (D.D.C. 2019) ............................................ 11, 16, 18, 22

*Reniger v. Hyundai Motor Am.,*
    122 F. Supp. 3d 888 (N.D. Cal. 2015) ..................................................... 25

*Sai v. Dep't of Homeland Sec.,*
    99 F. Supp. 2d 136 (D.D.C. 2007) .......................................................... 25

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)............................................................................. 6

*United States v. Taylor,*
    339 F.3d 973 (D.C. Cir. 2003)...................................................... 3, 24, 25

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) .................................................................. 8

*Williams v. Donavan*,
    219 F. Supp. 3d 167 (D.D.C. 2016) ....................................................................... 4

**STATUTES**

42 U.S.C. § 7607(b)(1) ......................................................................................................... 4

**RULES**

Fed. R. Civ. P. 56(e) ............................................................................................................ 23

**REGULATIONS**

42 C.F.R. §§ 1302.33, 1302.44 .......................................................................................... 13

45 C.F.R. § 1302.21(c)(3) .............................................................................................. 12, 14

81 Fed. Reg. 60,784 ............................................................................................................ 24

83 Fed. Reg. 24,920 ....................................................................................................... 19, 20

84 Fed. Reg. 11,269 ................................................................................................... 11, 12, 13

**EXECUTIVE MATERIALS**

 Executive Order 13,771 ............................................................................................... *passim*

**INTRODUCTION**

In their Complaint, the Plaintiff States alleged several purported injuries that they believed flow from the operation of Executive Order 13,771. In their Motion for Summary Judgment, however, Plaintiffs have largely shifted away from their original theories, effectively conceding, as they must, that they cannot sue the federal government on behalf of their citizens in a *parens patriae* capacity and that their purported voluntary expenditure of resources to monitor rulemakings is insufficient to establish standing to challenge the Executive Order.

In place of these abandoned allegations from the Complaint, Plaintiffs assert a new, but equally meritless, ground for standing in their Motion for Summary Judgment. Although nowhere alleged in the Complaint, Plaintiffs now assert that they have suffered a "procedural injury" as a result of the Executive Order. According to Plaintiffs, they have standing to sue whenever the government takes an action that they believe is inconsistent with governing statutes. That expansive conception of procedural injury, which has never been adopted by a court, confuses the merits of arbitrary and capricious review with a procedural right granted by statute. Accordingly, even if such an allegation were proper for the first time at summary judgment, Plaintiffs' theory fails as a matter of law.

Plaintiffs' remaining standing arguments are rooted in speculation about various agency actions that they believe may cause them some harm at some unspecified point in the future. However, in moving for summary judgment, Plaintiffs do not dispute the testimony from relevant agency officials establishing that the Executive Order did not cause their claimed injuries. Plaintiffs' failure to establish causation, or indeed any of the necessary elements of Article III injury, necessitates the grant of summary judgment on standing in favor of Defendants.

# ARGUMENT

The parties agree that there is no dispute of material fact that precludes the entry of summary judgment on the issue of standing.  And Plaintiffs' Cross-Motion for Summary Judgment greatly narrows the grounds on which that issue should be resolved.

First, by failing to respond to Defendants' arguments, Plaintiffs effectively concede that several bases of injury asserted in their Complaint—*parens patriae* protection of their citizens and voluntary expenditure of resources to monitor rulemakings—are not cognizable forms of injury that can serve as a basis for their standing.  *See* Defs.' Mot. Dismiss ("Defs.' Mot."). 8-12, ECF No. 14; *see also* Compl. ¶¶ 13, 103, 107, 112-116, ECF No. 1.  Instead, Plaintiffs raise for the first time the novel theory that they are asserting a procedural injury rather than a substantive one.  But even if Plaintiffs had properly alleged this form of injury, they fail to make out the required elements of a procedural injury claim.

Second, Plaintiffs abandon multiple rulemakings as a potential basis for standing, failing to respond to the arguments in Defendants' Motion on injury, causation and redressability.  Plaintiffs instead focus on only four rulemakings: (1) HHS's Head Start Rulemaking; (2) DOT's V2V Rulemaking; (3) DOT's Repeal of the Greenhouse Gas Performance Measure; and (4) DOE's Energy Efficiency Standards for Residential Cooking Products.  However, in addressing these rules, Plaintiffs fail to contest the testimony of agency officials that establish that the rulemakings were not substantively affected by the Executive Order.  In response, Plaintiffs offer only unsupported speculation and conclusory assertions that are insufficient to meet their burden at this stage.

## I.    Plaintiffs Have Abandoned Their Theories of Alleged Harm from the Expenditure of Resources to Review Regulations and Standing in Their *Parens Patriae* Capacity

In their Complaint, Plaintiffs set forth theories of standing based on the protection of citizens in their *parens patriae* capacity and based on their alleged voluntary expenditure of resources to monitor federal regulatory activity.  *See* Compl. ¶¶ 13, 113-116.  Defendants explained in their opening brief how these theories were unavailable as a matter of law or

otherwise inadequately pled.  *See* Defs.' Mot. 9-12.  Plaintiffs fail to respond to any of these

arguments and have therefore conceded that they cannot establish standing based on either

theory.  *See, e.g*, *United States v. Taylor*, 339 F.3d 973, 977 (D.C. Cir. 2003) (explaining that

arguments that are ripe for consideration are waived when not raised in opening brief); *Hopkins*

*v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is

well understood in this Circuit that . . . a court may treat those arguments that the plaintiff failed

to address as conceded.").

## II.     Plaintiffs Cannot Establish Standing Based on an Erroneous Understanding of Procedural Injury That They Failed to Allege in Their Complaint

Perhaps recognizing the deficiencies in their original theories of injury, Plaintiffs attempt

a novel approach: characterizing their injury as procedural rather than substantive in an effort to

find a more relaxed standard for standing.  *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572

n.7 (1992); *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 34 (D.D.C.

2012).[1]  Plaintiffs' belated attempt to invoke this theory fails to save their claims.  Plaintiffs

invoke it too late, fail to establish either of the required elements of a procedural injury claim,

and misstate how the remaining elements of standing would apply if this were a case involving a

purported procedural injury.

As an initial matter, Plaintiffs' new theory comes too late; the failure to allege a

procedural injury in the Complaint precludes Plaintiffs' attempt to do so now.  The only harms

---

[1] The Supreme Court has held that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).  Thus, when an agency takes an action without complying with a procedural requirement, a plaintiff may be able to establish standing without showing that "(1) the agency action would have been different but for the procedural violation, and (2) court-ordered compliance with the procedure would alter the final result."  *In re Endangered Species Act Section 4 Deadline Litigation–MDL No. 2165*, 704 F.3d 972, 977 (D.C. Cir. 2013) (quotation marks and alterations omitted).  The "archetypal" example is that a plaintiff whose concrete interests would be affected by the construction of a federally licensed dam can challenge "the licensing agency's failure to prepare an environmental review statement, even though he cannot establish with any certainty

cited in the Complaint take the form of substantive injuries to Plaintiffs' citizens, Compl. ¶ 103, their finances, *id.* ¶ 98, their environmental interests, *id.* ¶ 41, or other "public health and safety issues," *id.* ¶ 65.[2]  Plaintiffs cannot now attempt to amend their Complaint through their briefs to include a newly-raised claim of procedural injury.  *See Fares v. Smith*, 249 F. Supp. 3d 115, 125 (D.D.C. 2017) ("[I]t is axiomatic that Plaintiffs cannot amend their Complaint via their briefs[.]"); *see also Williams v. Donavan*, 219 F. Supp. 3d 167, 177-78 (D.D.C. 2016) ("Where a plaintiff fails to include allegations in her complaint, she may not amend her complaint via the briefs in opposition to a motion to dismiss.").[3]

        But even if Plaintiffs had alleged a procedural injury in their Complaint, such an allegation would be meritless here.  To demonstrate standing on the basis of a procedural injury, Plaintiffs must: (1) point to a specific statutory procedure that has been or will be violated by the Executive Order, and (2) demonstrate that the violated procedure was designed to protect Plaintiffs' interests.  *See, e.g.*, *In re Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165*, 704 F.3d 972, 977 (D.C. Cir. 2013) (holding that plaintiffs were required to show both a "statutory procedure" that would be violated by a challenged action, and that the procedure "is

---

[2] that the statement will cause the license to be withheld or altered."  *Id.* (quoting *Lujan*, 504 U.S. at 572 n.7).

[2] The word "procedural" in fact appears only once in Plaintiffs' 42-page Complaint, vaguely referencing the "substantive and procedural interests" of Plaintiff states.  Pls' Compl. ¶ 6, ECF No. 1.  And that very paragraph concludes by alleging only substantive injuries: "[The Executive Order] deprives Plaintiff States of the benefits those regulations would have provided, in some instances leaving them exposed to harms they may be unable to adequately address themselves." *Id.*

[3] For this reason, Plaintiffs' reliance on *Massachusetts v. U.S. EPA*, 549 U.S. 497 (2007), is inapposite here.  There, the plaintiff-State's quasi-sovereign interests were considered in the standing analysis only because the Clean Air Act *expressly granted* a "concomitant procedural right" to challenge the EPA's rejection of a petition to exercise its authority to regulate greenhouse gases under the Clean Air Act.  *See Massachusetts*, 549 U.S. at 520 (citing 42 U.S.C. § 7607(b)(1) and explaining that "[g]*iven that procedural right* . . . the Commonwealth is entitled to special solicitude in our standing analysis.") (emphasis added); *see generally* 42 U.S.C. § 7606(b)(1) (providing for the filing of a petition for judicial review of final EPA action under the Clean Air Act).  There is no such "concomitant procedural right" authorizing a judicial challenge to the agency actions at issue in this lawsuit.

designed to protect" the plaintiffs' interests).  These requirements apply regardless of whether litigants are states or private parties.  *See, e.g.*, *Del. Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 578-79 (D.C. Cir. 2009) ("Delaware's difficulty is that an alleged procedural injury does not confer standing unless the procedure affects a concrete substantive interest."); *California ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874, 883–84 (N.D. Cal. 2006) (applying general test of procedural injury to non-profit and state plaintiffs).  Plaintiffs here fail to satisfy either requirement.

First, Plaintiffs fail to point to a specific statutory procedure that has been or will be violated by the Executive Order.  Indeed, Plaintiffs expressly disclaim the existence of any specific procedural mandate.  *See* Pls.' Mot. at 15 ("Here, the States are *harmed not because an agency disregarded a particular procedural mandate* (e.g., a public-comment requirement), but because of the imposition of unlawful procedural requirements on the rulemaking process generally.") (emphasis added).  At most, Plaintiffs contend that the Executive Order could violate "procedural rights embodied in the APA" such as the "right" to "have agencies base rules on factors Congress has directed them to consider and not to rely on factors which Congress has not intended them to consider."  *Id.*  But the D.C. Circuit has squarely rejected this type of argument.  Specifically, plaintiffs may not claim a procedural injury based solely on a purported right to "be subject to such a rulemaking only to the extent the statute commands it or authorizes [the agency] . . . to undertake it."  *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324 (D.C. Cir. 2013).  Where a plaintiff raises such an argument, it must further "identify a statutory procedure that the [challenged action] requires [the agency] to violate."  *Perciasepe*, 714 F.3d at 1324.[4]

---

[4] Plaintiffs assert with respect to the V2V rule and Energy Efficiency Standard that their injury is based on delay. *See, e.g.*, Pls. Mot 21, 31.  This assertion underscores the substantive, rather than procedural, nature of their claim.  Procedural claims require plaintiffs to demonstrate "that the defendant's acts omitted some procedural requirement," and if successful the remedy is to remand to the agency to reconsider the decision with the proper procedural framework. *Fla. Audubon Soc'y*, 94 F.3d at 664–65.  Redressability requirements are relaxed because the substance of the ultimate rule is not at issue; it is the agency's failure to follow the specified procedure.  Here, by contrast, if the agency were to reconsider the rule on remand, it would

Plaintiffs have not done so here.  *Cf. Envtl. Integrity Project v. McCarthy*, 319 F.R.D. 8, 15–16 (D.D.C. 2016) (rejecting claim of procedural injury where "movants have failed to identify a 'statutory procedure'" which the agency would be required to violate) *aff'd sub nom. Envtl. Integrity Project v. Pruitt*, 709 F. App'x 12 (D.C. Cir. 2017).  There is no identified statutory "procedure" that the Executive Order requires agencies to violate.  To the contrary, litigants frequently allege that an agency has erroneously considered certain issues in rulemaking via a substantive arbitrary and capricious claim under the APA.  *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987) ("As elaborated by the case law, an agency rule is arbitrary and capricious if the agency relies upon improper factors . . . .").  But the fact that a court may find agency action to be arbitrary or capricious on the merits does not provide standing on the theory of a "procedural injury."  To hold otherwise would open the floodgates to any litigant suing under the APA to characterize their substantive claims instead as procedural injury.[5]

Second, Plaintiffs also cannot show that the statutory procedure at issue was designed to protect their concrete interest.  *Summers v. Earth Island Inst*., 555 U.S. 488, 496–97 (2009) ("Only a 'person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'") (citing *Lujan*, 504 U.S. at 572 n.7).  Generously reading their arguments, Plaintiffs assert that it is the principles "embodied" in the APA that are generally violated by the Executive Order.  Pls.' Mot at 15.  Even if such principles were correctly stated and could constitute a statutory

---

likely *exacerbate* the precise harm of which Plaintiffs complain by imposing *additional* delay on the rulemaking.

[5] Plaintiffs' unsubstantiated contention that their so-called "procedural injury" is that the requirements of the Executive Order are "unlawful" merely begs the question.  Pls.' Opp'n. at 12, ECF No. 16.  Nor can Plaintiffs seriously contend, after over 40 years of Executive Branch practice, that consideration of economic impacts are inherently "unlawful" in rulemaking.  *See* Defs.' Mot. at 4-10, *Public Citizen Inc. v. Trump*, No. 17-cv-253 (D.D.C. Apr. 10, 2017) ECF No. 9-1 (setting forth history of Executive Branch practice of considering burden).

procedure, which they do not, Plaintiffs fail to explain how Congress specifically established these amorphous principles to protect their state interests.

That is, Plaintiffs point to no evidence that Congress intended to protect the specific interests asserted by Plaintiff states by limiting agency considerations in rulemaking to only certain factors, and expressly excluding those set forth in the Executive Order. *See In re Endangered Species*, 704 F.3d at 978-79 (rejecting allegation of procedural injury where "there is nothing to indicate that Congress intended these provisions" to protect the interests asserted); *New Hampshire v. Holder*, 293 F.R.D. 1, 6 (D.D.C. 2013) (rejecting claim of procedural injury where interests asserted "are no different than the benefit conferred upon *any* New Hampshire voter"). Although Plaintiffs may contend that in some circumstances they may benefit from the consideration of certain statutory factors, to the exclusion of others, such benefits do not establish that Congress established a procedural right in the APA to ensure that these factors are promoted to the exclusion of all others. *See Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 786 F.3d 1050, 1052–53 (D.C. Cir. 2015) (rejecting procedural injury claim, holding that even where plaintiffs benefited from certain procedures, those procedures were not inherently "designed to protect such interests").[6]  Accordingly, Plaintiffs have failed to demonstrate the existence of a proper claim of procedural injury, asserting instead a merits argument masquerading as a basis for standing.

Even if Plaintiffs could invoke the procedural injury doctrine here, they misstate its requirements.  In fact, "[w]here plaintiffs allege injury resulting from violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not

---

[6] Plaintiffs drop a cryptic footnote on this point, asserting that "States are among the persons whose interests are protected by the APA . . . ." Pls.' Mot. at 15 n.15.  But the sole case cited in support, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013), stands only for the unremarkable proposition that states may challenge agency action or inaction under the APA. Plaintiffs cite no support for the claim that the APA, or the principles therein, were specifically designed to benefit the interests of states.

the issues of injury in fact or causation." *Perciasepe*, 714 F.3d at 1323-24 (citation omitted).

Moreover, "[a]lthough it is true that the redressability requirement is 'relaxed' for plaintiffs

asserting procedural injuries, 'relaxed' does not mean erased." *Nat'l Wildlife Fed'n v. U.S. Army

Corps of Eng'rs*, 170 F. Supp. 3d 6, 15 (D.D.C. 2016) (citation omitted).  Litigants asserting a

procedural injury need not show "that the righting of a procedural wrong will *necessarily* lead to

a different substantive outcome," but must show that "such a result is at least possible."  *Id.*

Therefore, Plaintiffs here must show that their requested relief could cause the agency to "change

its mind" with respect to the alleged delays or repeals cited by Plaintiffs here.  *WildEarth

Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).  As set forth below, Plaintiffs would

still fail to establish standing in this case under this procedural injury standard if it were

applicable.

### III.   Plaintiffs Have Not and Cannot Demonstrate Standing Based on the Specific Rules Addressed in Their Motion

In their Opposition and Cross-Motion, Plaintiffs have narrowed their arguments about

injury from specific rulemakings to four rules.  For the reasons already set forth in Defendants'

Motion, however, the uncontroverted evidence demonstrates that the Executive Order has not

affected these rulemakings in a manner that has caused Plaintiffs harm.  Indeed, Plaintiffs'

arguments with respect to all four rulemakings fail to establish any of the necessary elements of

standing.

Perhaps most straightforwardly, Plaintiffs cannot demonstrate that Executive Order

13,771 caused their alleged injuries from these rulemakings.  Plaintiffs cite various speculative

statements from declarations purporting to establish that Executive Order 13,771 delays or

"block[s]" certain rulemakings.  Pls.' Mot. at 18-19.  But speculation by those who lack personal

knowledge of the specific rulemakings at issue cannot establish a dispute of material fact.  *See,*

*e.g.*, *id.* at 18 (citing statement in Michaels Declaration that performing cost estimates for rules being considered for elimination could "perhaps" delay new rules for years).

It is also telling that these statements do not address *any* of the specific rulemakings Plaintiffs use to support their standing, and in some cases do not even address the agencies responsible for the rules at issue in their motion.  *See id.* (citing statements regarding EPA and OSHA).  Plaintiffs argue that the Court should disregard the evidence from agency employees with personal knowledge and instead accept "circumstantial evidence" in the form of speculation and generalized statements.  *Id*. at 19.  Plaintiffs ground this extraordinary contention on the premise that OMB Guidance explains that offsetting the costs of regulatory actions to comply with the Executive Order "should not serve as the basis or rationale . . . for issuing an EO 13771 deregulatory action."  Final Guidance, Q&A 37; *see* Pls.' Mot. at 19.  Plaintiffs suggest that this guidance requires federal agencies to conceal their actual basis for conducting certain rulemakings and that Defendant agencies did so.  That is an incorrect understanding of the guidance, which instead explains that agencies should not take deregulatory actions that are unjustified on the merits as a result of the Executive Order.  It certainly does not provide a basis to disregard the sworn statements of those with personal knowledge of the actual rulemakings at issue.

Plaintiffs accordingly have no answer to the evidence submitted with Defendants' Motion that establishes that Executive Order 13,771 did not cause *any* of the putative delays or repeals of the rules at issue.  *See* Rathgeb Decl. ¶¶ 29-30, ECF No. 14-7 ("[T]he Executive Order did not cause HHS to propose rolling back the 100% requirement" and "there is no causal link between E.O. 13,771 and the Rollback of the Head Start service duration requirements."); Lynch Decl. Ex. A at 8, 16, ECF No. 14-8 ("Executive Order 13,771 has not been a factor affecting any DOT decisions about when or whether to issue a Final Rule with respect to the V2V Rulemaking," and the Order has not been "a factor affecting any DOT decisions to delay, postpone or make inactive the V2V rulemaking."); Everett Decl. ¶ 8, ECF No. 14-4 ("EO 13771 did not cause [the agency] to repeal the GHG Performance Measure."); Nemtzow Decl. ¶ 8, ECF No. 14-2

9

("Executive Order 13771 has not been a factor affecting any DOE decisions about when or whether to issue a final rule in the Cooking Products Rulemaking" and "has not been a factor affecting any DOE decision to delay, postpone, or make inactive" this rulemaking).

Because Plaintiffs fail to meet this basic requirement of causation, or any of the remaining elements of Article III injury, they do not have standing.  Accordingly, judgment should be entered for Defendants.

### A.   Plaintiffs Have Failed to Establish Standing Through the Repeal of the Increased Service Duration Requirements for Head Start Programs

As set forth above and in Defendants' opening brief, Plaintiffs can meet none of the requirements of standing with respect to HHS's proposed elimination of the increased Head Start service duration requirement slated to go into effect on August 1, 2021.

### 1.   Plaintiffs Fail to Contest Defendants' Evidence Establishing the Executive Order Did Not Cause the Head Start Rule Change

First, Plaintiffs fail to establish a causal connection between the Executive Order and the Head Start rule.  Plaintiffs do not even attempt to rebut the testimony of Colleen Rathgeb that "the Executive Order did not cause HHS to propose rolling back the 100% requirement" and that "there is no causal link between E.O. 13,771 and the rollback of the Head Start service duration requirements."  Rathgeb Decl. ¶¶ 29-30.  Instead, Plaintiffs speculate that the Executive Order must have influenced the decision to propose the rule change because the current rule enables the Secretary to achieve the same end, and the agency "could . . . have waited" to make a decision about waiving the service duration requirements.  Pls.' Mot. at 36.  This type of unadorned speculation is plainly insufficient to meet Plaintiffs' burden at summary judgment.  *See, e.g.*, *Nunnally v. Dist. of Columbia*, 243 F. Supp. 3d 55, 68 (D.D.C. 2017)  ("[A] plaintiff's mere speculations are insufficient to create a genuine issue of fact . . . .").  In any event, HHS explained in the rulemaking process why it chose to act earlier rather than later, as its timely

action provides clarity and certainty to affected stakeholders.[7]  Plaintiffs thus fail to establish

causation.  *Pub. Citizen v. Trump*, 361 F. Supp. 3d 60, 65 (D.D.C. 2019) ("Public Citizen II")

(explaining that the test for causation here is whether the "Executive Order, as opposed to

separate policy considerations or other factors," caused the challenged aspect of the rulemaking,

which in turn caused Plaintiffs "to suffer a redressable injury").

> ### 2.    Plaintiffs Have Failed to Demonstrate an Injury in Fact Related to the Head Start Rule

Plaintiffs also have not articulated a cognizable injury that can support their standing

based on this rule.  *See* Defs' Mot. at 8-12; *supra* Part I.B.  Plaintiffs fail to respond to the case

law cited in Defendants' opening brief that rejects the voluntary expenditure of resources as a

cognizable Article III injury, or to Defendants' arguments that their allegations of injury were

speculative and conclusory.  Def's Mot. at 9-10.   Plaintiffs instead simply double down on their

contention, arguing that California and Minnesota "will be required to fill the gap by increasing

services provided by other programs, at a cost to the state" if Head Start services are reduced.

Pls.' Mot at 38.

---

[7] Plaintiffs' suggestion that it is implausible that HHS considered local flexibility an important factor in its proposed repeal of the 100% service duration requirement because HHS *also* considered local flexibility an important factor in the September 6, 2016 Final Rule establishing the increased service duration requirement cannot be credited.  *See* Pls.' Mot at 37 n.35.  That the issue was considered on both occasions simply demonstrates that local needs are an important concern that HHS takes seriously.  As is clear from the language Plaintiffs quote, the earlier and later rules address local flexibility in different ways.  The September 6, 2016 Final Rule furthered flexibility with respect to the manner in which the increased service duration requirement was to be met and how it was to be phased in.  *Id.* (quoting Federal Register and Rathgeb Decl.).  The 2019 proposed rule challenged by Plaintiffs, by contrast, was promulgated with the knowledge that "Congress has not appropriated sufficient additional funding to support increased service duration since the publication of the 2016 HSPPS final rule[.]"  Head Start Serv. Duration Requirements, 84 Fed. Reg. 11,269, 11,270 (Mar. 26, 2019) (to be codified at 45 C.F.R. pt.1302).  Given the expectation that Congress would similarly not adequately fund the requirements in the future, the March 26, 2019 NPRM was intended to restore the flexibility needed to maintain services for the same number of children who currently benefit from the program, rather than mandating that benefits be provided to fewer children.  *Id.*

But even if this theory could support standing in other cases, it would not do so here. Plaintiffs argue that they may face costs from Head Start Services being reduced, either by funding the program themselves or from putative costs resulting from children going without early education services.  Pls. Opp'n. at 37-39.  As an initial matter, Plaintiffs incorrectly characterize the proposed rule.  It would not "reduce" any services; it repeals a proposed *increase* in services that was always contingent and never took effect.

Further, Plaintiffs' claimed costs, even taken at face value, are of no help to Plaintiffs here, because it is not the rule change that would impose either of these costs.  The regulatory action Plaintiffs target does not withdraw or establish funding levels for Head Start, preclude the Federal Government from funding the increased hours of operation that Plaintiffs prefer, or eliminate any Head Start hours.  It merely permits—in light of an anticipated lack of funding by *Congress*—Head Start programs to choose how to allocate the benefits of the program (i.e. to more children for fewer hours *or* to fewer children at a greater number of hours).  *See* 84 Fed. Reg. at 11,270 ("While exposure to more high-quality early education services can benefit low-income children in terms of developmental outcomes, the tradeoffs associated with providing longer services for some children at the expense of providing no services for other children are too severe.").  This choice enabled programs to save a slot in Head Start for up to an estimated 77,522 children that would have lost those slots if the increased service duration requirements remained in effect without being fully funded.  Rathgeb Decl. ¶ 25.  And the 2019 proposed rule merely codified in a different form what was already contemplated by the existing rule: The September 6, 2016 Final Rule expressly provided the Secretary with the discretionary authority to waive the 50% and 100% service duration requirements because it was clear when the Final Rule was enacted that without sufficient funding, increasing the length of services for some children would result in the undesired effect of eliminating slots for other children.  *See* 45 C.F.R. § 1302.21(c)(3).

Should they choose to do so, the Plaintiff states may fund additional early childhood education that has not been funded by Congress, but they would have that choice to make with or

without the proposed rule.  In short, Plaintiffs' real concern with respect to Head Start coverage lies with Congress' funding decisions, and the choices of the Head Start programs themselves, not with the proposed rule at issue.  Pls.' Mot. at 38 ("Where Head Start services *are reduced*, California will be required to fill the gap.") (emphasis added); *id.* ("Where this gap is not filled, and early education services . . . are simply reduced, the long term costs to the States would likely be even greater.").[8]  Because this putative injury would be caused by third parties, if at all, it cannot support Plaintiffs' standing to sue Defendants in this case.  *See, e.g.*, *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (finding alleged injury "speculative at best" where it "depend[ed] upon the acts of third parties not before the court").

Further, Plaintiffs make no showing that, given a fixed early childhood education budget, greater societal costs are incurred by giving a larger number of children fewer hours in an early education program than by giving fewer children more hours in an early childhood education program.[9]  *See also* 84 Fed. Reg at 11,272 ("There is not sufficient evidence to support favoring longer service hours for some children at the expense of providing no services to others."); *id.* at

---

[8] Plaintiffs' argument that Congress *could* still provide additional funding for Head Start in the future does not help.  Beyond being pure speculation, if Congress chooses to provide additional funding in the future, Head Start programs will not be prevented from providing service of longer duration with those funds.  The decision to issue a regulation repealing the requirement was to provide clarity for programs to plan for the future: "If we eliminate this requirement through the rulemaking process, rather than wait for the Secretary to make a determination closer to February 1, 2020, we will provide grantees additional time to thoughtfully plan for how to best use existing federal resources to continue to prepare children from low-income families to succeed in school and life."  84 Fed. Reg. at 11,270; *see id.* ("We believe that by eliminating the 100-percent service duration well in advance of the August 1, 2021 effective date, we can ensure programs do not make unwanted and unnecessary changes to their program operations.").  Plaintiffs do not dispute HHS' findings that (1) "Congress has not appropriated sufficient additional funding to support increased service duration since the publication of the 2016 HSPPS final rule"; (2) "it is unlikely that the 100-percent requirement will be fully funded prior to the date when programs will have to comply"; and (3) the funding in FY 2018 appropriated to increase service duration "is not sufficient for Head Start programs to move 100-percent of their slots to 1020 annual hours."  *Id.*

[9] The societal costs associated with eliminating slots at the expense of longer classroom instruction time include the loss of required child screenings, developmental assessments, and nutrition services.  *See* 42 C.F.R. §§ 1302.33, 1302.44.

11270 ("[T]he vast majority of commenters stated that while longer service duration may be more beneficial for children, they would not support the policy without adequate funding because it would deprive many children of early learning opportunities due to a decrease in available Head Start slots.").  Without such a showing, Plaintiffs do not speak to the effects of the rule change at issue and fail to demonstrate injury from it.

### 3.   Plaintiffs Fail to Establish Redressability

Plaintiffs also offer no response to Defendants' argument that their purported injuries are not redressable by invalidation of Executive Order 13,771.  Rather, Plaintiffs appear to suggest that as a general matter under their theory of procedural injury, any requirement of redressability is satisfied simply by a showing that the Executive Order would be enjoined.  Pls.' Mot. at 13-14 ("[E]njoining further use of an unlawful process is redress sufficient to support standing.").  Even assuming that the injury alleged here is procedural, which it is not, that assumption would be incorrect.  *See supra* at 7-8.

With respect to the HHS Head Start rulemaking in particular Plaintiffs entirely fail to address redressability, and this failure is accordingly fatal to Plaintiffs' contention that this rule establishes their standing.  Plaintiffs concede, as they must, that the September 6, 2016 Final Rule provides the Secretary with "unilateral authority to achieve the same outcome."  Pls.' Mot at 36; *see* 45 C.F.R. § 1302.21(c)(3).  Thus, invalidation of Executive Order 13,771 would not cause the elimination of the rule about which Plaintiffs complain, and even invalidation of the March 26, 2019 NPRM itself—which Plaintiffs do not request in this lawsuit—would not prevent the Secretary from waiving the requirements.

In sum, Plaintiffs can establish none of the elements of standing with respect to the Head Start rule.

### B.   Plaintiffs Have Failed to Establish Standing through DOT's Actions Relating to the V2V Rulemaking

Plaintiffs also argue that they have standing on the basis of a purported delay in DOT's V2V rulemaking process.  Plaintiffs' argument here again rests on the assumption that this Court

will permit them to avoid the traditional standing requirements, as Plaintiffs rely on "circumstantial evidence of the Order's impact" and ask this Court to "give the States the benefit of the doubt" on the legal question at issue.  Pls.' Mot. at 32.  This assumption is inconsistent with Plaintiffs' burden on summary judgment, *Lujan*, 504 U.S. at 561, and no amount of solicitude can correct their inability to demonstrate the necessary elements of standing relating to the V2V Rulemaking.

         **1.**       **Executive Order 13,771 Has Not Caused the Purported Delay of the V2V Rulemaking**

Plaintiffs' only effort to demonstrate causation relating to the V2V Rulemaking is the conclusory assertion that the V2V rule "has been at the very least delayed (and will be further delayed) as a result of the Order."  Pls.' Mot. at 31.  In support, Plaintiffs cite purportedly "circumstantial evidence of the Order's impact on the ongoing rulemaking," such as DOT's general statements concerning the timeline of the V2V rulemaking.  *Id.* at 32.  As justification for the lack of evidence, Plaintiffs assert that they "are not likely to obtain any more direct evidence from the agency" on this point.  But that statement ignores the dispositive evidence that has been provided in this very case.

Defendants attached to their Motion a declaration on behalf of DOT, stating, among other things that, "EO 13771 has not affected NHTSA's decisions about whether to issue a Final Rule in the V2V rulemaking."  Declaration of Deborah Aiken ("Aiken Decl.") ¶ 7.  Similarly, DOT confirmed in discovery responses submitted in the *Public Citizen* litigation that "Executive Order 13,771 has not been a factor affecting any DOT decisions about when or whether to issue a Final Rule with respect to the V2V Rulemaking[,]" and that the Order has not been "a factor affecting any DOT decisions to delay, postpone or make inactive the V2V rulemaking."  Lynch Decl. Ex. A (Defendant Secretary of Transportation Elaine L. Chao's Responses to Plaintiffs' First and Second Sets of Interrogatories) at 8.  Instead, policy decisions, such as the type of technology to

be mandated in any V2V rule, have been the driving force for the rulemaking, including its current timing and status.  *Cf. Pub. Citizen II*, 361 F. Supp. 3d at 65 (D.D.C. 2019).

The evidence before this Court thus establishes that the Executive Order is not the cause of Plaintiffs' claimed injuries here, and Plaintiffs' decision to ignore those facts does not compel a contrary conclusion.

### 2.      Plaintiffs Have Failed to Establish an Injury in Fact Relating to the V2V Rulemaking

Defendants previously explained that Plaintiffs' only claim of injury related to the V2V rulemaking in the Complaint was a conclusory assertion that a delay in issuing the V2V rule would lead to "costs" on defendant states' "health care and emergency-response systems, among other harms" and that this contention failed to satisfy Article III.  Defs.' Mot at 12.  In their cross-motion, Plaintiffs fail to elucidate any concrete and particularized injury that they will suffer as a result of any purported delay in issuing the V2V rule.

Plaintiffs spend over a page reciting statistics regarding the consequences of all traffic accidents, such as monetary costs and fatalities, but nowhere do Plaintiffs explain exactly how a delay in the V2V rulemaking would injure Plaintiffs, through traffic accidents or otherwise. Plaintiffs thus appear to make the same argument that the *Public Citizen* plaintiffs originally asserted (before it was abandoned).  Namely, Plaintiffs argue that a delay in finalizing a V2V rule will increase the risk of accidents in the future and thus increase the risk that Plaintiff states will bear the cost of those accidents.  But just as this Court held in *Public Citizen I*, Plaintiffs here fail to explain when a V2V rule would achieve "a 'substantial' decrease in the risk of accidents, how that risk will decline over time, 'how many accidents would be avoided by' finalizing the proposed rule . . . and whether [Plaintiffs] face a 'substantial probability of harm' taking into account the increased risk posed by the delay in finalizing the V2V rule."  *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 34 (D.D.C. 2018) ("*Public Citizen* I").  Accordingly, Plaintiffs have failed to identify, let alone establish at summary judgment, the existence of any cognizable injury in fact.

### 3.     Plaintiffs Fail to Establish Redressability

Plaintiffs also make no effort to demonstrate that their claimed injuries here would likely be redressed by invalidating the Executive Order.  Nor could they make such a showing.  DOT "is still determining – based solely on factors other than EO 13771 – whether to issue a final rule, when to issue any final rule, and what the contents of any final rule should be."  Aiken Decl. ¶ 7, ECF No. 14-5.  As a result, invalidating the Executive Order would not cause DOT to stop its ongoing evaluation and speedily issue a V2V rule sought by Plaintiffs.

To the extent Plaintiffs contend that they must satisfy only the relaxed redressability standard for procedural injuries, they are incorrect for the reasons described above.  But even if this standard had some relevance here, it similarly would not be satisfied.  As noted above, a plaintiff claiming a procedural injury may not need to show that correcting the procedural defect will necessarily lead to a different substantive outcome, but still must show that such a change is possible.  *See Nat'l Wildlife Fed'n*, 170 F. Supp. 3d at 15 (holding that substantive relief must be "possible.").  Here, because the relevant agency actions have not been prompted or otherwise caused by the Executive Order, and DOT is evaluating whether and when to issue a final rule for reasons having nothing to do with the Executive Order, Plaintiffs cannot show that invalidation of the Executive Order could cause the agency to change course and issue a final V2V rule.  For this reason as well, Plaintiffs lack standing on the basis of the V2V rulemaking.

### C.     Plaintiffs Cannot Establish Standing from the Federal Highway Administration's Repeal of its Greenhouse Gas Performance Measure

Plaintiffs also reiterate their argument that they have standing on the basis of the repeal of DOT's Greenhouse Gas Performance Measure Rule ("Performance Measure Rule").  As with the other rules discussed in their brief, they fail to satisfy a single element of the standing inquiry.

### 1.     Executive Order 13,771 Did Not Cause the Repeal of the Performance Measure Rule

On the crucial question of whether the Executive Order caused the repeal, Plaintiffs spend only two sentences asserting that the Performance Measure rule is "subject to the

[Executive] Order," and that the repeal of the rule was done in compliance with the Order.  Pls.'

Mot. at 28.  But these facts are neither disputed here nor relevant.  Rather, the simple test for

causation is whether the "Executive Order, as opposed to separate policy considerations or other

factors," caused the repeal of the rule, which in turn caused Plaintiffs "to suffer a redressable

injury."  *Public Citizen II*, 361 F. Supp. 3d at 65.  On this point, Plaintiffs tacitly concede that the

reasons set forth by the agency justifying the repeal did not include Executive Order 13,771.

Indeed, in both the notice of repeal and declaration here, the agency explained the three primary

reasons justifying the repeal: (1) relevant statutes did not authorize the rule, (2) the cost of the

measure was not justified, and (3) the rule was unnecessary given the existence of duplicative

data.  The agency's declaration could not have been more definitive on this point: "EO 13771 did

not cause [the agency] to repeal the GHG performance measure."  Everett Decl. ¶ 8, ECF No.

14-4.

Plaintiffs fail meaningfully to respond to the agency's declaration, contending instead

that the agency's reasons justifying the repeal are mere "pretext" and "unpersuasive."  Pls.' Mot.

at 29.  But to support their claim of "pretext," Plaintiffs assert only that the agency reached

different conclusions on certain points when it originally promulgated the performance measure

rule.  Yet, it is "axiomatic that an agency is free to change its mind so long as it supplies 'a

reasoned analysis,' showing that 'prior policies and standards are being deliberately changed, not

casually ignored.'"  *Nat'l Cable & Telecomms. Ass'n v. FCC,* 567 F.3d 659, 667 (D.C. Cir.

2009) (citations omitted).  There can be little doubt that DOT's notice of proposed rulemaking

and final rule constitute a through and reasoned analysis.

Nor do Plaintiffs explain *why* DOT would have needed to repeal the performance

measure rule to comply with the Executive Order.  That is, DOT's FY2018 regulatory budget

called for $500 million in cost reductions, and DOT easily met this goal, resulting in a total cost

savings of approximately $1.24 billion.  *See* Rumsey Decl. Ex. R, ECF No. 18 (FY 2018 Present

Value Cost Cap for DOT of -$500 million); Regulatory Reform under Executive Order 13771:

Final Accounting for Fiscal Year 2018 (Cost of -1,237.3 million for DOT).[10]  Plaintiffs put forward no facts or other evidence showing that the approximately $11 million in cost savings associated with the performance measure repeal was needed to comply with any offset requirement of the Executive Order.  *See* National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24920, 24,926.  Plaintiffs thus fail to undermine the conclusive evidence set forth in the Federal Register and in the agency's declaration that Executive Order 13,771 was not the cause of the repeal.

> **2.     Plaintiffs Cannot Demonstrate a Cognizable Injury from the Repeal of the Performance Measure Rule**

Plaintiffs fare no better with their contention that the Performance Measure Rule injured them.  This rule required state departments of transportation to measure the overall change in certain vehicular emission levels, and set future targets for those levels.  However, the regulation did not require any decrease in emission levels and rather permitted states to set whatever target for emissions they chose, including a target of *increased* emissions levels.  *See* Nat'l Performance Mgmt. Measures; Assessing Performance of the Nat'l Highway Sys., Freight Movement on the Interstate Sys., & Congestion Mitigation & Air Quality Improvement Program, 83 Fed. Reg. 24920, 24929 (May 31, 2018) (to be codified at 23 C.F.R. pt. 490) ("[T]he GHG measure required States to go through the process of setting targets, allowing States at their discretion to set targets that either increase, decrease, or maintain the *status quo* over time.").

Plaintiffs assert injury from the May 2018 repeal of this rule on the grounds that the repeal will increase emissions levels and exacerbate the effects of climate change.  Pls.' Mot. 28. That is, Plaintiffs argue that they are injured by the repeal of the rule because data collected would have eventually given rise to policies to reduce greenhouse gases, in turn mitigating the effects of climate change.  But Plaintiffs lack support for this chain of causation.

---

[10] https://www.reginfo.gov/public/pdf/eo13771/EO_13771_Final_Accounting_ for_Fiscal_Year_2018.pdf.

Plaintiffs point to no evidence or other basis on which to conclude that the Performance Measure would necessarily have reduced greenhouse gas emissions, and by what amount. At most, Plaintiffs quote broad statements from the original rule, such as that data collection could potentially "drive decisions that contribute to national GHG reduction goals." *Id.* at 28. But regardless of what could have possibly resulted under the rule, it created "no legal power to force any change in CO2 emissions levels, and the GHG measure had no predictable effect on those emissions." 83 Fed. Reg. at 24,925. And there is no dispute that the rule "required very limited actions (though with some cost) from State DOTs and MPOs, and those actions were purely administrative in character." *Id.* Indeed, even Plaintiffs cannot bring themselves to assert that the data-collection rule would necessarily have reduced greenhouse gas emissions. *See* Pls.' Mot. at 29 ("*Insofar* as the GHG Performance Measure would have resulted in reduced greenhouse gas emissions . . . .") (emphasis added).

Absent any evidence that this data-collection would have led to lower emissions levels, Plaintiffs cannot plausibly contend that repeal of the rule caused increased emissions levels, or any harms associated with climate change. Plaintiffs thus cannot show any injury arising out of the repeal of the performance measure rule.

### 3.    Plaintiffs Fail to Demonstrate Redressability

Plaintiffs again make no effort to show that a favorable ruling here would redress their claimed injuries. DOT explained in its declaration that because Executive Order 13,771 did not cause the repeal of the performance measure, the agency "would not reissue the rule regardless of the status of Executive Order 13,771 until it separately reconsiders th[e] policy issues" that caused the repeal. Defs.' Mot. at 24. Plaintiffs offer nothing in response and thus effectively waive any arguments on this point.

At most, Plaintiffs generally contend that because they are asserting a procedural injury, they do not have to demonstrate that "delayed rules would promptly issue nor that repealed rules would spring back into place." Pls.' Mot. at 3. Yet Plaintiffs' assertion of procedural injury is meritless for the reasons set forth above.

And even if Plaintiffs had cited a viable procedural injury here, they still fail to meet the requirement of redressability.  In its declaration, DOT explained that the reasons for repealing the performance measure were distinct from Executive Order 13,771 and that "[a] court order enjoining EO 13771 thus would not lead to FHWA re-establishing the GHG Performance Measure absent reconsideration of the policy reasons for FHWA's repeal, since those reasons would not be affected in any way by such a court order."  Everett Decl. ¶ 9, ECF No. 14-4. Because invalidation of the Executive Order could not cause the agency to reinstate the performance measure rule, and thus could not redress Plaintiffs' claimed injuries, Plaintiffs fail to show standing for this reason as well.

### D.   Plaintiffs Do Not Have Standing with Respect to DOE's Energy Efficiency Standards for Residential Cooking Products

Finally, Plaintiffs argue they have standing based on a purported delay in the DOE's energy efficiency standards for residential cooking products (the "Cooking Products Rulemaking").  Once again, Plaintiffs fail to satisfy any of the necessary elements of standing.

### 1.   Executive Order 13,771 Has Not Caused the Purported Delay in the Cooking Products Rulemaking

As with every other rulemaking addressed in their motion, Plaintiffs fail to establish that Executive Order 13,771 has caused or will cause their putative injury with respect to the Cooking Products Rulemaking. They do not in any way rebut David Nemtzow's testimony that "Executive Order 13771 has not been a factor affecting any DOE decisions about when or whether to issue a final rule in the Cooking Products Rulemaking" and "has not been a factor affecting any DOE decision to delay, postpone, or make inactive" this rulemaking.  Nemtzow Decl. ¶ 8, ECF No. 14-2.  Mr. Nemtzow also explained the process for rulemaking and the reasons why a final rule has not been issued to date: questions about the test procedures related to certain cooking products covered by the rule, which are necessary for any performance standard to be in place, must be resolved prior to the finalization of any rule.  *See id.* at ¶¶ 6-7. These reasons are in accord with the Court's previous understanding of the issue in *Public*

*Citizen* that "it is far from clear that either the Executive Order or OMB Guidance is to blame" for a final rule not being issued within two years of a proposed rule, given those documents' express authorization to comply with statutory deadlines. *See Pub. Citizen II*, 361 F. Supp. 3d at 89.

Plaintiffs do not dispute this evidence.  Instead, Plaintiffs argue that the Executive Order "will" in the future delay finalization of a cooking products standard "[b]ecause . . . the agency must identify for repeal two existing regulations whose regulatory costs would offset the costs imposed by the rules." Pls.' Mot. 21.  Putting aside the speculation inherent in an assertion that says nothing about when such delay would occur or how it would affect the Plaintiffs at that unspecified time,[11] it is also based on a fundamentally mistaken premise about the Executive Order, i.e. that DOE must identify other rules to repeal "before the DOE can finalize the [Cooking Products Rulemaking]." Pls. Opp'n at 21.  As DOE has explained,

> Compliance with the numerical requirement and the cost offset requirement in E.O. 13,771 is not assessed on a rule-by-rule basis. Instead, [OMB] assesses compliance with those requirements Department-wide on an annual basis only at the end of each fiscal year.  For example, the cost savings from one deregulatory action could support the agency's compliance with the cost offset requirement for several new regulations. OMB's E.O. 13771 guidance thus does not require an agency to identify specific regulations, prior to issuing a rule, that would satisfy both the E.O. 13771 numerical requirement and the cost offset requirement.

Rumsey Decl. Ex. H at 4, ECF No. 16-8; *see also* Drezner Decl. Ex. A at 4, *Pub. Citizen Inc. v. Trump*, No. 17-253 (D.D.C. July 15, 2019), ECF No. 96-3 (verified interrogatory responses stating same).  Thus, Plaintiffs are incorrect that delay is inevitable, such that this Court should afford any weight to their unsupported speculation.  Plaintiffs offer no evidence of what specifically the Executive Order ultimately will require of DOE in connection with the as-yet-

---

[11] The weakness of this argument is evident from the sole citation in support—the declaration of a former OSHA official *that is devoted entirely to the rulemaking process in OSHA*, not DOE. *See* Pls.' Opp'n 21 (citing Michaels Decl. ¶ 36); Michaels Decl. ¶ 36 (speculating on the situation "presented by an executive order that requires *OSHA* to revoke two rules for the purpose of offsetting costs") (emphasis added); *see generally* Michaels Decl. (addressing OSHA's rulemaking process).

undetermined cooking products final rule, let alone demonstrate how such requirements cause Plaintiffs' asserted injury.

### 2. Plaintiffs Have Failed to Demonstrate an Injury in Fact Related to the Cooking Products Rulemaking

Plaintiffs also fail to show a cognizable injury for purposes of standing with respect to DOE's Residential Cooking Products Rulemaking.  Plaintiffs argue that any putative delay in issuing the residential cooking products standard injures them.  Tellingly, although Plaintiffs spend over five pages of the section of their brief purporting to set forth their injury from this rulemaking discussing their concerns over climate change, Pls. Mot. 22-26, Plaintiffs do not and cannot specify how an asserted delay of unknown duration in promulgating final standards of unknown substance has resulted, or imminently will result, in a specific climate change impact that constitutes a concrete and particularized injury-in-fact to Plaintiffs.[12]  They neither cite any language from any Federal Register notice about the rulemaking itself nor any other evidence specific to this rulemaking.  Instead, their argument appears to be that states have standing to challenge any rulemaking process that could conceivably fail to address climate change to the states' satisfaction, no matter how generalized their allegations.  *See* Pls. Mot. at 27 ("[W]here greenhouse gasses are concerned, *no* delay in reducing emissions is insignificant[.]") (emphasis added).  This cannot be the case.  *See, e.g., Gov't of Manitoba v. Bernhardt,* 923 F.3d 173, 178 (D.C. Cir. 2019) (noting that in cases where a state brings claims based on alleged injury to itself it must still meet "the ordinary demands of Article III—that is, establish injury-in-fact, causation and redressability").  Plaintiffs have presented no specific facts, as required at summary judgment, to show that a delay in finalizing energy conservation standards for cooking products has resulted, or will imminently result, in a cognizable injury.  *See, e.g., Lujan*, 504 U.S. at 561 ("In response to a summary judgment motion . . . the plaintiff . . . must 'set forth' by affidavit or other evidence 'specific facts[.]'" (quoting Fed. R. Civ. P. 56(e)).

### 3. Plaintiffs Fail to Demonstrate Redressability

As with the rules discussed earlier, Plaintiffs do not attempt to argue that their putative

injury with respect to the Cooking Products Rulemaking is redressable.  Their failure to do so

presents an independent bar to their standing on the basis of this rule, regardless whether the

court applies the "relaxed" showing required for procedural injuries or the standard showing for

substantive ones.  *Nat'l Wildlife Fed'n*, 170 F. Supp. 3d at 15.  In either case, enjoining the

Executive Order would not and could not result in the issuance of a final rule.  As explained by

David Nemtzow, the Director of the Building Technologies Office in DOE's Office of Energy

Efficiency and Renewable Energy, prior to a final rule being issued, the issues relating to the test

procedure would still require resolution.  Nemtzow Decl. ¶¶ 2, 7.  This resolution, in turn, may

well require a new rulemaking process for a test procedure and subsequent additional rulemaking

process for energy efficiency standards prior to a final rule being issued.  Regardless of whether

the Executive Order is in effect, DOE still will have to resolve these substantive issues before

any standards can be finalized.  Providing Plaintiffs with their requested relief would thus not

redress their putative injury.

### E.     Plaintiffs Have Abandoned Their Allegations that Any Other Rulemaking Is Affected by the Executive Order

Plaintiffs do not raise arguments at summary judgment that any other rulemaking

supports their standing.  In particular, Plaintiffs have failed to respond to Defendants' arguments

about EPA's Emissions Guidelines and Performance Standards for Solid Waste Landfills, EPA's

Accidental Release Prevention Requirements, and BLM's Waste Prevention Rule.  *See* Defs.'

Mot. 18-21 & n.2, 24-27.  Likewise, Plaintiffs do not allege in their Complaint or raise in their

motion any argument concerning *any* Department of Labor rulemaking.  They have thus waived

any argument that rules by these agencies or any others provide a basis for standing.  *See, e.g*,

---

[12] In correcting a misstatement in their Complaint, Plaintiffs incorrectly claim in their brief that "DOE . . . estimated *the final rule* would reduce cumulative greenhouse gas emissions by a total of 45.3 million metric tons of carbon dioxide."  Pls.' Mot. at 20 (emphasis added).  Not so.  DOE estimated that its *proposed* rule, if adopted, would do so.  *See* Energy Conservation Program: Energy Conservation Standards for Residential Conventional Cooking Prods., 81 Fed. Reg. 60,784, 60,787 (Sept. 2, 2018) (to be codified at 10 C.F.R. pts. 429 & 430).  This proposed rule, however, was formulated subject to a test procedure that DOE intends to propose withdrawing; there is as yet no final rule and no estimate of the potential savings of any final rule.

*United States v. Taylor*, 339 F.3d 973, 977 (D.C. Cir. 2003) (arguments that are ripe for consideration are waived when not raised in opening brief); *Sai v. Dep't of Homeland Sec.*, 99 F. Supp. 3d 50, 68 (D.D.C. 2015) (Moss, J.) ("If a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (quoting *Burnett v. Sharma*, 511 F. Supp. 2d 136, 145-46 (D.D.C. 2007)).

Further, because they have abandoned any argument with respect to EPA, BLM, and DOL, the defendants named from these agencies—the Acting Secretary of the Interior, the Administrator of the EPA, and the Secretary of Labor—should all be dismissed as defendants. *See, e.g., Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015) ("[W]here there are multiple defendants and multiple claims, there must exist at least one named plaintiff with *Article III standing as to each defendant* and each claim[.]") (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment on Standing (ECF No. 14), deny Plaintiffs' Cross-Motion for Summary Judgment on Standing (ECF No. 16), and close this case.

DATED:  September 13, 2019                    Respectfully submitted,

                                              JOSEPH H. HUNT
                                              *Assistant Attorney General*
                                              Civil Division

                                              JESSIE K. LIU
                                              *United States Attorney*

                                              ERIC R. WOMACK
                                              *Assistant Branch Director*
                                              Civil Division, Federal Programs Branch

                                              *Christopher M. Lynch*
                                              MICHAEL DREZNER (VA Bar No. 83836)
                                              MICHAEL H. BAER (NY Bar No. 5384300)
                                              CHRISTOPHER M. LYNCH

(D.C. Bar No. 1049152)
*Trial Attorneys*

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, DC 20005
Telephone: (202) 353-4537
Facsimile: (202) 616-8470
Email: Christopher.M.Lynch@usdoj.gov

*Counsel for Defendants*