**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, STATE OF OREGON, by and through Attorney General Ellen F. Rosenblum, and the STATE OF MINNESOTA, by and through Attorney General Keith Ellison, | Civil Action No. 1:19-cv-0960-RDM |

Plaintiffs,

v.

DONALD J. TRUMP, President of the United States of America; MICK MULVANEY, Director of the Office of Management and Budget; RICK PERRY, Secretary of Energy, U.S. Department of Energy; ELAINE L. CHAO, Secretary of Transportation, U.S. Department of Transportation; PATRICK PIZZELLA, Acting Secretary of Labor, U.S. Department of Labor; DAVID BERNHARDT, Secretary of the Interior, U.S. Department of the Interior; ANDREW WHEELER, Administrator, U.S. Environmental Protection Agency; and ALEX M. AZAR II, Secretary of Health and Human Services, U.S. Department of Health and Human Services,

Defendants.

**PLAINTIFFS' REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT ON STANDING**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................ 2

    I.    The States Have Established Standing on the Basis of
Procedural Injury ................................................................... 2

        A.    The States Properly Pled Injury to their Interests
in the Integrity of the Rulemaking Process ................. 2

        B.    The States' Injury Is Cognizable for Standing
Purposes ....................................................................... 4

            1.    The Order and Guidance require
agencies to violate the APA's procedural
requirements ...................................................... 5

                a.    The Order and Guidance require
agencies to consider arbitrary
factors that Congress did not intend
for them to consider ................................. 6

                b.    The Guidance precludes disclosure
of the whole record underlying
agency action ........................................... 7

            2.    The States have a concrete interest in the
integrity of the administrative process ........... 11

    II.    The States Have Established Standing on the Bases of
Specific Exemplar Rulemakings .......................................... 13

        A.    HHS's Head Start Rule ............................................. 15

            1.    The HHS's proposal to eliminate the
increased Head Start service duration
requirement is fairly traceable to the
Order ............................................................... 15

        B.    NHTSA's V2V Rule ................................................. 18

        C.    FHWA's GHG Performance Measure ...................... 19

        D.    DOE's Energy Conservation Standards .................... 23

CONCLUSION ................................................................................ 24

# TABLE OF AUTHORITIES

**Page**

CASES

*Amfac Resorts, LLC v. U.S. Dep't of Interior*
   143 F.Supp. 2d 7 (D.D.C. 2001) ..........................................................................10

*Arpaio v. Obama*
   797 F.3d 11 (D.C. Cir. 2015) ................................................................................11

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) ................................................................................................2

*Center for Biological Diversity v. U.S. Dep't of Interior*
   563 F.3d 466 (D.C. Cir. 2009) ..............................................................................11

*Chamber of Commerce of U.S. v. Reich*
   74 F.3d 1322, 1328–29 (D.C. Cir. 1996) ................................................................2

*Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of
   Energy*
   485 F.3d 1091 (10th Cir. 1985)............................................................................10

*Citizens to Pres. Overton Park, Inc. v. Volpe*
   401 U.S. 402 (1971) ................................................................................................7

*City of Dania Beach, Fla. v. FAA*
   485 F.3d 1181 (D.C. Cir. 2007) ......................................................................13, 23

*Clapper v. Amnesty Int'l USA*
   568 U.S. 398 (2013) ....................................................................................13, 16, 23

*Clinton v. Jones*
   520 U.S. 681 (1997) ................................................................................................2

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*
   901 F.2d 107 (D.C. Cir. 1990) .........................................................14, 18, 21, 23

*Defs. of Wildlife v. Perciasepe*
   714 F.3d 1317 (D.C. Cir. 2013) ..............................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page

*Dep't of Commerce v. New York*
  139 S. Ct. 2551 (2019) ...................................................................................8

*Duke Power Co. v. Carolina Envtl. Study Group*
  438 U.S. 59 (1978) ...................................................................................14, 15

*F.C.C. v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009) ...............................................................................20, 22

*FBME Bank Ltd. v. Lew*
  125 F.Supp.3d 109 (D.D.C. 2015) ...................................................................12

*Galindo v. Precision Am. Corp.*
  754 F.2d 1212 (5th Cir. 1985) .......................................................................14

*Garfield v. United States*
  211 U.S. 249 (1908) ...................................................................................10

*Hawai'i v. Trump*
  859 F.3d 741 (9th Cir.) .................................................................................14

*Leedom v. Kyne*
  358 U.S. 184 (1958) ...................................................................................11

*Lujan v. Defs. of Wildlife*
  504 U.S. 555 (1992) ...............................................................................15, 22

*Massachusetts v. EPA*
  549 U.S. 497 (2007) ...............................................................................11, 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*
  463 U.S. 29 (1983) .....................................................................................6, 7

*Myers. v. U.S.*
  272 U.S. 52, 293 (1929) ...............................................................................25

*National Ass'n of Home Builders v. Defs. of Wildlife*
  551 U.S. 644 (2007) .....................................................................................6

## TABLE OF AUTHORITIES
### (continued)

Page

*National Parks Conservation Ass'n v. Manson*
   414 F.3d 1 (D.C. Cir. 2005) ..............................................................15

*Nebbia v. People of New York*
   291 U.S. 502 (1934) .........................................................................13

*New York v. U.S. Dep't of Commerce*
   351 F. Supp. 3d 502 (S.D.N.Y. 2019)............................................5, 10

*Pac. Shores Subdiv., Cal. Water Dist. v. U.S. Army Corps of
   Engineers*
   448 F. Supp. 2d 1 (D.D.C. 2006) .......................................................10

*Pub. Citizen, Inc. v. Trump*
   297 F. Supp. 3d 6 (D.D.C. 2018) ...................................................8, 18

*Pub. Citizen, Inc. v. Trump*
   361 F. Supp. 3d 60, 65 (D.D.C. 2019) ..............................................14

*Pub. Citizen, Inc. v. Trump*
   No. 17-cv-253 (RDM) (D.D.C)...........................................................4

*SEC v. Chenery Corp.*
   318 U.S. 80 (1943) .............................................................................7

*Sierra Club v. EPA*
   755 F.3d 968 (D.C. Cir. 2014) ..........................................................14

*Sierra Club v. Perry*
   373 F. Supp. 3d 128 (D.D.C. 2019) ...................................................18

*Susan B. Anthony List v. Driehaus*
   573 U.S. 149 (2014) ....................................................................13, 23

*Texas v. United States*
   809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015)...................11

*United States v. Chem. Found., Inc.*
   272 U.S. 1 (1926) .............................................................................10

# TABLE OF AUTHORITIES
## (continued)

Page

*WildEarth Guardians v. Jewell*
    738 F.3d 298 (D.C. Cir. 2013) ....................................................................16, 22

*Youngstown Sheet & Tube Co. v. Sawyer*
    103 F. Supp. 569 (D.D.C. 1952) *aff'd*, 343 U.S. 579 (1952)................................2

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579, 629 (1952) ..........................................................................25

*Zero Zone, Inc. v. U. S. Dep't of Energy*
    832 F.3d 654 (7th Cir. 2016)................................................................6, 7

**STATUTES**

5 U.S.C.
    § 551(1) ............................................................................................2
    § 552(a)(1)(D) ..................................................................................6
    § 706 .........................................................................................4, 5, 6, 7
    § 706(1) ..........................................................................................12
    § 706(2)(A)................................................................................6, 12

31 U.S.C.
    § 503(a) ............................................................................................4
    § 1120(a)(1)(A) ................................................................................4
    § 1120(b)(1)......................................................................................4

42 U.S.C.
    § 7607(b) ........................................................................................11

**COURT RULES**

Fed. R. Civ. P. 8(a) ..........................................................................2

**FEDERAL REGISTER**

Federal Motor Vehicle Safety Standards; V2V Communications
    82 Fed. Reg. 3,854 (Jan. 12, 2017) ....................................................18

**TABLE OF AUTHORITIES**
**(continued)**

Page

Energy Conservation Standards for Residential Conventional Cooking
   Products
   81 Fed. Reg. 60,784, 60,787 (Sept. 2, 2016) .......................................................24

Head Start Performance Standards
   81 Fed. Reg. 61,294 (Sept. 6, 2016)....................................................................17

National Performance Management Measures; Assessing Performance
   of the National Highway System, Freight Movement on the
   Interstate System, and Congestion Mitigation and Air Quality
   Improvement Program
   82 Fed. Reg. 5,970 (Jan. 18, 2017). ....................................................................21

National Performance Management Measures; Assessing Performance
   of the National Highway System, Freight Movement on the
   Interstate System, and Congestion Mitigation and Air Quality
   Improvement Program
   83 Fed. Reg. 24,920 (May 31, 2018) ......................................................19, 20, 21

**EXECUTIVE ORDERS**

Regulatory Planning and Review Exec. Order No. 12866 58 Fed. Reg.
   51,735 (Oct. 4, 1993) ............................................................................................4

*Reducing Regulation and Controlling Regulatory Costs Exec. Order
   No. 13771 82 Fed. Reg. 9339 (Jan. 30, 2017) ............................................ *passim*

**MISCELLEANEOUS**

Centers for Disease Control and Prevention (CDC), State-Specific
   Cost of Death Fact Sheets ....................................................................................17

C. Wright, A. Miller & M. Kane, Federal Practice and Procedure:
   Civil 2d § 2738 (1983) ........................................................................................14

EPA, OIG, *Compliance with the law: EPA Exceeded the Deregulatory*
   *Goals of Executive Order 13771*
   Report No. 19-P-0267 (Aug. 9, 2019)...................................................................4

**TABLE OF AUTHORITIES**
**(continued)**

Page

DOT/NHTSA, The Economic and Societal Impact of Motor Vehicle
    Crashes, 2010 (Revised)......................................................................................17

EPA, Reducing Regulation and Controlling Regulatory Costs...................................9

## INTRODUCTION

To establish standing in this matter, the States must show that federal agencies have taken or will be compelled to take actions to comply with Executive Order 13771 (Order) and OMB's related interim and final guidance (together, Guidance). Where the agencies take any such action, the States are harmed, because such actions result in the delay, withdrawal, or repeal of rules that would otherwise confer substantive benefits on the States. The States are also harmed because—given that the Order and Guidance's requirements themselves are plainly arbitrary, capricious, and not in accordance with law—any action taken to comply with those requirements is also arbitrary, capricious, and *otherwise not in accordance with law*, including the Constitution and the Administrative Procedure Act (APA). Both the substantive and procedural harms are sufficient to provide the States standing to challenge the Order and Guidance.

Seeking to evade judicial review here, Defendants argue that the States do not have standing by disclaiming that the Order and Guidance have had, or will have, any effect. *See, e.g.*, Defs.' Opp'n (Dkt. 20) at 9–10, 17, 21. To support this argument, they present affidavits from agency officials stating simply that the Order has not impacted their decision-making processes, and that any notion that the Order will have an effect is "unsupported speculation." *Id*. at 22. There is significant evidence to the contrary. The States have established there is at least a "substantial likelihood" that the Order and Guidance have already caused and will continue to cause agencies to delay or rescind rulemakings, which delay or revocation has harmed and will harm the States. That is all that is required to establish standing.

Even accepting that the Order and Guidance have had no substantive effect on agency rulemaking, as Defendants argue, the states would still have standing. The States have established that they are harmed by the Order and Guidance's adverse impact on the integrity of

the rulemaking process, which integrity is safeguarded by the APA. The OMB, which issued the

Guidance, is subject to the APA. 5 U.S.C. § 551(1). The President is not himself subject to the

APA, but there can be no doubt that "when the President takes official action, the Court has the

authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703

(1997); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952),

*aff'd*, 343 U.S. 579 (1952) (courts have nonstatutory authority to enjoin any action by the

Executive that "is unauthorized by statute, exceeds the scope of constitutional authority, or is

pursuant to unconstitutional enactment"); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322,

1328–29 (D.C. Cir. 1996) ("[W]e have never held that a lack of a statutory cause of action is *per

se* a bar to judicial review."). The States have demonstrated standing to invoke this Court's

jurisdiction to exercise that authority here, to uphold the rule of administrative law set forth in

the Constitution and the APA.

## ARGUMENT

I.   **THE STATES HAVE ESTABLISHED STANDING ON THE BASIS OF PROCEDURAL
     INJURY**

A.   **The States Properly Pled Injury to their Interests in the Integrity of the
     Rulemaking Process**

Allegations that Defendants, by issuing and/or implementing the Order and Guidance, have

undermined the structure and integrity of the federal system—including the separation of powers

and the statutory framework governing agency rulemaking—are pervasive throughout the States'

Complaint and form the basis of the States' standing based on procedural injury. Under the

notice-pleading standard, Defendants cannot reasonably assert that they did not have "fair

notice" of the States' procedural injury claims, and the grounds upon which those claims rest.

*See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (noting that Fed. R. Civ. P. 8(a)'s

"simplified notice pleading standard" relies on liberal discovery rules and summary judgment

motions to define disputed facts and issues and dispose of unmeritorious claims) (internal quotations and citations omitted).

The gravamen of the States' Complaint in this matter is that the President and the OMB have upended the federal regulatory system by imposing unlawful requirements on the rulemaking process. *See, e.g.*, Compl. (Dkt. 1) ¶¶ 4, 22–33, 47–64, 66-69, 117–146 (describing how the Order and Guidance violate the separation of powers doctrine, Take Care clause, represent an impermissible delegation of authority, and/or are ultra vires); *id.* at ¶ 5, 34-38, 47– 64, 66-69, 147–157 (describing how the Order and Guidance require agencies consider actions (or inactions) beyond their statutory mandates). The States also specifically identified the Order and Guidance's harm to the procedural integrity of the federal administrative system. *Id.* at ¶ 6 ("Plaintiff States have substantive and procedural interests in ensuring that members of the federal executive branch respect the bounds of their constitutional and statutory authority and do not hamstring agencies' ability to execute Congressional mandates"). Additionally, the States noted the harms they face because the "existence of this unlawful Order calls into question the lawfulness of agencies' decisions to repeal regulations as well as their inaction on any new regulation." *Id.* at ¶ 113; *see also*, ¶¶ 115-116. Finally, the States allege that the Order and Guidance conflict with the APA, which (as the name implies) sets forth procedural requirements for agency rulemakings. *See id*. at ¶¶ 147-157.

The substantive harms that result from specific agency actions alleged by the States flow from this overarching procedural harm. That those substantive harms derive from specific rulemakings undertaken by named agencies (and provide a distinct basis for standing) does not change the fact that the States challenge the Order and Guidance themselves, not particular applications of them.

**B.      The States' Injury Is Cognizable for Standing Purposes**

The arbitrary procedural obstacles imposed by the Order and Guidance are facially

unlawful and undermine the integrity of the rulemaking process upon which the States depend

for agencies to achieve their legislative mandates. The Order, for one, is meaningfully distinct

from prior executive orders that have sought to achieve regulatory reform. *See* Compl. at ¶ 37, 59.

Prior executive orders have required agencies to "consider" or analyze the economic impacts of a

proposed rule, or to review their regulations to identify potentially outdated regulations. *Id.*

Those orders, which include Executive Order 12866,[1] are consistent with agencies' existing duty

to make rational regulatory decisions based on their review of the relevant data and any statutory

Congressional directives. The Order here, on the other hand, requires that agencies repeal at least

two regulations, outdated or not, to fully offset the cost of a new regulation. Further, the Order

and Guidance implicitly authorize the OMB to block agency rulemakings not in compliance with

the Order's arbitrary mandates, which would be contrary to OMB's authority. *See* 31 U.S.C. §§

503(a), 1120(a)(1)(A), and 1120(b)(1) (describing OMB's statutory authority). While the

consequences of disobeying the Order are not clear, it is apparent that agencies believe they must

comply and are working to comply. *See, e.g.*, Rumsey Decl., Exh. H (DOE Resp. to Req. for

Adm. Nos. 1, 2, 4–6 in *Pub. Citizen, Inc. v. Trump*, No. 17-cv-253 (RDM) (D.D.C.).); U.S. EPA,

Office of the Inspector General (OIG), *Compliance with the law: EPA Exceeded the*

*Deregulatory Goals of Executive Order 13771*, Report No. 19-P-0267 (Aug. 9, 2019)[2]

(hereinafter EPA Audit Report).

---

[1] Regulatory Planning and Review (1993).
[2] https://www.epa.gov/sites/production/files/2019-08/documents/_epaoig_20190809-19-p-0267.pdf (attached as Exh. A to Rumsey Decl.)

It is Defendants' position that because the Order and Guidance do not conflict with a specific statutory mandate, there is no procedural violation. This disregards that the Order and Guidance require agencies to comply with arbitrary requirements that are neither substantively related to the rulemaking nor within the scope of any enabling statute, therefore rendering any subject rulemaking inherently arbitrary and not in accordance with law under the APA. 5 U.S.C. § 706. The Order and Guidance also conflict with the APA's requirement that an agency fully disclose the bases for its rulemaking decision. *Id*. There can be no doubt that the intent of Congress in enacting the APA was to bring procedural regularity and transparency to the federal rulemaking process. *See, e.g.*, *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 518 (S.D.N.Y. 2019) ("[T]he APA exists to protect core constitutional and democratic values."), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). As quasi-sovereigns that have surrendered certain self-governing prerogatives to the federal government, the States are particularly harmed by the Order and Guidance's impact on a process that should otherwise operate within parameters defined by constitutional and statutory law and with full transparency.

### 1.   The Order and Guidance require agencies to violate the APA's procedural requirements

Defendants contend that "the D.C. Circuit has squarely rejected" the States' procedural injury argument. Defs.' Opp'n at 5–6, citing, *inter alia*, *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324 (D.C. Cir. 2013). But in the cases cited by Defendants, the plaintiffs failed to "identify a statutory procedure that the challenged action requires the agency to violate." *Perciasepe*, 714 F.3d at 1324 (internal alterations omitted). In contrast, the Order at issue in this case directly conflicts with at least two core requirements of the APA statute: (1) in promulgating rules, agencies must operate within the bounds of their statutory authority, and (2)

agencies must disclose the "whole record" underlying any action. 5 U.S.C. § 706. In this context,

the States satisfy the requirement of showing that the Order conflicts with the law. That is

sufficient to establish procedural injury.

> **a.    The Order and Guidance require agencies to consider arbitrary factors that Congress did not intend for them to consider**

The APA's requirement that agencies operate within the bounds of their statutory authority

is reflected both in the APA's presumption that "substantive rules of general applicability" will

be "adopted as authorized by law" (5 U.S.C. § 552(a)(1)(D)) and its express direction to courts to

set aside agency action that is "arbitrary, capricious … or *otherwise not in accordance with law*."

5 U.S.C. § 706(2)(A) (emphasis added). An agency action is "arbitrary and capricious" where,

among other things, the agency, in promulgating the rule, "relied on factors which Congress has

not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463

U.S. 29, 43 (1983); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).

On judicial review, the reasonableness of an agency's action is determined with reference

to the enabling statute. For example, in *Zero Zone, Inc. v. U. S. Dep't of Energy*, 832 F.3d 654

(7th Cir. 2016), the court—citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 658, for the

proposition that "[a]n agency decision is arbitrary and capricious when the agency has relied on

factors which Congress had not intended it to consider" (internal quotations and citations

omitted)—analyzed the scope of DOE's statutory authority under the Energy Policy and

Conservation Act (EPCA) to determine whether it was arbitrary and capricious for DOE to

consider "environmental benefits" in its rulemaking. *Id*. at 677. The court found that

consideration of that factor was not arbitrary and capricious, because several of the factors the

agency was required or authorized to consider were arguably broad enough to include

environmental benefits. *Id*. and n. 24, citing 42 U.S.C. § 6295(o)(2)(B)(i)(I), (VI), and (VII)).

Had the court *not* found a basis in the statute for the agency to consider the rule's environmental benefits, it would have been compelled to hold the agency action unlawful. 5 U.S.C. § 706.

There is no basis in EPCA, nor any other statute of which the States are aware, for an agency to consider the "factors" the Order and Guidance require agencies to consider. The Defendants do not identify any statute vesting any agency with the authority to consider the costs of *other* rules or to consider the cumulative costs of the agency's regulatory portfolio. Accordingly, had the DOE in *Zero Zone* determined that before it could issue the rule, it needed to reduce the cost of the rule (relative to at least two rules identified for repeal) to be able to comply with the Order, or to repeal two rules to offset the cost, those actions would have been subject to set aside, as relative cost is a factor that "Congress had not intended [the agency] to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The same is true of the DOE energy efficiency standard discussed below. The enabling statute does not authorize DOE to consider the factors the Order requires it to consider. When the agency does consider those factors in issuing the final rule, it renders the resulting action unlawful. *Id*. The fact that the Order requires DOE to consider such arbitrary factors in its regulatory decision-making offends well-established administrative procedure on which the States, as well as other actors in the federal system, rely.

### b.     The Guidance precludes disclosure of the whole record underlying agency action

The Order, and in particular the Guidance, also conflict with the APA's requirement that an agency fully disclose the bases for its rulemaking decision. *See* 5 U.S.C. § 706 (noting that in reviewing an agency's action, a court "shall review the whole record"); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (where "the bare record may not disclose the factors that were considered," a court may demand an explanation "to determine if the [agency] acted within the scope of [its] authority and if the [agency's] action was justifiable under the

applicable standard"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977);

*SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of

review requires that the grounds upon which the administrative agency acted be clearly disclosed

and adequately sustained.")

One of the most troubling issues with the Order and Guidance is their intentional lack of

transparency. As the States noted in their Motion, and as this Court has recognized, neither the

Order nor the Guidance provides a mechanism for notifying the public whether and when a

proposed (or considered) action might be delayed or abandoned due to the requirements of the

Order. *See Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 15 (D.D.C. 2018). The fact that the

States are not able to determine the actual impact of the Order and Guidance, or to square

Defendants' assertions here that the Order has had no effect with the Administration's

proclamations of its effectiveness (*see* Pls.' Mot. for Summ. J. (Pls.' MSJ) (Dkt. 16) at 6–7), only

highlights the way in which the Order and Guidance obfuscate the administrative record. As the

Supreme Court recently said,

> The reasoned explanation requirement of administrative law, after all, is meant to
> ensure that agencies offer genuine justifications for important decisions, reasons that
> can be scrutinized by courts and the interested public. Accepting contrived reasons
> would defeat the purpose of the enterprise. If judicial review is to be more than an
> empty ritual, it must demand something better than the explanation offered for the
> action taken … .

*Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

More troubling than the lack of transparency is the fact that the Order and Guidance—in

disregard of these core principles—directs agencies to simultaneously comply with the Order's

requirements but not disclose they are doing so. Pursuant to the Guidance, agencies cannot rely

on the Order as a basis, in whole or in part, for their deregulatory actions. *See* Guidance, Q&A

37. Defendants chide the States' assertion that the Guidance thus requires agencies to disclaim

any role the Order may have played in their decision-making process (Defs.' Opp'n at 9), but Defendants present no authority to support their conclusory opinion that that is "an incorrect understanding" of the Guidance (*id.*), and it is by no means an illogical one. Not only does Defendants' statement fail to address the real issue at hand—what agencies understand the Guidance to mean—but it does nothing to negate the significant evidence showing that agencies *have not been transparent* in disclosing their efforts to implement the Order.

To the States' knowledge, EPA is the only federal agency that has publicized its efforts to comply with the Order (*see, e.g.*, EPA Audit Report and *EPA, Executive Order 13771— Reducing Regulation and Controlling Regulatory Costs*[3]). Even that agency's efforts provide insufficient information for the public, including States, to be able to know the Order's material effects on EPA's regulatory decisions. As the States explained in their motion, the EPA Audit Report is clear that there are extensive communications with OMB regarding the "EO 13771 status" of rules. Yet EPA's Office of Inspector General (OIG) noted that "[t]he OMB did not respond to OIG emails requesting information on EO guidance documents and conversations with the EPA." Pls.' MSJ at 6, citing EPA Audit Report at 13, n 9; *see also* EPA Audit Report at 13 (observing that "EPA actions under EO 13771 can be difficult for the public to monitor"); *id.* at 7 (concluding that "both the transparency of EO decision-making and the outreach for deregulatory recommendations could be enhanced and clarified").

To avoid this damning evidence, Defendants argue that it should be ignored: "Because Plaintiffs do not assert standing on the basis of any rulemaking by EPA, this fact is immaterial to the pending motion." Defs.' Resp. to Pls.' Stmt. of Mat. Facts (Dkt. 21-1) at 8. Not so.

---

[3] https://www.epa.gov/laws-regulations/executive-order-13771-reducing-regulation-andcontrolling-regulatory-costs (last visited Aug. 20, 2019) (attached as Exh. C to Rumsey Decl.).

Particularly where (to the best of the States' knowledge) EPA is the only federal agency to make any effort to disclose the impact of the Order on its rulemaking activities, the fact that those efforts have been deemed inadequate *by the agency itself* is plainly relevant to the States' alleged failure to establish the impact of the Order on agency rulemaking across the board. The individual declarants offered by Defendants have not performed the type of agency-wide review and investigation completed by EPA's OIG; their representations are correspondingly limited and therefore unhelpful and immaterial at the summary judgment stage.

This lack of transparency with respect to the Order and Guidance is particularly troubling in light of the fact that agencies are accorded a "strong presumption of regularity" absent a showing of bad faith. *Pac. Shores Subdiv., Cal. Water Dist. v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) ("Common sense dictates that the agency determines what constitutes the 'whole' administrative record because it is the agency that did the 'considering,' and that therefore is in a position to indicate initially which of the materials were 'before' it— namely, were 'directly or indirectly considered.'") (internal quotations and citations omitted).[4] The Order and Guidance undermine and render suspect the completeness of every administrative record relating to any rulemaking subject to the Order.

---

[4] *See also Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1097 (10th Cir. 1985) ("designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity") (citation and quotations omitted); *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F.Supp. 2d 7, 12 (D.D.C. 2001); *see also United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

### 2. The States have a concrete interest in the integrity of the administrative process

Arbitrary agency action violates not only the APA, but also the Constitution. *See, e.g.*, *Garfield v. United States*, 211 U.S. 249, 262 (1908) ("[T]here is no place in our constitutional system for the exercise of arbitrary power."); *New York v. Dep't of Commerce*, *supra*, 351 F. Supp. 3d at 518 ("[T]he APA exists to protect core constitutional and democratic values.") For the same reason the States have special solicitude in the standing analysis in this matter,[5] they have a concrete interest in ensuring that administrative rulemaking observes constitutional and statutory bounds. *See Leedom v. Kyne*, 358 U.S. 184, 190 (1958) ("This Court cannot lightly

---

[5] In a footnote, Defendants assert that the States' reliance on *Massachusetts v. EPA*, 549 U.S. 497 (2007), is "inapposite" because the States failed to assert procedural injury in their Complaint. Defs' Opp'n at 4 n.3. As discussed in Part I.A., *supra*, pp. 2–3, the States adequately pled procedural injury.

Defendants further assert "[t]here is no such 'concomitant procedural right' authorizing a judicial challenge to the agency actions at issue in this lawsuit." *Id*. Not so. For one, nothing limits the Supreme Court's holding in *Massachusetts* to the specific procedural right at issue in that case. And there is no meaningful distinction between the right of review of agency action under the APA and the right at issue in *Massachusetts* to challenge EPA's action as arbitrary and capricious under the Clean Air Act (42 U.S.C. § 7607(b)). *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("The Clean Air Act's review provision is more specific than the APA's, but the latter is easily adequate to justify 'special solicitude' here.") States arguably have special solicitude to enforce any procedural right.

Moreover, *Massachusetts* does not stand for the proposition that a state is entitled to special solicitude *only* where it is enforcing a procedural right. Numerous courts, including the D.C. Circuit, have read *Massachusetts* to accord a state special solicitude on the basis of its status as a sovereign. *See Arpaio v. Obama*, 797 F.3d 11, 26 (D.C. Cir. 2015) (noting that, in *Massachusetts*, in addition to the fact that the state did not have to "'meet[] all the normal standards for redressability and immediacy' because it was enforcing a procedural right, "Massachusetts received a further benefit. As a sovereign state, it was 'entitled to special solicitude in [the] standing analysis.'") (internal citations omitted); *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009) (identifying the "critical" factors entitling Massachusetts to special solicitude in *Massachusetts* as (1) the state's status as a sovereign, and (2) the fact that Massachusetts sought to assert its own rights as a state and not the rights of its citizens). In short, *Massachusetts* is much broader than Defendants allow, and confirms the States' standing to protect their interests here.

infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers."). As sovereigns that have surrendered certain self-governing prerogatives to the federal government, the States are invariably harmed when other players in the federal system act in a manner that disrespects and ultimately violates the bounds of their precisely defined constitutional and statutory authority.

By way of example, the APA's procedural notice requirements relate to and uphold constitutional due process. As this court has held in context of a rulemaking focused on a particular entity, "due process required that the entity in question be 'provide[d] notice of those unclassified items upon which [the agency] proposes to rely.'" *FBME Bank Ltd. v. Lew*, 125 F.Supp.3d 109, 122 (D.D.C. 2015) (quoting *Nat'l Council of Resistance of Iran v. U.S. Dep't of State*, 251 F.3d 192, 209 (D.C. Cir. 2001) (finding APA violation where record was incomplete). Without complete knowledge of the basis for an agency's action—which the States presumptively lack where an agency takes action to comply with the Order—the States' are not able to ensure that the agency properly considered only those factors that Congress intended it to consider, and that the action was not unduly delayed by the agency's need to comply with unlawful procedural requirements. Given that courts may set aside agency actions that are unreasonably delayed (5 U.S.C. § 706(1)), or that are not in accordance with law (5 U.S.C. §706(2)(A)), it is clear that Congress intended for agencies to be held accountable to their legislative mandates.[6] Fulfillment of these mandates is critically important to the States, for the many reasons articulated in their Complaint. *See* Compl. at ¶¶ 39–46. Those reasons include that there are substantive areas where the States themselves are preempted from regulating and so

---

[6] This harm is thus separate and distinct from the harms that result from the delay, withdrawal, or repeal of particular rules, although those harms also flow from the procedural improprieties the States allege, and form yet another basis for standing under this theory.

must rely entirely on federal agencies (*see id.* at ¶ 42), or where the scope of states' regulatory

jurisdiction may not be sufficient to fully address issues that pose a significant threat to their

quasi-sovereign and proprietary interests. *Id.* at ¶ 43.

Defendants assert that accepting the States' theory of standing on the basis of procedural

injury "would open the floodgates to any litigant suing under the APA to characterize their

substantive claims instead as procedural injury." Defs.' Opp'n at 6. This assertion misconstrues

the nature of the States' allegations. This is not a matter about a particular rulemaking, where a

plaintiff complains that an agency considered a factor it lacks statutory authority to consider

(which could be challenged at any rate under the APA, with reference to that agency's enabling

statute(s)). Rather, the States challenge an executive order that requires *all agencies* to consider

factors that *no agency* is statutorily authorized to consider, all while not disclosing the fact that

the factor was considered. That is absurd. The paucity of case law on point only reflects the

novelty of the Order and Guidance's approach, which is to impose on the existing rulemaking

framework requirements that only Congress is authorized to impose.[7]

## II.   THE STATES HAVE ESTABLISHED STANDING ON THE BASES OF SPECIFIC EXEMPLAR RULEMAKINGS

For the States to prevail on their motion, they must show a "substantial risk" that the Order

and Guidance caused the harm of which they complain. *Clapper v. Amnesty Int'l USA*, 568 U.S.

398, 414 n. 5 (2013); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *City of

Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007)). This they have done.

As Defendants would have it, causation fails wherever the agency can assert "separate

policy considerations or other factors" (*see, e.g.*, Defs.' Opp'n at 18, citing *Pub. Citizen v. Trump*,

---

[7] Even then, "the means selected shall have a real and substantial relation to the object sought to be attained." *See, e.g.*, *Nebbia v. People of New York*, 291 U.S. 502, 525 (1934).

361 F. Supp. 3d 60, 65 (D.D.C. 2019), but there is no basis in law for what amounts to a "but-for" standard here. It is well-settled that "[f]or standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; *substantial likelihood* of the alleged causality meets the test. … This is true even in cases where the injury hinges on the reactions of third parties." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990), citing, *inter alia*, *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 75 n. 20, (1978). The States have met their burden here.

For the exemplar rules discussed below,[8] Defendants proffer declarants' statements that the "Order has not been a factor" on their rulemaking (or that "there is no causal link") as dispositive of a lack of causation. *See* Defs.' Opp'n at 9–10, compiling statements from agency declarants. But those statements do not sufficiently rebut the principle undisputed material facts supporting the States' motion, which include that, when the agencies took the actions at issue here, they stated they were taking those actions under or pursuant to the Order. Nor do Defendants' declarants address the matter of the Guidance's admonition not to rely on the Order as basis for any deregulatory action. Thus, while the States admit they do not have complete facts, the facts they do have show that it is substantially likely that, contrary to the declarants' statements, the Order factored into the agencies' decisions. Moreover, under the circumstances at issue here, the declarants' statements amount to legal conclusions and/or statements of ultimate fact and need

---

[8] In the Administration's own words, executive agencies "*in this Administration … have withdrawn or delayed 1,579 planned regulatory actions,*" "exceed[ing] its promise to eliminate regulations at a 2:1 ratio." *See* https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-delivering-deregulation/) (last visited Oct. 4, 2019) (emphasis added). Defendants now disown these claims. *See* Defs.' Resp. to Pls.' Stmt. of Mat. Facts at ¶ 24. Regardless of the actual numbers, executive agencies have delayed or withdrawn hundreds if not thousands of regulations under the Order. The States lack the resources to determine the impact that each of these actions has had on them; the four rules discussed herein serve merely as exemplars, or illustrations, of these impacts.

not be credited. *See, e.g.*, *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)

("affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to

either support or defeat a motion for summary judgment"), citing C. Wright, A. Miller & M.

Kane, Federal Practice and Procedure: Civil 2d § 2738 (1983).

With respect to each rule, Defendants also challenge that the States have established

redressability. But in keeping with Defendants' misstatement of the causation standard, they also

misstate the redressability standard. Where an agency's regulatory failure is at issue, "the [party]

need not establish that, but for that misstep, the alleged harm certainly would have been averted."

*Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014); *see also Hawai'i v. Trump*, 859 F.3d

741, 763, 767 n.8 (9th Cir.) (finding standing where challenged executive order posed a barrier

that delayed or prevented issuance of visas, notwithstanding existence of other barriers), *vacated*

*on other grounds*, 138 S. Ct. 377 (2017); *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1,

7 (D.C. Cir. 2005) (finding standing to challenge agency action where ruling for plaintiff would

affect ongoing proceedings, although not guarantee plaintiff's desired outcome). Nor must the

States show that, were this Court to invalidate the Order, the delayed or repealed rules at issue

here would be promulgated or spring back to life; again, a "substantial likelihood" of such an

outcome suffices. *Duke Power Co.,* 438 U.S. at 79 ("We … cannot accept the contention that …

a litigant must demonstrate something more than … a substantial likelihood that the judicial

relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy'

requirement of Art. III."). Regardless of the substantive outcome of the rulemakings at issue here,

declaring the Order and Guidance unlawful will remove a significant impediment to agencies'

abilities to fulfill their statutory mandates, which is also sufficient to show redressability. *Lujan v.*

15

*Defs. of Wildlife*, 504 U.S. 555, 57 2, n.7 (1992); *WildEarth Guardians v. Jewell*, 738 F.3d 298,

306 (D.C. Cir. 2013).

    **A.**    **HHS's Head Start Rule**

        **1.**    **The HHS's proposal to eliminate the increased Head Start service**
             **duration requirement is fairly traceable to the Order**

The Order is "fairly traceable" to the challenged HHS proposal to roll back the Head Start

service duration requirements for all the reasons set forth in the States' motion. *See* Pls.' MSJ. at

35–37. The Rathgeb Declaration does not dispute—and cannot serve to replace—the facts on

which the States rely, which speak to the underlying animus for the rulemaking, not the bases

proffered by the agency to justify it in this litigation.

    In their Opposition, Defendants oppose the States' reliance on the repeal of the increased

service duration requirements on essentially three fronts. First, as they do with other exemplar

regulations the States have cited, Defendants incorrectly hold the States to a higher burden of

showing causation than is applicable. Again, the States' burden is only to demonstrate that it is

substantially likely that the Order improperly influenced HHS's decision to repeal the increased

service duration requirements. *See, e.g.*, *Clapper*, 568 U.S. at 414 n. 5.

    Second, Defendants attempt to defeat the States' showing of injury-in-fact by reducing

the claimed economic injury to a "voluntary expenditure of resources." Defs' Opp'n p. 11. There

is nothing voluntary about the long-term costs incurred where at-risk children go without

appropriate services. *See* Garcia Decl. in support of Pls.' MSJ (Dkt. 16-3) ¶ 12(d) (noting that

"for every dollar spent on high quality 'birth-to-five' programs for disadvantaged children . . . ,

there is a return of 7.3 dollars"); *id*. at ¶ 13 ("The long-term benefits to the participants in early

childhood education programs such as Head Start result in direct cost savings to state

governments," including saved incarceration and health care costs and "the benefit of a higher

state tax base"). It is certainly the States' prerogative to *avoid* those costs by incurring *lesser* cost to fill the education gap.

Defendants also try to undermine the States' claim of injury by emphasizing that HHS's deregulatory action merely "repeals a proposed increase in services that was always contingent and never took effect," Defs' Opp, p. 12, and they point to Congress' and even local Head Start programs' funding and allocation decisions as the real source of the States' harm. *Id*. The simple fact is that HHS promulgated the service duration requirements in 2016 with the intent of increasing the hours of services provided to children of low-income families, a decision that was based on the agency's thorough consideration of numerous factors, including those cited as bases for the repeal. *See, e.g.*, Head Start Performance Standards, 81 Fed. Reg. 61,294, 61,304 (Sept. 6, 2016). Because of HHS's decision to repeal the increased service duration requirement, which was compelled at least in part because of the Order, that goal will not be achieved.[9]

Finally, Defendants claim the States cannot demonstrate redressability with respect to the repeal of the service duration requirements because the HHS Secretary is free to exercise his discretion to waive the requirements without resorting to rulemaking. Defs.' Opp'n at 14. Just because HHS could achieve the same end via a different mechanism does not legitimize otherwise improper motives for the mechanism used here. (Indeed, it only serves to highlight the

---

[9] Defendants also wrongly suggest that for standing, the States must show that "given a fixed early childhood education budget" (from Congress) that HHS was wrong to prioritize providing *fewer* kids *more* hours than *more* kids *fewer* hours. Defs' Opp'n at 13. This is a straw man argument. HHS doubtless promulgated the increased requirements with the hope that Congress *would* provide sufficient funding, and the States are not challenging the repeal rule itself; they assert only that the Order improperly influenced HHS's decision to promulgate the repeal. Pls.' MSJ at 35-37; *see also* 81 Fed. Reg. at 61,378.

impropriety of the agency's action: if the Secretary could have unilaterally achieved the same

result, why did he not?) Redressability is otherwise established for the reasons set forth above.

**B.    NHTSA's V2V Rule**

In responding to the States' arguments with respect to the V2V rule, Defendants grossly

mischaracterize them. Defendants assert that the States, like the individuals named in *Public*

*Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 34 (D.D.C. 2018), have not demonstrated an injury in

fact. The relevant passage in *Public Citizen* reads as follows:

> Plaintiffs, however, say nothing about how long it will take before there is a "substantial"
> decrease in the risk of accidents, how that risk will decline over time, "how many
> accidents would be avoided by" finalizing the proposed rule, *Pub. Citizen,* 489 F.3d at
> 1296, how V2V technology compares to other safety technologies that are likely to
> develop over the next several years, and whether Fleming or Weissman face a
> "substantial probability of harm" taking into account the increased risk posed by the
> delay in finalizing the V2V rule, *id.* at 1295.

297 F.Supp.3d 6, 34.

Here, however, the States have in fact explained "how many accidents would be avoided

by" finalizing the proposed rule, noting that when the National Highway Transportation Safety

Administration (NHTSA) issued the V2V rule, it estimated that the technology could prevent

424,901–594,569 crashes and save 955–1,321 lives annually. Compl. at ¶ 101. And the States are

not individuals trying to demonstrate the increased personal risk to them of failure to adopt the

V2V rule. Rather, they represent over 14 percent of the population of the United States; as noted

in the States' Motion (pp. 32-33), Centers for Disease Control and Prevention (CDC) and

NHTSA statistics show that plaintiff states represented 12.7 percent of vehicle-related fatalities

in 2013.[10] The States further established that motor vehicle crashes cause them economic injury.

---

[10] State-Specific Cost of Death Fact Sheets,
https://www.cdc.gov/motorvehiclesafety/statecosts/index.html (attached as Exh. M to Rumsey
<span style="text-align:right;display:block">(continued…)</span>

*See* Mot. at pp. 32–34, citing, inter alia, *The Economic and Societal Impact of Motor Vehicle Crashes, 2010 (Revised)* 145–146 (Crash Report);[11] Jensen Decl. (Dkt. 17-4) at ¶¶ 3–4. Defendants did not dispute these facts, stating only that they "lack[] knowledge concerning the truth or falsity of the statement[s]." *See* Defs.' Resp. to Pls.' Stmt. of Mat. Facts (Dkt. 21-2), ¶¶ 70–72. Thus, there is not just a "substantial probability" but a *certainty* that the States will be harmed by those additional half-million crashes annually.

The States have thus established that they are harmed by delay of the V2V rule and that there is a "substantial likelihood" that this delay (and thus the States' resulting harm) is attributable to the Order. *Competitive Enter. Inst.*, 901 F.2d at 113. Redressability is also established. In addition to the reasons set forth above, by invalidating the Order, the Court can ensure that the unlawful Order will not cause *further* delay of the V2V rule, avoiding additional harm the States would incur with each passing day the rule is not implemented.

### C.   FHWA's Greenhouse Gas Performance Measure

In repealing the Greenhouse Gas Performance Measure (or Measure), the Federal Highway Administration (FHWA) itself stated that it "initiated this rulemaking [to repeal the Measure] *after reviewing existing and pending regulations pursuant to Executive Order 13771* and 13777." National Performance Management Measures, 83 Fed. Reg. 24,920, 24,922 (May 31, 2018) (emphasis added). The agency further stated its understanding that the Order "requires Federal agencies to take proactive measures to reduce the costs associated with complying with Federal regulations." *Id*. These public statements regarding the impetus for the agency's action,

---

(…continued)
Decl.); *see also* Federal Motor Vehicle Safety Standards; V2V Communications, 82 Fed. Reg. 3,854, 3,860 (Jan. 12, 2017).
[11] https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812013 (attached as Exh. N to Rumsey Decl.).

made in direct connection and contemporaneous with that action, should weigh at least as much as any post-hoc statement made for purposes of this litigation. *See Sierra Club v. Perry*, 373 F. Supp. 3d 128, 141 (D.D.C. 2019) ("DOE's own words provide the required causal connection. … DOE recognized: '[t]he proposed rule also would produce environmental benefits in the form of *reduced emissions of air pollutants and greenhouse gases associated with electricity production*.'") (Emphasis in original) (internal citation omitted).

Contrary to Defendants' assertion, the States' claim of pretext thus does not rest "only" on the mere fact "that the agency reached a different conclusion on certain points when it originally promulgated the performance measure rule." Defs. Opp'n at 18. In addition to the fact that the agency itself identified the Order as the impetus for the repeal, there is also the fact that the other stated bases for the repeal *are groundless*. It may be "axiomatic that an agency is free to change its mind," but it is equally axiomatic that "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 16 (2009); *see also id*. at 15 (where an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate. … It would be arbitrary or capricious to ignore such matters.") Such "detailed justification" is lacking with respect to all three stated bases for the repeal.

For one, with respect to FHWA's about-face on the matter of its legal authority to issue the Measure in the first place, the agency purports to have determined that it was not authorized to issue the Measure, but it concedes that it could issue the Measure if it chose to do so. *See, e.g.*, 83 Fed. Reg. at 24,922 (noting that it had "the discretion to determine the proper interpretation of the statute" but that it was opting not to do so, "because the [statute] does not *require* a GHG

measure … ."). Thus, the agency's decision to repeal the Measure could not have been compelled by a lack of authority to issue it.

As a second basis for the repeal, FHWA pointed to "the cost of the GHG measure when considered in relation to the lack of demonstrated benefits." *Id*. at 24,922. Noting that "[r]educing regulatory burdens is a FHWA priority," the agency stated, without reference to data or authority, that it had "decided that the GHG measure imposes unnecessary regulatory burdens on State DOTs and MPOs with no predictable benefits." *Id*. Then, without reference to the benefits the agency had earlier identified in issuing the Measure, FHWA here simply noted its concern for the costs necessary "to obtain and review the required data, to calculate the measure, and to coordinate and select a $CO_2$ emissions target," *id*. at 24,924, notwithstanding the agency's observations that some state and local agencies already collect such data or that they may wish to do so voluntarily. *Id*. at 24,925.

The third stated basis for the repeal was "that there was "*potential duplication* between information produced by the GHG measure and information produced by other initiatives related to measuring $CO_2$ emissions." *Id*. at 24,922 (emphasis added). This is an interesting spin on existing data sources FHWA earlier took into consideration when it issued the Measure in the first place, wherein the agency stated that it "designed the measure in a manner that uses existing data sources and minimizes burden on transportation agencies." National Performance Management Measures, 82 Fed. Reg. 5,970, 5,993 (Jan. 18, 2017). In other words, the agency always knew "the data needed to support the GHG measure is at least somewhat duplicative of [other agencies'] data on $CO_2$ emissions," 83 Fed. Reg. at 24,925, but only now does that cut *against* the rule, a conclusion the agency expressly reached "[p]ursuant to the mandate[] of Executive Order 13771" (among other executive orders). *Id*.

Regardless, the burden is not on the States to show that the Order is the but-for cause of the agency's action, only that there is a "substantial likelihood" that Order caused the agency to repeal the Measure. *Competitive Enter. Inst.*, 901 F.2d at 113. In light of the agency's own statements referencing the Order as the impetus for its review of the Measure, and the failure of the agency to provide a "detailed [alternative] justification" or "reasoned [alternative] explanation," this standard is easily met. *Fox Television Stations,* 556 U.S. at 16.

Finally, the fact that DOT exceeded its $500 million cost-reduction "goal" for FY2018 is not (as Defendants would have it) proof that the Order did not compel the agency's action. Defs.' Opp'n at 18–19. The fact that the agency met this goal does not change the fact that before the agency can issue any new rule subject to the Order, it must repeal at least two existing regulations and fully offset the cost of the proposed rule. Having this repeal and all other repeals and their associated cost savings in the bank will ease but not eliminate the agency's burden under the Order. Further, by Defendants' reasoning, it could be argued that the Order had nothing to do with *any* of the repeals that constitute the purported $1.24 billion in cost savings achieved by the agency, but (and Defendants gloss over this detail), the fact that DOT was required to meet that cost-reduction goal in the first place was *because of the Order*.

Defendants also assert the States cannot establish redressability, because enjoining the Order "would not lead to FHWA re-establishing the GHG Performance Measure absent reconsideration of the policy reasons for FHWA's repeal, since those reasons would not be affected in any way by such a court order." Defs. Opp'n at 21, citing Everett Decl. ¶ 9. As set forth above, under *Lujan,* 504 U.S. at 57, and *WildEarth Guardians*, 738 F.3d at 306, the States need not show that the Measure would spring back to life with a favorable ruling here; it is

sufficient that invalidation of the Order would remove a significant impediment to agencies' abilities to fulfill their statutory mandates, regardless of the substantive outcome.

### D.    DOE's Energy Conservation Standards

As with their opposition to the States' use of the other exemplar regulations, Defendants' arguments about DOE's delay in finalizing energy conservation standards for cooking products holds the States to incorrect standards. As to causation, this involves two incorrect arguments: (1) that the States must establish complete or "but-for" causation between the Order and alleged harm; and (2) that the States had to rebut the assertions by Defendants' declarants to establish standing. Defs' Opp'n at 21-22. Both points fail.

As mentioned above, the States' causation burden is to demonstrate that it is substantially likely that the Order improperly influenced DOE's decision to slow-walk the subject rule, which delay harmed the States. *Clapper*, 568 U.S. at 414 n. 5; *Susan B. Anthony List*, 573 U.S. at 158; *City of Dania Beach*, 485 F.3d at 1185. The States need not meet a "but-for" and proximate cause standard here. *Competitive Enter. Inst.*, 901 F.2d at 113. In short, it is irrelevant to the States' standing analysis if DOE can point to additional reasons for its delay of the rule.

Similarly, the States need not have rebutted the assertions—much of it legal opinion—by Defendants' declarant about the rulemaking process to establish the substantial likelihood that the Order factored into the process. The States appropriately objected to statements of legal opinion, such as that the Order "has not been a factor affecting any DOE decisions." *See* Pls.' Resp. to Defs.' Stmt. of Mat. Facts (Dkt. 17-11) at 1. That the States met the requisite burden for standing causation is plain because of the Guidance's prohibition on the agencies relying on the Order as a basis for deregulatory actions. *See* Guidance, Q&A 37. *Competitive Enter. Inst.*, 901 F.2d at 113.

Defendants also misstate the States' arguments that delay of finalizing energy efficiency standards constitutes a concrete and particularized injury-in-fact. Defendants incorrectly claim "Plaintiffs do not and cannot specify how an asserted delay of unknown duration in promulgating final standards of unknown substance has resulted, or imminently will result, in a specific climate change impact that constitutes a concrete and particularized injury-in-fact to Plaintiffs." Defs.' Opp'n at 23. In fact, the States correctly assert that any delay in a rulemaking like this one that is intended to reduce greenhouse gases causes a forfeiture of emissions reductions that would have been achieved but for the delay, which results in an increased risk of climate-related harms. Pls.' MSJ at 26, citing the National Assessment.

Also, Defendants erroneously claim that the States failed to cite Federal Register notice language or other evidence about the rulemaking. Defs.' Opp'n at 23. However, the States quoted the Federal Register notices of proposed rulemakings that DOE has stalled for years now, in which DOE had determined that the proposed energy conservation standards would result in significant reductions of greenhouse gases. Pls.' MSJ at 20-21, citing Energy Conservation Standards for Residential Conventional Cooking Products, 81 Fed. Reg. 60,784, 60,787 (Sept. 2, 2016). Defendants' mischaracterizations of the States' points fail to rebut them; the States have presented the Court with sufficient evidence of harm for purposes of standing. *Id.* at 21-27; *Massachusetts,* 549 U.S. at 521-22.

Finally, Defendants incorrectly claim that the States cannot establish redressability, because "enjoining the Order would not and could not result in the issuance of a final rule." Defs.' Opp'n at 24. As discussed above, this is not the correct standard; redressability is established.

**CONCLUSION**

Every Administration brings its unique policy vision to the Executive Office. The Order and Guidance, however, are not just policy; they are executive overstep. Our government's system of checks and balances exists to correct such overstep.[12] As the States are sovereigns themselves suing to protect their own interests, and because the crux of the States' complaint seeks redress of the procedural harms this executive overstep causes them and the very process of lawful, non-arbitrary rulemaking, the States' standing requirements are met: The States have presented undisputed facts showing a substantial likelihood that the Order and Guidance have influenced agencies' rulemaking decisions to the States' detriment. Defendants failed to rebut those facts. They claim the States have misunderstood the Order; misunderstood the Guidance; they announce that the Order and Guidance really had no effect at all on the States' exemplar regulations, despite evidence to the contrary including most obviously that these regulations have been labeled "deregulatory" under the Order. None of Defendants' arguments in opposition rebut the indisputable fact that that the Order created a new layer of arbitrary requirements that agencies must satisfy to be able to issue new rules. Not only do these requirements hinder the agencies' abilities to meet their statutory mandates, but they actually *require* the agencies to violate fundamental rules of administrative law. The States have demonstrated sufficient standing for the Court to adjudicate the merits of their complaint. For the foregoing reasons, the Court should grant the States' Cross-Motion for Summary Judgment on Standing.

---

[12] As the Court noted in 1952, "[t]he doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 629 (1952) (Douglas, J. concurring) (quoting *Myers. v. U.S.*, 272 U.S. 52, 293 (1929) (Brandeis, J. dissenting).

Dated: October 4, 2019                    Respectfully submitted,

                                          XAVIER BECERRA
                                          Attorney General of California
                                          DAVID ZONANA (CA SBN 196029)
                                          Supervising Deputy Attorney General
                                          MEGAN K. HEY (CA SBN 232345)
                                          Deputy Attorney General

                                           /s/ Elizabeth B. Rumsey
                                          ELIZABETH B. RUMSEY (CA SBN 257908)
                                          Deputy Attorney General
                                          California Department of Justice
                                          1515 Clay Street, 20th Floor
                                          Oakland, CA 94612
                                          (510) 879-0860
                                          liz.rumsey@doj.ca.gov
                                          *Counsel for the State of California*

                                          ELLEN F. ROSENBLUM
                                          Attorney General of Oregon
                                          PAUL GARRAHAN
                                          Attorney-in-Charge
                                          Natural Resources Section
                                          Oregon Department of Justice
                                          1162 Court Street, N.E.
                                          Salem, Oregon 97301-4096
                                          (503) 947-4342
                                          Paul.Garrahan@doj.state.or.us
                                          *Counsel for the State of Oregon*

                                          KEITH ELLISON
                                          Attorney General
                                          State of Minnesota
                                          PETER SURDO (Bar No. 339015)
                                          Special Assistant Attorney General
                                          445 Minnesota Street, Suite 900
                                          St. Paul, Minnesota 55101-2127
                                          (651) 757-1061
                                          Peter.Surdo@ag.state.mn.us
                                          *Attorneys for the State of Minnesota*