# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, *et al.*,

   *Plaintiffs*,

  v.

DONALD TRUMP, *et al.*,

   *Defendants*.

Civil Action No. 19-960 (RDM)

## MEMORANDUM OPINION

Plaintiffs—the states of California, Oregon, and Minnesota—challenge Executive Order 13,771 and the implementing Guidance issued by the Office of Management and Budget ("OMB") as violative of the separation of powers, the Constitution's Take Care Clause, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* California and Oregon first moved to intervene in a parallel case also before the Court, *Public Citizen, Inc. v. Trump*, No. 17-253 (filed Feb. 8, 2017), but the Court denied their motion because of doubts as to whether the plaintiffs who brought that case had Article III standing. California, Oregon, and Minnesota then filed this action. Dkt. 1 (Compl.). To a considerable degree, this case echoes the issues and arguments that this Court considered in *Public Citizen*. *See Pub. Citizen, Inc. v. Trump* ("*Public Citizen I*"), 297 F. Supp. 3d 6, 34 (D.D.C. 2018); *Pub. Citizen, Inc. v. Trump* ("*Public Citizen II*"), 361 F. Supp. 3d 60 (D.D.C. 2019); *Pub. Citizen, Inc. v. Trump* ("*Public Citizen III*"), No. 17-253, 2019 WL 7037579 (D.D.C. Dec. 20, 2019). In both this case and in *Public Citizen*, the plaintiffs challenged the Executive Order and argued that it had delayed or derailed the promulgation of desired rules. In both cases, the defendants denied that the Executive Order was to blame—at least with respect to the specific regulatory actions or inactions the plaintiffs

identified.  And, in both cases, the plaintiffs offered declarations describing the actual or imminent injuries they alleged, and the defendants offered declarations denying that the Executive Order caused the delays or precipitated the regulatory actions.

Despite these similarities, this case raises issues of its own.  First, unlike the organizations that sued in *Public Citizen*, the plaintiffs in this case are sovereign states.  That makes a difference, according to Plaintiffs, because states are entitled to "special solicitude" in evaluating their Article III standing to sue.  Second, unlike the plaintiffs in *Public Citizen*, the plaintiffs in this case assert procedural injuries.  That matters, according to Plaintiffs, because the imminence and redressability requirements for Article III standing are relaxed when a plaintiff asserts a procedural injury.  Third, unlike the plaintiffs in *Public Citizen*, the plaintiffs in this case assert that they have been, or will likely be, injured by the repeal of two rules not at issue in *Public Citizen*—revocation of the Federal Highway Administration's Greenhouse Gas Performance Measure and the rollback of the Head Start minimum service duration requirement. The first of these actions harms the states, according to Plaintiffs, because they bear "real and significant costs as a result of greenhouse gas-induced climate change," Dkt. 17 at 37, and the second harms the states because they must fill the service gap left by the repeal, *id*. at 46. Plaintiffs contend that those injuries, along with the injuries resulting from the delays in finalizing two additional rules that were at issue in *Public Citizen*, were caused by the Executive Order and could be redressed by its invalidation.

Plaintiffs are correct in several respects: this case is not on all fours with *Public Citizen*; states are entitled to special solitude in evaluating Article III standing; the imminence and redressability requirements are relaxed in cases asserting procedural injuries; and this case involves two rules not at issue in *Public Citizen*.  None of that is determinative, however,

2

because—as in *Public Citizen*—the ultimate question here is whether Plaintiffs have carried their burden of demonstrating that the Executive Order has caused, or is likely to cause, a material delay or the repeal of any of the specific rules at issue. As in *Public Citizen*, the Court concludes that Plaintiffs here have failed to carry this essential burden. The Court will, accordingly, **DENY** Plaintiffs' motion for partial summary judgment, will **GRANT** Defendants' motion for summary judgment, and will **DISMISS** the case for lack of Article III standing.

## I. BACKGROUND

### A.    Factual Background

Because the Court has previously described the challenged Executive Order and OMB Guidance at length, *Public Citizen I*, 297 F. Supp. 3d at 13–15; *Public Citizen II*, 361 F. Supp. 3d at 65–68; *Public Citizen III*, 2019 WL 7037579, at *2–3, the Court will do so only briefly here.

Executive Order 13,771 imposes three restrictions on the authority of agencies to adopt or to propose new regulations: a "two for one" requirement, an "offset" requirement, and an "annual cap" on the net costs of covered regulations. Exec. Order No. 13,771, 82 Fed. Reg. 9,339 (Jan. 30, 2017). First, the "two-for-one" requirement provides that "whenever an executive department or agency . . . publicly proposes for notice and comment or otherwise promulgates a new regulation," it must "identify at least two existing regulations to be repealed." *Id.* § 2(a). Second, the "offset" requirement provides that agencies must offset "any new incremental cost associated with new regulations" by eliminating "existing costs associated with at least two prior regulations." *Id.* § 2(c). Finally, the "annual cap" provision prohibits an agency from adopting new regulations that, in the aggregate, exceed the agency's "total incremental cost allowance" for the year. *Id.* § 3(d). The total cost allowance—or "annual

cap"—is set each year for each agency by the Director of OMB and may be zero, positive, or negative. *Id.*

OMB issued interim guidance on the meaning and implementation of the Executive Order on February 2, 2017, and it issued final guidance on April 5, 2017. *See* Office of Mgmt. & Budget, Exec. Office of the President, Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017, Titled "Reducing Regulation and Controlling Regulatory Costs" (2017) ("Interim Guidance"); Office of Mgmt. & Budget, Exec. Office of the President, Guidance Implementing Executive Order 13,771 (2017) ("Final Guidance"). In the Final Guidance, OMB explained that the Executive Order applies only to "significant regulatory action[s]" and "significant guidance document[s]," Final Guidance, Q & A 2, which are "action[s]" or "guidance" that are likely to "[h]ave an annual effect on the economy of $ 100 million or more" or meets other, specified criteria, Exec. Order 12,866 § 3(f), 58 Fed. Reg. 51,735 (Sept. 30, 1993). Deregulatory actions, in contrast, need not qualify as "significant" to factor into this calculus. Final Guidance, Q & A 4.

The OMB Guidance further explains that the Executive Order considers only compliance *costs* borne by regulated parties; it does not consider the public *benefit* of the existing or proposed rule. *See* Final Guidance, Q & A 21, 32; Interim Guidance at 4. In other words, a regulation that costs $10 to implement and that saves $100, is treated as a $10 loss and not a $90 gain. Applying this methodology, agencies must determine the present value of the costs of the regulatory action or the avoided costs of the deregulatory action "over the full duration of the expected effects of the action[ ]." Final Guidance, Q & A 25. An agency's "total incremental cost" for a fiscal year "means the sum of all costs from" significant regulatory actions and guidance documents "minus the cost savings from . . . deregulatory actions." *Id.*, Q & A 8.

Agencies may, however, "bank" cost savings and deregulatory actions "for use in the same or a subsequent fiscal year" to offset significant regulatory actions or guidance documents and to meet their "total incremental cost allowance[s]." *Id.*, Q & A 29.

The Executive Order recognizes that agencies face various statutory obligations, and it does not—and could not—purport to override those obligations. Rather, the Executive Order requires agencies to implement it in a manner "consistent with applicable law" and cautions that that "[n]othing in th[e] [O]rder shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." Exec. Order 13,771 § 5. Recognizing that certain federal statutes prohibit agencies from considering costs in deciding whether to take a significant regulatory action, the OMB Guidance explains that the Executive Order does not "change the agency's obligations under [such a] statute." Final Guidance, Q & A 18. Nevertheless, it "generally . . . require[s]" agencies implementing these statutory obligations "to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs." *Id.* If an agency faces an imminent statutory (or judicial) deadline requiring it to take regulatory action, the Executive Order "does not prevent" the agency from complying with that deadline, even if it cannot first satisfy the Executive Order's mandates. *Id.*, Q & A 33. The agency must, however, "offset [the] regulatory action[] as soon as practicable thereafter." *Id.* Finally, the OMB Guidance prohibits agencies from relying on the Executive Order "as the basis or rationale, in whole or in part, for" taking a deregulatory action, even though it puts pressure on agencies to take such actions. *See id.*, Q & A 37.

**B.      Procedural Background**

On June 4, 2018, California and Oregon moved to intervene as plaintiffs in *Public Citizen*. *See Public Citizen, Inc. v. Trump*, No. 19-253, ECF No. 73; *see also Public Citizen II*, 361 F. Supp. 3d at 93. Because the *Public Citizen* plaintiffs' standing remained in doubt, and because a new party may not intervene in an action in which the original plaintiffs lack standing, the Court denied the motion to intervene. *Public Citizen II*, 361 F. Supp. 3d at 93. On April 4, 2019, the states of California, Oregon, and Minnesota filed the present action against Donald J. Trump, in his official capacity as President of the United States, and the heads of seven agencies: the Office of Management and Budget ("OMB"), the Department of Energy ("DOE"), the Department of Transportation ("DOT"), the Department of Labor ("DOL"),[1] the Department of Interior ("DOI"), the Environmental Protection Agency ("EPA"), and the Department of Health and Human Services ("HHS"). Dkt. 1.

The complaint alleges that Plaintiffs have suffered, or are likely to suffer, various injuries due to the Executive Order's effects on six different rulemakings: (1) the EPA's reconsideration of rules governing emissions from solid waste landfills; (2) the Federal Highway Administration's ("FHWA") repeal of its Greenhouse Gas Performance Measure; (3) the Bureau of Land Management's ("BLM") delay of enforcement of a rule requiring the reduction of waste from oil and gas production on federal leases; (4) the DOE's delay in issuing new energy efficiency standards for residential cooking products; (5) HHS's relaxation of an earlier rule setting a strict minimum service duration requirement for the Head Start program; and (6) the

---

[1] Defendants note that Plaintiffs have not "allege[d] any injury connected with any action of the Department of Labor" and argue that "the case should accordingly be dismissed with regard to that Defendant." Dkt. 15 at 12 n.1. The Court agrees and can therefore dismiss Plaintiffs' claims against the Secretary of Labor without further analysis.

National Highway Traffic Safety Administration's ("NHTSA") delay in finalizing a proposed rule requiring the implementation of vehicle-to-vehicle ("V2V") technology that would prevent vehicular crashes.  *Id.*

Defendants move to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for summary judgment on standing, Dkt. 14, and Plaintiffs cross-move for partial summary judgment on standing, Dkt. 17.  Plaintiffs have narrowed their standing argument to focus on four regulatory or deregulatory actions: (1) the FHWA repeal of the Greenhouse Gas Performance Measure; (2) the DOE's delay in issuing the new energy efficiency standards for residential cooking products; (3) HHS's relaxation of the Head Start minimum service duration requirement, and (4) the NHTSA's delay in finalizing the V2V rule.  Defendants, in turn, maintain—with no objection from Plaintiffs—that the parties' respective motions for summary judgment can, and must, be resolved based on these four actions.

## II.  LEGAL STANDARD

A "plaintiff bears the burden of . . . establishing the elements of standing," and each element "'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'"  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citation omitted).  At the motion to dismiss "stage, general factual allegations of injury resulting from the defendant's conduct" will often suffice.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Thus, if the defendant raises a "facial" challenge to the plaintiff's standing, the court need consider only "the legal sufficiency of the jurisdictional allegations contained in the complaint."  *Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).  But "[w]here a motion to dismiss a complaint presents a dispute over the factual basis of the court's subject matter

jurisdiction[,] . . . the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (internal quotation marks and citation omitted). Instead, the court "must go beyond the pleadings and resolve any disputed issue of fact . . . necessary to a rule upon the motion to dismiss." *Id.* (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Even under that mode of analysis, however, "the allegations of the complaint should be construed favorably to the pleader." *Lemma v. Hispanic Nat'l Bar Ass'n*, No. 17-2551, 2019 WL 4043983, at *2 (D.D.C. Aug. 27, 2019) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When a plaintiff moves for summary judgment on the issue of standing, it may not rest on the mere allegations of the complaint but must, instead, "cit[e] to particular parts of materials in the record," Fed. R. Civ. P. 56(c), that demonstrate that there is no genuine dispute of material fact as to the existence of "a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citation omitted). Likewise, when a defendant moves for summary judgment on standing, it must demonstrate "that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and that the plaintiff cannot establish the required elements of Article III standing based on the undisputed evidence, *see Lujan*, 504 U.S. at 561. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

### III. ANALYSIS

"The 'irreducible constitutional minimum of standing contains three elements': '(1) injury-in-fact, (2) causation, and (3) redressability.'" *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 48 (D.C. Cir. 2016) (quoting *Lujan*, 504 U.S. at 560). First, under the injury-in-fact element, the injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Second, under the causation element, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Id.* at 560–61. Courts must therefore determine "whether it is substantially probable that the challenged acts of the defendant . . . will cause the particularized injury of the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citations omitted). Finally, under the redressability element, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" of the court. *Lujan*, 504 U.S. at 561. A plaintiff bears the burden of demonstrating its standing at every stage of the litigation, but that burden evolves with the progressively demanding standards at the motion to dismiss and summary judgment stages. *See id.*; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

According to Plaintiffs, the burden of establishing standing is relaxed in this case for two reasons. First, Plaintiffs are not private parties but, rather, states suing in their sovereign capacities. Dkt. 17 at 17–19. Second, the injury that they assert is a procedural one—the agency defendants have engaged in, or delayed engaging in, regulatory activity "potentially affecting the States' interests without adhering to lawful rulemaking requirements." *Id.* at 19. As explained in section A below, Plaintiffs are correct that these factors can, at least at times, relax some of the elements required to establish Article III standing. But, as explained in section B, even with the

benefit of those less demanding requirements, Plaintiffs have failed to carry their burden of demonstrating that they have standing to sue in this case.

## A.     Relaxed Requirements for Establishing Article III Standing

### 1.     *"Special Solitude"*

To set the stage, Plaintiffs invoke the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), and a handful of out-of-circuit precedents and argue that states are entitled to "special solicitude" for purposes of establishing Article III standing, at least when they sue in their sovereign capacity.[2]  In *Massachusetts v. EPA*, a group of states (and other plaintiffs) sued the EPA, alleging that the agency had statutory authority to regulate greenhouse gases, that the EPA's stated reasons for declining to do so were inconsistent with the Clean Air Act, and that its failure to regulate contributed to increased global warming and harm to the environment.  *Id*. at 504.  Before reaching the merits, however, the Supreme Court was required to decide whether the states had Article III standing to sue.

The principle hurdle that the states faced was the well-established principle that Article III standing demands a "particularized" harm—a generalized harm "to humanity at large" will not suffice.  *Id.* at 515.  As the Supreme Court explained, Article III does not empower federal courts "to entertain citizen suits to vindicate the public's non-concrete interest in the proper administration of justice."  *Id*. at 516–17 (quoting *Lujan*, 504 U.S. at 580).  But, even though

---

[2]  "A State's standing depends on the capacity in which it initiates a lawsuit."  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019) (citing Erwin Chemerinsky, Federal Jurisdiction 121 (7th ed. 2016)).  States may either "sue to redress [their] own injuries" through a direct-injury lawsuit or they may "sue in a representative capacity to vindicate [their] citizens' interests" by bringing a *parens patriae* lawsuit.  *Id.*  Traditionally, however, states do not have "standing as *parens patriae* to bring an action against the federal government."  *Id.* (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)).  Presumably for this reason, Plaintiffs do not assert *parens patriae* standing for present purposes.

global warming is an issue of near-universal concern, the breadth of that concern did not deprive the courts of jurisdiction in *Massachusetts v. EPA* because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Id*. at 518. Quoting the words of Justice Holmes, the Supreme Court explained that, when a state sues in its sovereign capacity, it "'has an interest independent of and beyond the titles of its citizens, in all the earth and air within its domain.'" *Id*. at 518–19 (quoting *Georgia v. Tenn. Copper Co*., 206 U.S. 230, 237 (1907)). "'It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.'" *Id.* (quoting same). That interest in protecting its "sovereign territory," along with its interest in protecting its own coastal property from the encroachment of rising sea levels, was enough to establish that Massachusetts had a particularized injury in fact. *Id*. at 519–23. "Given [the] stake [that Massachusetts had] in protecting its quasi-sovereign interests," and given the right that Congress conferred on the states and others "to challenge the rejection of [an EPA] rulemaking petition as arbitrary and capricious," the Court concluded that Massachusetts was "entitled to *special solicitude* in [the Court's] standing analysis." *Id.* at 520 (emphasis added); *see also Gov't of Manitoba*, 923 F.3d at 182 (quoting *Massachusetts v. EPA*, 549 U.S. at 519–20).

Lower courts have lamented the "lack of guidance on how [they] are to apply the special solicitude doctrine to standing questions," *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1238 (10th Cir. 2012), but some have read *Massachusetts v. EPA* to hold that a state might at times have standing where a non-state plaintiff would not. In *Texas v. United States*, most notably, the Fifth Circuit concluded that states that challenged the Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA") had Article III standing because (1) DAPA treated participants as "lawfully present" in the United States; (2) that status

"allow[ed] otherwise ineligible aliens to become eligible for state-subsidized driver's licenses;" and (3) the cost of subsidizing those licenses imposed a concrete injury on the states. 809 F.3d 134, 149–50, 155 (5th Cir. 2015), *aff'd by an equally divided court, United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam). Although the Fifth Circuit recognized that the harm that the states asserted was indirect—DAPA did not regulate the states but, rather, deferred actions against a group of immigrants—the court stressed that "the states . . . 'are not normal litigants for the purposes of invoking federal jurisdiction.'" *Id.* at 152 (quoting *Massachusetts v. EPA*, 549 U.S. at 518). That unique status mattered, according to the Fifth Circuit, for two reasons. First, unlike "normal litigants," the states have the power and obligation to legislate, and DAPA imposed "substantial pressure" on the states "to change their laws" relating to the issuance of driver's licenses. *Id.* at 153. Second, unlike "normal litigants," the states "surrendered some of their control over immigration to the federal government" when they joined the Union. *Id.* at 155. Although it cautioned that its decision was *sui generis*, the Fifth Circuit concluded that these factors were sufficient in that case to invoke the "special solicitude" doctrine recognized in *Massachusetts v. EPA* and to sustain their standing to sue. *Id.* at 154–55.

As Plaintiffs acknowledge, the "special solitude" that the federal courts owe to the states does not mean that states that elect to sue in federal court are relieved of their burden of establishing each of the traditional elements of Article III standing. Dkt. 17 at 18. What it does mean, in Plaintiffs' view, is that "state plaintiffs" must receive "the benefit of any doubt" with respect to whether those elements are satisfied. *Id.* But even that more restrained view overstates *Massachusetts v. EPA*'s holding. The Supreme Court did not alter the standard of proof applicable to state-plaintiffs; instead, it simply recognized that the requirement that a plaintiff establish a particularized harm, and not merely a "general interest . . . common to all

members of the public," *Massachusetts v. EPA*, 415 F.3d 50, 59 (D.C. Cir. 2005) (Sentelle, J., concurring) (citations omitted), does not always apply to a sovereign state in the same way it applies to other litigants. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476–77 (D.C. Cir. 2009) ("*Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm."). States are unique in this respect because they have a sovereign interest in "'all the earth and air within [their] domain'" and because they "surrender[ed] certain sovereign prerogatives" to the national government when they joined the Union. *Massachusetts v. EPA*, 549 U.S. at 518–19 (citation omitted). In other words, the demands of Article III do not change depending on whether a state is a plaintiff. Rather, it is the unique and sweeping interests of the states, and the fact that a state—and only a state—may assert "quasi-sovereign interests," that affects the nature of the Court's Article III analysis.

### 2.    *Procedural Injuries*

Plaintiffs also invoke the less demanding standards applicable in procedural injury cases. In a procedural injury case, the plaintiff must establish that "(1) the government violated its procedural rights designed to protect a threatened, concrete interest, and (2) the violation resulted in injury to that concrete, particularized interest." *New Hampshire v. Holder*, 293 F.R.D. 1, 6 (D.D.C. 2013) (three-judge court) (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)). "[T]he procedural standing doctrine 'does not—and cannot—eliminate any of the "irreducible" elements of standing[.]'" *Id.* (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664). It does, however, "relax[] the immediacy and redressability requirements." *Id.*; *see also Massachusetts*, 549 U.S. at 517–18 (quoting *Lujan*, 504 U.S. at 572 n.7) (internal citation

omitted).  As a result, in a procedural injury case, the "litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Id.*; *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) (requiring that plaintiffs alleging procedural injuries "show that the procedural step was connected to the substantive result").  The injury-in-fact and causation requirements, in contrast, are not relaxed and apply just as they would in any other case.  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).

In *Lujan*, the Supreme Court provided the classic example of standing based on a procedural injury, explaining that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."  504 U.S. at 572 n.7.  The concrete interest in the *Lujan* example is the plaintiff's interest in not living next to a dam that would negatively affect the environment. Other examples of concrete interests include Delaware's interest in "the preventing of the construction of [a liquid natural gas terminal] project," *Del. Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 (D.C. Cir. 2009), a state's interest in "approval of an Indian gaming proposal," *id.* (citing *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007)), and farmers' interest in high sugar prices, *Sugar Cane Growers*, 289 F.3d at 92–93.

In contrast, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  There is no doubt, for example, that a plaintiff that is able to establish that an agency failed to comply with the notice

and comment procedures of the APA would, nonetheless, have no recourse in an Article III court absent a showing that it suffered or will suffer a concrete injury as a result of policy produced through the allegedly flawed process. *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239, 244–46 (D.C. Cir. 2015). In the procedural rights context, this entails a two-step analysis. First, the plaintiff must establish a causal connection between the omitted procedural step and "some substantive government decision that may have been wrongly decided because of the lack of" that procedural step. *Ctr. for Biological Diversity*, 861 F.3d at 184 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). Second, the plaintiff must establish a connection between that substantive decision and his "particularized injury." *Id.* (quoting same). "Importantly, with respect to the first link, the party . . . need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result" but just that "'the procedural step was connected to the substantive result.'" *Id.* (quoting *Sugar Cane Growers*, 289 F.3d at 94).

*       *       *

In summary, the special-solitude and procedural-injury doctrines do not—and cannot—alter the "irreducible constitutional minimum of standing" reflected in the elements of injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 560. Rather, the special-solitude doctrine merely recognizes the sweeping interests that states, as separate sovereigns, have over their domains, and the procedural-injury doctrine merely relaxes the imminence and redressability elements of Article III standing, while leaving the remaining elements unaffected.

### B.     Application

Plaintiffs identify four rulemakings that they contend were either delayed or undertaken as a result of the Executive Order, and they contend that these agency inactions or actions will or will likely cause them various harms, ranging from threatening their coastlines with rising tides

(as in *Massachusetts v. EPA*) to fiscal harms resulting from avoidable car crashes or from less federal support for early education. At times, Plaintiffs suggest that their standing is premised on "a concrete interest in the integrity of the administrative process." Dkt. 23 at 19; Dkt. 17 at 9 (referring to the "States' concrete interest in the rule of administrative law and in agencies' abilities to fulfill their statutory mandates"). But, presumably recognizing that federal jurisdiction requires more than "a generally available grievance about government," *Lujan*, 504 U.S. at 573, Plaintiffs also argue that the procedural violation they allege—interference with the proper application of the APA—is connected to "substantive rules" leading to "particularized injuries to the States." *Compare* Dkt. 17 at 22–23 *with id.* at 24–47.

As explained below, the Court is unconvinced that Plaintiffs have met their burden of establishing standing, even treating their claims with the "special solitude" to which states are entitled and even applying the relaxed immediacy and redressability requirements appropriate in procedural injury cases. Ultimately, with respect to each of the four regulatory inactions or actions at issue, Plaintiffs cannot show that any material delay in action or any agency action was caused by the Executive Order or the OMB Guidance. Although the plaintiff in a procedural-injury case need not show that the agency would have reached a different decision in the absence of the alleged procedural violation, the plaintiff must establish some causal connection between the omitted procedural step and the substantive government decision at issue. Here, Defendants have submitted competent evidence demonstrating that neither the two-for-one rule nor the annual cap was "connected" to the agency inactions and actions Plaintiffs challenge.[3]

---

[3] As the Court explained in *Public Citizen III*, "it is certainly plausible, and perhaps likely, that the Executive Order and the OMB guidance have [caused], delayed, or derailed at least some regulatory actions," but "it is hard to say with the requisite degree of confidence which actions those are" because (1) "neither the Executive Order nor the OMB Guidance provides a mechanism for notifying the public whether and when a proposed . . . regulatory action [has

The Court will consider each of the four rulemakings in turn.

1.     *FHWA's Greenhouse Gas Performance Measure*

On January 18, 2017, the FHWA, an agency within the Department of Transportation, issued a final rule imposing a Greenhouse Gas ("GHG") Performance Measure. *See* National Performance Management Measure; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 82 Fed. Reg. 5,970 (Jan. 18, 2017) (codified at 23 C.F.R. pt. 490). Under that rule, state transportation departments and metropolitan planning organizations were required to track on-road greenhouse gas emissions and to establish two- and four- year emissions performance goals. *Id*. at 5,996–97, 6,000–02; Dkt. 14-4 at 2 (Everett Decl. ¶ 5) (GHG Performance Measure required State Departments of Transportation and Metropolitan Planning Organizations to measure, and to set targets for, changes in total annual tons of $CO_2$ emissions from all on-road mobile sources). The purpose of the rule was to "drive decisions that contribute to national GHG reduction goals." 82 Fed. Reg. at 6,001.

Nine months later, and after issuance of the Executive Order, the FHWA issued a Notice of Proposed Rulemaking ("NPRM") proposing to repeal the GHG Performance Measure rule. 82 Fed. Reg. 46,427, 46,430 (Oct. 5, 2017) (to be codified at 23 C.F.R. pt. 490). The NPRM explained that the Department of Transportation "commenced a review of existing and pending regulations" pursuant to the Executive Order "to determine whether changes would be

---

occurred, been] delayed or abandoned due to the requirements of the Executive Order," (2) "agency decisions about whether and how quickly to move forward with regulatory initiatives are often informed by a variety of considerations," and (3) the Executive Order does not stand alone but, rather, reflects the current Administration's more general wariness of federal regulation." 2019 WL 7037579, at *1. Those hurdles, although real, cannot alter the essential requirements for establishing Article III standing.

appropriate to eliminate duplicative regulations and [to] streamline regulatory processes.  *Id.*  The Department "identified the GHG measure . . . as being potentially duplicative of existing efforts in some States, and burdensome."  *Id.*  For these reasons, and because the governing statute, 23 U.S.C. § 150, did "not explicitly require a GHG measure," the FHWA proposed repeal of the GHG Performance Measure rule.  *Id.*  According to the NPRM, the proposed repeal constituted a "deregulatory action" for purposes of the Executive Order, and elimination of the GHG Performance Measure rule would result in approximately $11 million in cost-savings over nine years.  *Id*. at 46,431.

On May 31, 2018, after receiving public comments, the FHWA rescinded the GHG Performance Measure.  83 Fed. Reg. 24,920 (May 31, 2018) (codified at 23 C.F.R. pt. 490).  In the final rule, the FHWA explained that its decision was based on "three primary factors:" (1) the agency's "[r]econsideration of the legal authority under which the GHG Performance Measure rule was promulgated;" (2) "the cost of the GHG measure when considered in relation to the lack of demonstrated benefits;" and (3) "the potential duplication between information produced by the GHG measure and information produced by other initiatives related to measure $CO_2$ emissions."  *Id.* at 24,922.  With respect to the first factor, the FHWA acknowledged that it had "discretion" to read the governing statute to authorize the GHG Performance Measure but, nonetheless, characterized that interpretation as "strained."  *Id.* at 24,293.  The better reading of the statute, according to the 2018 final rule, excludes "environmental sustainability" from the definition of "performance."  *Id.*  With respect to the second factor, the agency noted that it was "giving particular attention to opportunities to reduce burdens imposed by existing regulations" and that it was guided, at least in part, by Executive Orders 13,777 and 13,783 (but, notably, not Executive Order 13,771).  After considering the costs and benefits of the GHG Performance

Measure rule, the FHWA concluded that, although the cost of the rule was low, "the speculative and uncertain benefits" resulting from the rule were insufficient to justify its retention. *Id.* at 24,924. And, with respect to the final factor, the FHWA observed that "the recent executive mandates to reduce regulatory costs and burdens mean[t]" that it was required to "consider whether the information the measure would produce duplicates information produced by others." *Id*. at 24,925. The agency concluded, "[p]ursuant to the mandates of Executive Order 13,771, Executive Order 13,777, and Executive Order 13,783, . . . that the data needed to support the GHG measure [was] at least somewhat duplicative of the EPA and DOE data on CO2 emissions," *id.* at 24,925–26, and that "repeal of the GHG performance measure will reduce the existing duplication, [will] streamline the regulations, and [will] reduce the potential for the confusion that can arise when multiple Federal and State entities impose different requirements for categorizing and measuring CO2 emissions," *id*. at 24,925.

In Plaintiffs' view, the agency's own explanation for why it rescinded the GHG Performance Measure rule shows "that there is a 'substantial likelihood' that the [Executive] Order caused the agency to repeal the Measure." Dkt. 23 at 30 (quoting *Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990)). Defendants, in turn, respond with a declaration from the Executive Director of the FHWA attesting that "EO 13,771 did not cause [the] FHWA to repeal the GHG Performance Measure," and, despite Plaintiffs' reading of the administrative record, he also points to the text of the Federal Register notice as setting forth the definitive statement of the reasons the agency acted. Dkt. 14-4 at 4–5 (Everett Decl. ¶ 8) ("FWHA repealed the GHS Performance Measure for the reasons discussed at length in the Federal Register notice announcing the repeal."). In the FHWA Executive Director's view, the

"FHWA's final decision to repeal was based on . . . substantive policy considerations" and not on the procedural requirements established by the Executive Order.  *Id.*

To sort through this disagreement, the Court returns to the jurisdictional tests set forth in *Lujan*, 504 U.S. at 560–61, and *Florida Audubon Society*, 94 F.2d at 664–65.  Plaintiffs bear the burden of showing that they have suffered an actual or imminent injury, caused by or fairly traceable to the specific act or conduct that they challenge, that is redressable by the court. *Lujan*, 504 U.S. at 560.  Moreover, "[t]he mere violation of a procedural requirement"—here, the FHWA's alleged consideration of factors not contemplated by the APA—"does not permit any and all persons to sue to enforce the [procedural] requirement."  *Fla. Audubon Soc'y*, 94 F.3d at 664.  Thus, even under the relaxed procedural injury standard, Plaintiffs must show that the FHWA's consideration of the Executive Order may have led the agency to reach a decision that it would not otherwise have reached and that the FHWA's decision is likely to cause at least one of them to suffer a particularized harm.  *Ctr. for Biological Diversity*, 861 F.3d at 184.  Plaintiffs need not show that the FHWA's compliance with the Executive Order was a but-for cause of its repeal of the rule but simply that its reliance on the Executive Order was "connected to the substantive result."  *Id.* (quoting *Sugar Cane Growers*, 289 F.3d at 94).

As an initial matter, the Court notes that it is far from clear that that Plaintiffs have carried their burden of showing that the repeal of the rule has caused, or is likely to cause, them any particularized harm.  In *Massachusetts v. EPA*, the Supreme Court concluded that the "special solicitude" afforded to states meant that it could accept receding coastlines and other environmental damage as particularized harms caused by the EPA's failure to exercise its authority to regulate greenhouse gas emission from motor vehicles.  549 U.S. at 519–21 ("Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards

applicable to the 'emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'" (quoting 42 U.S.C. § 7521(a)(1) (alteration in original)). Here, in contrast, the causal link between the challenged action and the asserted harm is far more attenuated. The GHG Performance Measure did not require states to take action in curbing harmful emissions. Rather, it simply required them to collect data (some of which was already collected through other processes), *see* 82 Fed. Reg. at 5,998 ("limit[ing] the measure to on-road CO2 emissions), and set emissions targets (which did not have to be lower than the status quo), *see* 82 Fed. Reg. at 6,001 ("State [Departments of Transportation] and [Metropolitan Planning Organizations] both have substantial flexibility in choosing targets. . . . [T]argets are generally established based both on policy aspirations and on analysis indicating what is believed to be attainable."); *see also id.* at 5,989. These are not insignificant steps, but they bear a more remote connection to climate change than rules that affirmatively regulate emissions. Given the more tenuous causal chain present in this case, *Massachusetts v. EPA* is not controlling, and Plaintiffs' assertion of a causal connection from the Executive Order *to* the 2018 final rule *to* a reduction in available data *to* reduced regulation or other actions to limit emissions *to* climate change *to* injury to the states may well be a stretch too far.

For present purposes, however, the Court need not reach that second link in the causal chain because Plaintiffs fail to establish the first link—that is, they have not shown that either the two-for-one rule or the annual cap provision were "connected to" the FHWA's decision to rescind the GHG Performance Measure rule. The relevant question is not whether the Executive Order prompted the FHWA to review its existing rules to look for duplication or unnecessary

burdens or whether the agency acted in a manner consistent with the Executive Order's goal of reducing regulation.  The key inquiry, instead, is whether the particular aspects of the Executive Order that Plaintiffs challenge played a role in the agency's process or decision.  In other words, the Court must consider whether either the two-for-one rule or the annual cap "was connected to" the agency's decision to repeal the rule.  *Id.* (quoting *Sugar Cane Growers*, 289 F.3d at 94).

Accepting the truth of the relevant Federal Register notices and the Executive Director's declaration, they were not.  To be sure, the FHWA candidly acknowledged that, pursuant to the Executive Order, it commenced a review of its existing rules for duplication.  82 Fed. Reg. at 46,430.  But Plaintiffs do not challenge the lawfulness of the Executive Order to the extent it merely requires or induces agencies "to review their regulations to identify potentially outdated regulations" or to "'consider' or analyze the economic impacts of proposed regulations."  Dkt. 1 at 2 (Compl. ¶ 3).  To the contrary, they acknowledge that "[p]ast Executive Orders have required" the same types of reviews and considerations and argue that what is "distinct" about Executive Order 13,771 is that it does more than compel or induce agencies to take a hard look their regulations.  It precludes agencies from proposing or adopting rules that they would otherwise support, unless they have repealed at least two regulations—outdated or not—and have accumulated sufficient regulatory savings to offset the cost of a new regulation.  *Id.*  Those operative provisions are given force, moreover, through the President's authorization for "OMB to block agency rulemakings not in compliance with the Order's mandates."  *Id.*  It is that feature of the Executive Order that Plaintiffs challenge—its requirement that agencies repeal or decline to adopt rules that they would otherwise leave in place or adopt because the President has directed that they do so, and not based on their best view of the legal and policy considerations that typically govern their actions.  The problem Plaintiffs face is that they have failed to

establish a connection between this operative feature of the Executive Order—that is, between the aspect of the Executive Order that they challenge—and the FHWA's decision to repeal the GHG Performance Measure rule.

To be sure, the final rule repealing the GHG Performance Measure rule does refer to the Executive Order indirectly in a couple of places and directly in one. First, in discussing the cost of the rule in relation to its asserted lack of demonstrated benefit, the FHWA asserted that it was guided by Executive Orders 13,777 and 13,783, both of which cross-reference Executive Order 13,771. Among other things, Executive Order 13,777 requires agency regulatory task forces to "make recommendations to the agency head regarding the repeal, replacement, or modification" of existing regulations that "are outdated, unnecessary, or ineffective" or that "impose costs that exceed benefits." Exec. Order 13,777, Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12,285, 12,286 (Feb. 24, 2017). Likewise, although the focus is more limited, Executive Order 13,783 directs agencies "immediately [to] review existing regulations that potentially burden the development or use of domestically produced energy resources" and to "rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise to comply with law." Exec. Order 13,783, Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16,093 (Mar. 28, 2017). The fact that both of these Executive Orders cross-reference Executive Order 13,771 adds little because the core provisions of both Executive Orders speak directly to the cost-benefit analysis that the FHWA undertook. There is certainly no basis to conclude that these cross-references show that the FHWA final rule was intended to implement the two-for-one or annual cap provisions of Executive Order 13,771.

With respect to the final factor that the FHWA proffered to explain its repeal of the GHG Performance Measure rule—the potential for duplication in the collection of CO2 data—the agency pointed to "recent executive mandates to reduce regulatory costs and burdens" and, more explicitly, to "the mandates of Executive Order 13,771, Executive Order 13,777, and Executive Order 13,783." 83 Fed. Reg. at 24,925–96. Nothing in the final rule, however, suggests that the "mandates" with which the rule was concerned were those that Plaintiffs challenge here. To the contrary, the relevant discussion focuses on the policy goal of "reduc[ing] . . . existing duplication, streamlin[ing] the regulations, and reduc[ing] the potential for the confusion that can arise when multiple Federal and State entities impose different requirements for categorizing and measuring CO2 emissions." *Id.* at 24,926. Although repealing the GHG Performance Measure rule was undoubtedly consistent with the goal of Executive Order 13,771 to eliminate "at least two prior regulations" for every new regulation an agency promulgates, 82 Fed. Reg. at 9,339, there is no evidence that the Executive Order, which was just one of three referenced in this portion of the final rule, caused the FHWA to act. The evidence that does exist—in the forms of the reasons for repeal identified in the final rule and the Executive Director's declaration— moreover, supports the conclusion that "EO 13,771 did not cause FHWA to repeal the GHG Performance Measure" and that, instead, the "FHWA's final decision to repeal was based on the substantive policy considerations" identified in the final rule. Dkt. 14-4 at 4 (Everett Decl. ¶ 8).

Plaintiffs find the proffered explanation implausible. In addition to references to Executive Order 13,771 in the regulatory history, they assert that the "bases for the repeal" set forth in the Federal Register "*are groundless*." Dkt. 23 at 28 (emphasis in original). They note, for example, that it was passing strange for the FHWA to assert, in the same breath, that it had discretion to interpret the governing statute to allow for issuance of the GHG Performance

Measure rule and that it was abandoning the rule because it was not based on the best reading of the statute. *Id.* Plaintiffs are, likewise, unimpressed by the FHWA's contention that the rule imposed costs that exceeded its value while simultaneously recognizing that "some state and local agencies already collect [the relevant] data." *Id.* at 28–29. And, they see little merit in the FHWA's concern about "potential duplication" because the agency had designed the GHG Performance Measure rule to rely on "some" existing data to "'minimize[] [the] burden [imposed] on transportation agencies.'" *Id.* at 29 (quoting 82 Fed. Reg. 5,970, 5,993 (Jan. 18, 2017)).

Those concerns might (or might not) form the basis for an APA challenge to the final rule itself. But they are insufficient to trigger the "narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers'" permitted only when there is a "'strong showing of bad faith or improper behavior.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2552, 2573–74 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Nor are they sufficient to rebut the "presumption of good faith" that the courts typically accord agency declarations and affidavits. *See*, *e.g.*, *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). The Court is, accordingly, constrained to conclude that neither of the challenged provisions of the Executive Order—the two-for-one rule or the annual cap—played a role in the agency's *decision* to repeal the GHG Performance Measure rule; at most, the Executive Order merely induced the FHWA to take a hard look at its existing regulations, including the GHG Performance Measure rule.

The Court recognizes that the line between an Executive Order's precipitating a review that leads to the repeal of a rule for independent policy reasons and its requiring or causing the repeal may, at times, be a fine one. But the distinction is both real and significant. *See* Elena

Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2277–78 (2001) (describing efforts of presidents since Reagan to influence administrative activity by requiring agencies to *consider* specific regulatory consequences, requiring OMB *review*, and requiring agencies to *initiate* notice-and-comment proceedings). Here, the uncontroverted evidence shows that the final 2018 rule lies on one side of this line (the agency review was precipitated by the Executive Order) while Plaintiffs' challenge lies on the other side of the line (they take issue with the mandatory, two-for-one and annual cap provisions of the Executive Order). Absent some evidence of bad faith or other misconduct, that is enough to defeat Plaintiffs' first theory of standing.

The Court, accordingly, concludes that Plaintiffs have failed to establish that they have standing to sue based on the FHWA's repeal of the GHG Performance Measure rule.

      2.     *DOE's Energy Efficiency Standards for Residential Cooking Products*

In June 2015, the Department of Energy proposed a new rule under the Energy Policy and Conservation Act, 42 U.S.C. § 6201 *et seq*., to set more stringent energy efficiency standards for residential cooking products, which it expected would result in considerable energy savings and reduced greenhouse gas emissions. *See* Energy Conservation Program: Energy Conservation Standards for Residential Conventional Ovens, 80 Fed. Reg. 33,030 (June 10, 2015) (to be codified at 10 C.F.R. pt. 430). After a public hearing and after receiving public comments, the Department issued a supplemental notice of proposed rulemaking in September 2016. *See* Energy Conservation Program: Energy Conservation Standards for Residential Cooking Products, 81 Fed. Reg. 60,784 (Sept. 2, 2016) (to be codified at 10 C.F.R. pts. 429 & 430). The Department subsequently extended the deadline for public comment until November 2016. Energy Conservation Program, Energy Conservation Standards for Residential Conventional Cooking Products; Supplemental Notice of Proposed Rulemaking, 81 Fed. Reg. 67,219 (Sept.

30, 2016) (to be codified at 10 C.F.R. pt. 430).  Under 42 U.S.C. § 6295(m)(3)(A), the Department was required to publish a final rule within two years of its initial rule proposal.  It has not done so to date.

Plaintiffs contend that, as a result of that delay, they have suffered or will suffer an injury in fact due to increased greenhouse gas emissions that will cause environmental damage within the states and that will require the use of state resources to deal with their collateral effects.  Dkt. 17 at 30–31, 34.  The states cite rising sea levels in California and Oregon, wildfires, and extreme weather including increased temperatures as particular causes of concern.  *Id.* at 32. They indicate that these climate change events will impact the states financially, for example by destroying coastal properties and requiring indigent sufferers of heat-related illnesses to rely on states' publicly-funded healthcare programs.  For present purposes, the Court can assume— without deciding—that the failure to finalize the revised efficiency standards has contributed to climate change and that that states have suffered corresponding injuries.  But, even with that assumption, Plaintiffs have still failed to satisfy Article III's causation element because the undisputed evidence demonstrates that the Executive Order has not caused, and is not likely to cause, the delay.

Defendants proffer the declaration of David Nemtzow, Director of the Building Technologies Office in the Office of Energy Efficiency and Renewable Energy at the Department of Energy, to show that the cause of the delay lies elsewhere.  Dkt. 14-2 at 1 (Nemtzow Decl. ¶ 1).  Nemtzow attests that, for a new energy efficiency standard to be established, the Department must also promulgate a test procedure to measure the energy efficiency of covered products.  *Id.* at 2–3 (Nemtzow Decl. ¶ 4).  He explains that related rulemakings, including consideration of a March 2018 petition from the Association of Home

Appliance Manufacturers seeking revocation of the existing test procedure, have caused the delays in finalizing the energy efficiency rule. *Id.* at 3–4 (Nemtzow Decl. ¶¶ 6–7). In unqualified terms, he attests that "Executive Order 13771 has not been a factor affecting any DOE decisions about when or whether to issue a final rule in the Cooking Products Rulemaking" and "has not been a factor affecting any DOE decision to delay, postpone, or make inactive" that rulemaking. *Id.* at 4–5 (Nemtzow Decl. ¶ 8).

The Court concludes, as it did in *Public Citizen*, that Plaintiffs fail to offer any controverting evidence that would allow a factfinder to conclude that the Executive Order has caused or is likely to cause delays in issuing the new energy efficiency standards. Indeed, as the Court observed in *Public Citizen II*, the fact that the Energy Policy and Conservation Act requires the Department to issue a final rule within two years of its publication of a proposed rule, *see* 42 U.S.C. § 6295(m)(3)(A), and the fact that the Executive Order "does not prevent agencies from issuing regulatory actions in order to comply with imminent statutory . . . deadlines," Final Guidance, Q. & A. 33, derail Plaintiffs' argument. 361 F. Supp. 3d at 89. There is not only a dearth of evidence that the Executive Order is to blame, there is also no reason to believe that the Executive Order even purports to reach circumstances, like those present here, where a statute compels prompt action. *See Public Citizen III*, No. 17-253, 2019 WL 7037579, at *9.

The Court, accordingly, concludes that Plaintiffs have not established standing based on DOE's failure to finalize the Energy Efficiency Standards for Residential Cooking Products.

3. *NHTSA's Proposed V2V Rule*

In January 2017, NHTSA proposed a regulation that would require all new light vehicles to include V2V technology, which allows vehicles to communicate data with one another to

prevent crashes.  *See* Federal Motor Safety Standards; V2V Communications, 82 Fed. Reg. 3,854, 3,855–57 (Jan. 12, 2017) (to be codified at 49 C.F.R. pt. 571).  In the proposed rule, NHTSA anticipated that this technology would prevent hundreds of thousands of crashes, save about a thousand lives annually, and avoid billions of dollars in property damage in the coming decades.  *Id.* at 3,855–58.  The parties agree that the V2V rule is subject to the Executive Order. Dkt. 17 at 39.  In February 2017, the Department of Transportation, NHTSA's parent agency, stated that it was evaluating its "rulemaking priorities . . . in accordance with Executive Order 13771" and, consistent with that review, the Department did not post a significant rulemaking report regarding the proposed V2V rule for several months.  Dkt. 17-8 at 91 (Rumsey Decl. Ex. K).  The Department eventually moved the V2V rulemaking from its "current agenda" to its list of "long term actions" and noted that the next action was "[u]ndetermined" and that the date on which that action would occur had not yet been determined.  *Id.* at 89 (Rumsey Decl. Ex. J).

Plaintiffs posit that the delay in finalizing the V2V rule has burdened, and will continue to burden, them with substantial costs resulting from otherwise avoidable light vehicle crashes. They assert that, together, California, Oregon, and Minnesota suffer more than eleven vehicle-related fatalities each day, Dkt. 17 at 40–41 (citing Centers for Disease Control and Prevention, State-Specific Cost of Death Fact Sheets), and that such accidents impose many millions of dollars in costs on them each per year, *id.* at 41 (citing The Economic and Societal Impact of Motor Vehicle Crashes, 2010 (Revised) 145–46).  For present purposes, the Court will assume without deciding that the delay in finalizing the V2V rule has caused and will continue to cause Plaintiffs' substantial fiscal injury.

But, like the plaintiffs in *Public Citizen*, the plaintiffs in this case have not shown that the Executive Order is the cause of any delay to date or of any future delay, and, in fact, the

uncontroverted evidence indicates other causes for the delay. In support of their contention that the cause of the delay lies elsewhere, Defendants proffer the verified answers to interrogatories from the Department of Transportation, which were propounded and answered in *Public Citizen*. *See* Dkt. 14-8 at 1–23. When asked to "[d]escribe in detail any consideration of Executive Order 13,771 in the agency's discussions of or decisions as to the V2V rulemaking," a Department official responded—under the penalty of perjury—that the Executive Order "has not been a factor affecting any DOT decisions about when or whether to issue a Final Rule with respect to the V2V Rulemaking." Dkt. 14-8 at 5. The Department further explained:

> DOT continues to engage in an evaluation of the substance and merits of the rulemaking. In December 2018, DOT requested public comments on several technical questions related to vehicle-to-vehicle, vehicle-to-infrastructure, and vehicle-to-pedestrian communications. 83 Fed. Reg. 66,338 (Dec. 26, 2018). DOT's request for comments noted that that proposed rule issued in the V2V Rulemaking identified Dedicated Short-Range Communications ("DSRC") as the primary communications medium, stated that there has been progress in two other technologies, "both of which may, or may not, offer both advantages and disadvantages over DSRC," and asked for public comment on this and several other technical matters. As it continues to evaluate the substance and merits of the V2V Rulemaking, DOT is reviewing and considering the 166 comments received in response to this request, the 460 comments received with respect to the proposed rule, and other information.

*Id.* at 6–7. The Department concluded: "This evaluation, review, and consideration has not been prompted by, or connected with" the Executive Order. *Id.* at 7.

Defendants supplement this earlier showing with the declaration of Deborah Aiken, the Director of Regulatory Analysis in the Office of the Secretary of Transportation. Dkt. 14-5 at 1 (Aiken Decl. ¶ 1). Aiken confirms that "EO 13,771 has not affected NHTSA's decisions about whether to issue a Final Rule in the V2V rulemaking." *Id.* at 3 (Aiken Decl. ¶ 7). She further attests that the "placement of the V2V rulemaking [on the list of long-term actions in Spring

2016] was . . . was completely unrelated to EO 13,771." *Id.* at 4 (Aiken Decl. ¶ 10). The evidence, accordingly, shows that the Executive Order has not delayed or derailed the V2V rule.

Nor is the Court persuaded that the risk that the Executive Order might do so in the future is sufficient to sustain Plaintiffs' standing. To be sure, the risk of future injury can, at times, support a plaintiff's standing to sue. *See*, *e.g.*, *Bennett v. Spear*, 520 U.S. 154, 168 (1997); *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 385–86 (2d Cir. 2015). A party "alleging only future injuries," however, "confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989). To satisfy that burden, a plaintiff must show that the asserted future injury "is 'certainly impending[]' or [that] there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). Although the imminence requirement is relaxed in procedural injury cases, a procedural-injury plaintiff must still show an imminent risk that the procedural violation will occur—that is, a procedural-injury plaintiff does not need to show that "the agency would have reached a different substantive result" but-for the procedural violation, *Ctr. for Biological Diversity*, 861 F.3d at 184, but she must show that the procedural violation itself has occurred or is imminent. Plaintiffs here have not demonstrated an imminent risk that the Executive Order will contribute to future delays in the finalization of the V2V rule.

The Court, accordingly, concludes that Plaintiffs have not established standing based on NHTSA's failure to promulgate a final V2V rule.

4.  *HHS's Service Duration Requirements for the Head Start Program*

In 2016, the Department of Health and Human services issued a rule requiring Head Start center-based programs to provide at least 1,020 hours of service per year to low income children. Head Start Performance Standards, 81 Fed. Reg. 61,294 (Sept. 6, 2016) (codified at 45 C.F.R.

Ch. XIII).  The new requirement was to be phased in gradually, with at least 50% of "Head Start center-based funded enrollment" children receiving the annual minimum by August 1, 2019 and 100% receiving it by August 1, 2021.  *Id.* at 61,296.  The regulation, however, contained a "safety valve," which allowed the Secretary to lower or eliminate the new requirements, if necessary, based on the potential unavailability of sufficient funds.  *Id.* at 61,419.  The acting Secretary did so with respect to the 50% requirement in January 2018, citing Congress's failure to appropriate sufficient funds to allow the hours increase to go into effect without requiring a corresponding reduction in the number of children served by the program.  Secretarial Determination to Lower Head Start Center-Based Service Duration Requirement, 83 Fed. Reg. 2,743 (Jan. 19, 2018).  The Secretary had until February 1, 2020 to waive the 100% requirement, 81 Fed. Reg. at 61,322, 61,403–04; Head Start Service Duration Requirements, 84 Fed. Reg. 11,269, 11,270 (Mar. 26, 2019) and on January 30, 2020 he did so, Secretarial Determination to Lower Head Start Center-Based Service Duration Requirements, 85 Fed. Reg. 5,332, 5,332 (Jan. 30, 2020).

On March 26, 2019, however, the Department issued an NPRM, proposing to eliminate the 100% requirement through rulemaking rather than the Secretary's waiver.  Head Start Service Duration Requirements, 84 Fed. Reg. 11,269 (Mar. 26, 2019).  The NPRM explains:

> The goal of this NPRM is to eliminate the 100-percent requirement to reduce [the] burden on grantees, restore programs' flexibility to design program schedules that best meet their community needs, and prevent a possible large reduction in children served in the Head Start programs as a result of a federal requirement. . . .
>
> We believe the requirement to provide 1,020 annual hours of services for all preschool center-based slots by August 1, 2021 may be overly prescriptive and may not allow programs enough autonomy to decide what is best for the communities and the families they serve. . . .

In addition, given that Congress has not appropriated sufficient additional funding to support increased service duration since the publication of the 2016 . . . final rule, it is unlikely that the 100-percent requirement will be fully funded prior to the date when programs will have to comply. . . . Therefore, if the 100-percent requirement were to go into effect, it would likely result in a substantial reduction in the number of children served by the Head Start program. If we eliminate this requirement through the rulemaking process, rather than wait for the Secretary to make a determination closer to February 1, 2020, we will provide grantees additional time to thoroughly plan how to best use existing federal resources to continue to prepare children from low-income families to succeed in school and in life.

*Id.* at 11,270. In the "Regulatory Process Matters" section of the NPRM, the Department noted that the "proposed rule, if finalized, would be considered an E.O. 13771 deregulatory action," and would generate approximately "$395,000 in annualized cost savings." *Id.* at 11,272.

According to Plaintiffs, this proposed action will cause them two types of harm. First, they will be forced to shoulder the costs associated with "fill[ing] the service gap" left because the Head Start service duration will not be increased to 100%. Dkt. 17 at 45. Second, they will suffer "long-term costs" imposed by children growing up without the benefits of extended Head Start programming, which will be inflicted through increased demands on the criminal justice system, states' health care systems, etc. *Id.* at 46–47. The Court will, again, assume without deciding that repeal of the 2016 rule would cause Plaintiffs some fiscal harm. But, as with the regulatory actions discussed above, Plaintiffs' arguments fail, even with this assumption, because they have not demonstrated that the Executive Order has caused, or is likely to cause, the Department to repeal the 2016 rule.

Plaintiffs argue that Executive Order must have motivated the Department's deregulatory action for four reasons. First, Plaintiffs contend that, because the Department has plans to finalize many other regulatory actions, and because the Executive Order demands at least two deregulatory actions for every new regulation the Department would like to issue, the

Department had reason to repeal the 2016 rule. Dkt. 17 at 43. Second, they point to the fact that the Secretary had the power to effect the same change without issuing a rule, and they urge the Court to infer that the Secretary proposed the rule in order to bank a deregulatory credit for purpose of the Executive Order 13,771. *Id.* at 43–44. Third, they stress that the Department acted prematurely in proposing the repeal of the 100% service duration requirement; Congress still had time to appropriate sufficient funds to cover the 100% requirement, yet the Department did not wait to see if Congress would do so. *Id.* at 44–45. Finally, Plaintiffs point to the text of the notice of proposed rulemaking, which characterizes the rollback as "an [Executive Order] 13,771 deregulatory action." *Id.* at 43 (quoting 84 Fed. Reg. at 11,272).

In response, Defendants proffer the declaration of Colleen Rathgeb, the Director of Policy, Oversight, and Planning for the Office of Head Start. Dkt. 14-7 at 1 (Rathgeb Decl. ¶ 1). The declaration acknowledges that the March 26, 2019 NPRM "included a cost-savings analysis under [Executive Order 13,771], and the agency considered whether and how this rulemaking would be affected by the Executive Order." *Id.* at 6 (Rathgeb Decl. ¶ 28). But Rathgeb attests, under the penalty of perjury, that "the Executive Order did not cause HHS to propose rolling back the 100% requirement" and that "there is no causal link between [Executive Order] 13,771 and the rollback of the Head Start service duration requirements." *Id.* (Rathgeb Decl. ¶¶ 29–30). Rather, according to Rathgeb, the policy concerns discussed in the NPRM motivated the rollback. *Id.* (Rathgeb Decl. ¶ 29). Rathgeb explains that the ability to achieve the 100% requirement without reducing the number of children served by Head Start was always contingent on Congress's appropriation of additional funding; without it, reaching the 100% service duration requirement would require decreasing overall enrollment in Head Start. *Id.* at 3–4 (Rathgeb Decl. ¶ 14). Finally, as the NPRM notes, the Department decided to proceed by

rulemaking, rather than waiting for the Secretary to waive the requirement, in order to provide grantees with earlier notice and the opportunity to plan accordingly. 84 Fed. Reg. at 11,270.

Plaintiffs have not met their burden of showing that the Executive Order caused the Department to issue the NPRM. *See Spokeo*, 136 S. Ct. at 1547. Although the facts that Plaintiffs cite might be sufficient to survive a motion to dismiss, the Department has now come forward with competent evidence that the Executive Order played no role in the Department's decision to issue the NPRM, and Plaintiffs have failed to offer any material, controverting evidence. Under those circumstances, Rule 56(c) requires the Court to enter judgment in favor of Defendants. *See* Fed. R. Civ. P. 56(c).

The Court, accordingly, concludes that Plaintiffs have failed to demonstrate that they have standing based on HHS's rollback of the Head Start service duration requirement.

\* \* \*

Plaintiffs bear the burden of establishing their standing to sue, yet, as to each of the four regulatory or deregulatory actions that they identify in their briefs and supporting materials, they have not shown that either the two-for-one rule or the annual cap caused the relevant agency to act or to decline to act. Without that essential link, they cannot satisfy Article III, even under the "special solicitude" and procedural injury doctrines. Finally, even though Plaintiffs' complaint includes references to other rulemakings, they have invoked none of those in attempting to carry their own burden to establish their standing or in opposing Defendants' motion for summary judgment on standing. *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (party waives arguments that it fails to raise in its opening brief); *Sai v. Dep't of Homeland Sec.*, 99 F. Supp. 3d 50, 68 (D.D.C. 2015) ("If a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the

plaintiff failed to address as conceded." (quoting *Burnett v. Sharma*, 511 F. Supp. 2d 136, 145–46 (D.D.C. 2007)). Plaintiffs' references to those additional rulemakings in their complaint do not suffice to establish Plaintiffs' standing at this stage of the proceedings.

The Court, accordingly, concludes that Plaintiffs lack standing to challenge Executive Order 13,771 and the OMB Guidance.

## CONCLUSION

For the foregoing reasons, Plaintiffs' cross-motion for partial summary judgment, Dkt. 17, will be **DENIED**; Defendants' motion for summary judgment, Dkt. 14, will be **GRANTED**; and the case will be **DISMISSED**.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: April 2, 2020